UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

```
------------------------------ x
                                :
 UNITED STATES OF AMERICA,      :
                 Plaintiff,     :     Criminal No.
                                :  3:13-CR-00226(RNC)
            vs.                 :
                                :     January 17, 2014
 DANIEL CARPENTER, ET AL.,      :
                 Defendants.    :
                                :
------------------------------ x
```

Federal Building
450 Main Street
Hartford, Connecticut

PRESENTMENT AND ARRAIGNMENT

(Transcription from Electronic Recording)

Held Before:

THE HON. DONNA F. MARTINEZ
United States Magistrate Judge

Transcription Services of
FALZARANO COURT REPORTERS, LLC
117 North Saddle Ridge
West Simsbury, CT  06092
860.651.0258

A P P E A R A N C E S:

    For the Plaintiff:

        OFFICE OF THE UNITED STATES ATTORNEY
        157 Church Street - 23rd Floor
        New Haven, Connecticut  06510
        203-821-3700
            BY:  DAVID E. NOVICK, ESQ.
                NEERAJ PATEL, ESQ.
                Assistant U.S. Attorneys


    For the Defendant Daniel Carpenter:

        BROWN, PAINDIRIS & SCOTT
        100 Pearl Street - 2nd Floor
        Hartford, Connecticut  06103
        860-522-3343
            BY:  RICHARD R. BROWN, ESQ.


    For the Defendant Wayne Bursey:

        FOX ROTHSCHILD LLP
        2000 Market Street - 20th Floor
        Philadelphia, Pennsylvania  19103
        215-299-2825
            BY:  PATRICK J. EGAN, ESQ.

        O'BRIEN, TANSKI & YOUNG
        CityPlace II
        185 Asylum Street - 10th Floor
        Hartford, Connecticut  06103
        860-525-2700
            BY:  STEPHEN V. MANNING, ESQ.

```
 1                      (Proceedings commenced at 12:10 p.m.)

 2                      THE COURT:  Good afternoon.

 3                      ALL:  Good afternoon, your Honor.

 4                      THE COURT:  All right.  This is United

 5  States vs. Carpenter and Bursey, 13-CR-226 assigned to

 6  Judge Chatigny.

 7                      Will you identify yourselves please,

 8  for the record?

 9                      MR. NOVICK:  For the Government, David

10  Novick and Neeraj Patel.  Also present at counsel

11  table is Special Agent Lynn Allen of the Department of

12  Labor, Officer of Inspector General.  Good afternoon,

13  your Honor.

14                      THE COURT:  Good afternoon.

15                      MR. BROWN:  Good afternoon, your Honor.

16  Attorney Richard Brown, 100 Pearl Street, Hartford.

17  With me of course is Mr. Dan Carpenter, one of the

18  Defendants in this matter, your Honor.

19                      THE COURT:  Good afternoon, Mr. Brown.

20                      MR. EGAN:  Good afternoon, your Honor.

21  Patrick Egan, Fox Rothschild, appearing pro hoc vice

22  along with local counsel, Stephen Manning from

23  O'Brien, Tanski & Young, and Mr. Bursey is of course

24  present.

25                      THE COURT:  Good afternoon.
```

1              All right.  We're here for presentment

2    and arraignment.  Let's begin with presentment.

3              Will you, Mr. Novick, advise the

4    Defendants of the charges and penalties they face?

5              MR. NOVICK:  Certainly, your Honor.

6              The Defendants are each charged, and

7    I'll list the specific counts, in Counts 5, 6, 19, 21,

8    22, 24, 25, 27 and 28 with mail fraud in violation of

9    18, Title 18 United States Code Section 1341.  Maximum

10   penalty for each count is 20 years imprisonment,

11   $250,000 fine or twice the gross gain or loss from the

12   offense, 3 years supervised release and a $100 special

13   assessment.

14             As to Counts 1 through 4, 7 through 18,

15   20, 23, 26 and 29 through 32, the Defendants are

16   charged with violating Title 18 United States Code

17   Section 1343, that's wire fraud.  Maximum penalty for

18   each violation is 20 years imprisonment, $250,000 fine

19   or twice the gross gain or loss from the offense, 3

20   years supervised release and a $100 special

21   assessment.

22             And in Count 33 Defendants are charged

23   under Title 18 United States Code Section 1349, that

24   is conspiracy to commit mail wire fraud, and again the

25   penalties are 20 years imprison -- maximum penalties

1    are 20 years imprisonment, $250,000 fine or twice the

2    gross gain or loss from the offense, 3 years

3    supervised release and a $100 special assessment.

4                    THE COURT:  All right.  Will the

5    Defendants stand, please?

6                    Because this is your first appearance

7    before the court I'm going to advise you of your

8    rights.

9                    You have a right to remain silent.

10   That is you're not required to make any statement.  If

11   you do make a statement that statement can and

12   probably will be used against you.

13                   Mr. Carpenter, do you understand?

14                   MR. CARPENTER:  Yes, your Honor.

15                   THE COURT:  And Mr. Bursey, do you

16   understand?

17                   MR. BURSEY:  Yes, your Honor.

18                   THE COURT:  If you've already made a

19   statement you need not continue.  If you make a

20   statement in the future you may stop at any time.

21                   Mr. Carpenter, do you understand?

22                   MR. CARPENTER:  Yes, your Honor.

23                   THE COURT:  Mr. Bursey, do you

24   understand?

25                   MR. BURSEY:  Yes, your Honor.

1                    THE COURT:  You also have a right to

2   counsel, that is you have a right to be represented by

3   a lawyer at every stage of the proceedings against

4   you.  If you cannot afford a lawyer the court will

5   appoint a lawyer for you at no cost to you.

6                    Mr. Carpenter, do you understand?

7                    MR. CARPENTER:  Yes, your Honor.

8                    THE COURT:  Do you want me to appoint

9   counsel to represent you?

10                   MR. CARPENTER:  No, but thank you, your

11  Honor.  I like the counsel I have.

12                   THE COURT:  All right.

13                   Mr. Bursey, do you understand?

14                   MR. BURSEY:  Yes, I do.

15                   THE COURT:  And do you want me to

16  appoint counsel for you?

17                   MR. BURSEY:  No, your Honor.

18                   THE COURT:  All right.  Are both

19  Defendants American citizens?

20                   MR. EGAN:  Yes, your Honor.

21                   MR. BROWN:  Yes, your Honor.

22                   THE COURT:  All right.

23                   All right.  Let's proceed to

24  arraignment.

25                   Mr. Carpenter, have you received a copy

```
 1    of the indictment that charges you with these crimes?
 2                        MR. CARPENTER:  Yes, your Honor.
 3                        THE COURT:  And have you had time to
 4    review it with your lawyer?
 5                        MR. CARPENTER:  Yes, your Honor.
 6                        THE COURT:  Do you understand the
 7    charges that you face?
 8                        MR. CARPENTER:  Yes, your Honor.
 9                        THE COURT:  And do you understand the
10    penalties that accompany the charges?
11                        MR. CARPENTER:  Yes, your Honor.
12                        THE COURT:  I'm about to take your not
13    guilty plea.  I'll have the indictment read to you
14    unless you waive a reading of the indictment.  Do you
15    waive the reading?
16                        MR. BROWN:  Yes, your Honor.
17                        MR. CARPENTER:  Yes, your Honor.
18                        THE COURT:  All right.
19                        Mr. Clerk, please.
20                        THE CLERK:  Yes, your Honor.
21                        In the case of the United States of
22    America vs. Daniel Carpenter, Criminal Number 3:13-CR-
23    226(RNC), as to Counts 1 through 4, 7 through 18, 20,
24    23, 26 and 29 through 32, charging violation of Title
25    18 United States Code Sections 1343(n)(2), how do you
```

1  wish to plead?

2          MR. CARPENTER:  Your Honor, I'm

3  absolutely innocent of all charges.

4          THE CLERK:  And as to Counts 5 through

5  6 --

6          MR. BROWN:  Not guilty, your Honor.

7          THE COURT:  Thank you.

8          THE CLERK:  -- 19, 21 through 22, 24

9  through 25, and 27 through 28, charging violation of

10  Title 18 United States Code Section 1341(n)(2), how do

11  you wish to plead?

12          MR. CARPENTER:  Not guilty.

13          THE CLERK:  And as to Count 33,

14  charging violation of Title 18 United States Code

15  Section 1349, how do you wish to plead?

16          MR. CARPENTER:  Not guilty.

17          THE CLERK:  Your Honor, the Defendant

18  pleads not guilty to Counts 1 through 33 of the

19  indictment.

20          THE COURT:  Not guilty pleas to Counts

21  1 through 33 shall enter on the record.

22          You may sit down, sir.

23          MR. CARPENTER:  Thank you, your Honor.

24          THE COURT:  Mr. Bursey, have you

25  received a copy of the indictment that charges you?

```
 1                      MR. BURSEY:  Yes, I have, your Honor.

 2                      THE COURT:  And have you had time to

 3   talk with your lawyer about it?

 4                      MR. BURSEY:  Yes, I have, your Honor.

 5                      THE COURT:  Do you understand what

 6   you're charged with?

 7                      MR. BURSEY:  Yes, I do, your Honor.

 8                      THE COURT:  Do you understand the

 9   penalties that accompany the charges?

10                      MR. BURSEY:  Yes, I do, your Honor.

11                      THE COURT:  I'm going to take your not

12   guilty plea.  Do you want the indictment read to you

13   or do you prefer to waive the reading of the

14   indictment?

15                      MR. BURSEY:  Please waive.

16                      THE COURT:  All right.

17                      Mr. Clerk?

18                      THE CLERK:  Yes, your Honor.

19                      In the case of the United States of

20   America vs. Wayne Bursey, Criminal Number 3:13-CR-

21   226(RNC), as to Counts 1 through 4, 7 through 18, 20,

22   23, 26 and 29 through 32, charging violation of Title

23   18 United States Code Sections 1343(n)(2), how do you

24   wish to plead?

25                      MR. CARPENTER:  Not guilty.
```

```
 1                    THE CLERK:  And as to Counts 5 through
 2    6, 19, 21 through 22, 24 through 25, and 27 through
 3    28, charging violation of Title 18 United States Code
 4    Section 1341(n)(2), how do you wish to plead?
 5                    MR. BURSEY:  Not guilty.
 6                    THE CLERK:  And as to Count 33,
 7    charging violation of Title 18 United States Code
 8    Section 1349, how do you wish to plead?
 9                    MR. CARPENTER:  Not guilty.
10                    THE CLERK:  Your Honor, the Defendant
11    pleads not guilty to Counts 1 through 33 of the
12    indictment.
13                    THE COURT:  Not guilty plea shall enter
14    on the record.
15                    You may sit down, Mr. Bursey.
16                    I have a scheduling order.  It provides
17    among other things that defense motions shall be due
18    on or before February 7th, 2014.  Government responses
19    are due on or before February 14, 2014.  Jury
20    selection is currently scheduled for March 11th at 9:00
21    o'clock in the morning.  The scheduling order shall be
22    filed.
23                    All right.  That brings us to the
24    question of detention or release.  What's the
25    Government's request?
```

1          MR. NOVICK:  Your Honor, the

2    Government's position is not to -- we are not moving

3    here for detention.  We believe that a secured bond

4    would be appropriate in each case.

5          With regard to Mr. Bursey, we have had

6    discussions with his counsel, with the -- let me just

7    explain to you what we have discussed with Mr. Bursey

8    and just see if it's appropriate for the court.  Mr.

9    Bursey would sign a note in the amount of $400,000, a

10   bond in the amount of $400,000 secured by an interest

11   in two IRA accounts that he has, and we would give him

12   a week to perfect the whatever security or freeze

13   notice was necessary from the bank in order to perfect

14   that security.  And that's acceptable to the

15   Government if it's acceptable to the court.

16          THE COURT:  Why don't we take Mr.

17   Bursey first.

18          All right.  For the record, I received

19   this morning a Pretrial Services report on Mr. Bursey.

20   Have both counsel received that?

21          MR. NOVICK:  Yes, your Honor.

22          MR. EGAN:  Yes, your Honor.

23          THE COURT:  And have you been over it

24   with your client?

25          MR. EGAN:  Yes, your Honor.

1          THE COURT:  Any modifications, changes,

2  errors you want to point out for the record?

3          MR. EGAN:  No, your Honor.

4          THE COURT:  All right.

5          All right.  So I understand you've had

6  discussions with the Government and agreed to this

7  proposal.  Why is this proposal appropriate?

8          MR. EGAN:  It's appropriate, your

9  Honor, for a number of reasons.

10         First of all, my client is a 63-year-

11  old gentleman who has lived in the District of

12  Connecticut his entire life.  He is presently

13  employed.  He is married.  His wife, Mary, is present

14  in the courtroom today.  They own or she owns a

15  property where they reside.  It's a modest property

16  and it's -- there's no equity in the property but it

17  is in the District of Connecticut.

18         He has two adult children and several

19  grandchildren.  He has never been charged with a

20  crime, more or less convicted of a crime in his entire

21  life.  He has been an upstanding citizen and member of

22  the -- in fact President of the Chamber of Commerce in

23  Simsbury at one point about 10 years ago, and he poses

24  no risk of flight and no danger to the community.

25         Your Honor, if it's appropriate I would

1    just -- at some point I'd like to address travel

2    restrictions and I don't know if this is the

3    appropriate time or not.

4                    THE COURT:  Right.  You want to be

5    heard on travel restrictions?

6                    MR. NOVICK:  I guess I'm more

7    interested to hear --

8                    THE COURT:  All right.

9                    MR. NOVICK:  -- what Mr. Egan has to

10   say.

11                   MR. EGAN:  Yes, your Honor.  I didn't

12   -- I failed to discuss this with the Government prior

13   to today's hearing.  Mr. Bursey does have business in

14   New York and interests in Rhode Island and family

15   members that he travels to Florida to visit with.  We

16   would ask that he be permitted to travel within the

17   district of Connecticut, Rhode Island, New York and

18   Florida.

19                   THE COURT:  All right.

20                   MR. NOVICK:  Your Honor, as far as the

21   contiguous states the Government has no objection.

22   With regard to Florida we would just ask that he

23   notify Probation before doing that.

24                   MR. EGAN:  And of course we would have

25   no objection to that, your Honor.

```
 1                    THE COURT:  All right.  You may sit
 2   down sir.
 3                    MR. EGAN:  Thank you.
 4                    THE COURT:  I'll set the following
 5   conditions.  I will say that the proposal agreed upon
 6   by counsel sounds reasonable to me and I will set
 7   that.  So this is a Type 3B bond.  It's in the amount
 8   of $400,000.  The $400,000 is to be secured by two IRA
 9   accounts in the Defendant's name.  The Defendant has
10   one week from today to accomplish the intent of the
11   bond, which is that the IRAs in their entirety be
12   forfeited to the United States in the event of his
13   failure to appear.  I have very experienced counsel
14   here and I will leave it to counsel to work out the
15   details of that in a way that's acceptable to the
16   Government.  I don't expect you to have any trouble in
17   doing that but if you -- if there are issues, of
18   course, you may bring them to the court.
19                    MR. EGAN:  Thank you, your Honor.
20                    THE COURT:  All right.  I'll set the
21   following conditions.
22                    The Defendant must not violate federal,
23   state or local law while on release.
24                    The Defendant must cooperate in the
25   collection of a DNA sample if it's authorized by
```

1    statute.

2                    The Defendant must advise the court or

3    Pretrial Services in writing before any change of

4    address or phone number.

5                    The Defendant appear in court as

6    required and if convicted surrender as directed to

7    serve any sentence that might be imposed.

8                    The Defendant must sign his appearance

9    bond.

10                   The Defendant must submit to

11   supervision and report for supervision to the United

12   States Probation Office.  The Probation Office will

13   have the discretion to order what they believe in

14   their judgment to be a reasonable reporting schedule.

15                   He shall continue or actively seek

16   employment.

17                   Sir, do you have a passport?

18                   MR. BURSEY:  No, your Honor.

19                   THE COURT:  All right.  The Defendant

20   shall not obtain a passport or any other international

21   travel document.  In the event he has a passport he

22   shall surrender it.

23                   The Defendant is restricted to the

24   district of Connecticut, New York and Rhode Island for

25   business purposes.  He may travel to Florida to visit

```
 1   family, but he must obtain the permission of the
 2   United States Probation Office to do that, with that
 3   request coming in at least 72 hours before travel.
 4                   Any restriction on victim or witness
 5   contact?
 6                   MR. NOVICK:  A moment, please, your
 7   Honor?
 8               (Pause.)
 9                   MR. NOVICK:  Right.  I don't think so
10   other than -- I expect him to have normal business
11   conversations with the employees of the companies for
12   which he is employed.  I don't think there needs to be
13   any restriction on --
14                   THE COURT:  All right.
15                   MR. NOVICK:  -- victim or witness
16   contact.  Thank you.
17                   THE COURT:  The Defendant shall get
18   medical and/or psychiatric treatment within the
19   discretion of the United States Probation Office.
20   That's at the Defendant's expense.
21                   Do you own any guns, sir?
22                   MR. BURSEY:  No, your Honor.
23                   THE COURT:  All right.  The Defendant
24   shall not possess a firearm, destructive device or
25   other weapon.  No excessive use of alcohol.  No use or
```

```
 1   possession of a controlled substance unless prescribed

 2   by a licensed medical practitioner.

 3                   Is there any history of substance

 4   abuse?

 5                   MR. EGAN:  No, your Honor.

 6                   THE COURT:  The Defendant shall report

 7   as soon as possible to the Pretrial Services Office or

 8   supervising officer every contact with law enforcement

 9   personnel including arrests, questioning or traffic

10   stops.

11                   All right.  Any other conditions,

12   either counsel or the Probation Officer?

13                   MR. EGAN:  No, your Honor.

14                   MR. NOVICK:  No, your Honor.

15                   PROBATION OFFICER:  No, your Honor.

16                   THE COURT: All right.  Mr. Bursey, as

17   soon as you complete the paperwork which the Clerk of

18   the Court will have for you, you're free to go.

19                   Has the Defendant been processed?

20                   MR. NOVICK:  No, your Honor.  We

21   assumed that we'd go out immediately after the

22   hearing.

23                   THE COURT:  Yes.  So you will be free

24   to go after this paperwork is completed and you're

25   processed by the United States Marshal.
```

```
 1                    MR. EGAN:  Thank you, your Honor.
 2                    THE COURT:  All right.  Let's turn to
 3      Mr. Carpenter.
 4                    (Pause.)
 5                    MR. NOVICK:  Your Honor, the position
 6      of the Government is that there may -- there are and
 7      there should be conditions that would secure Mr.
 8      Carpenter's appearance in court as required.  The
 9      primary issue and I think the dispute between the
10      Government and the Defendant here is whether Mr.
11      Carpenter's appearance can be secured by a non-surety
12      or I believe the request of the defense is a personal
13      recognizance bond, or whether that bond should be a
14      secured bond.  And the Government would suggest a
15      secured bond in the amount of $750,000.
16                    The reason why the Government believes
17      that that's appropriate is that this is clearly not
18      Mr. Carpenter's first interaction with the criminal
19      justice system.  As the court is now aware based on
20      our filing and the Defendant's filing, the Defendant
21      has had -- has been convicted --
22                    THE COURT:  Can we stop the chatter
23      please in the back of the courtroom?  If people want
24      to converse they're welcome to do so out in the
25      hallway, but we need everything focused here on what's
```

1    before us.

2              Go ahead, sir.

3              MR. NOVICK:  Thank you, your Honor.

4              The Defendant has been convicted in

5    Massachusetts.  There's an extensive history of that

6    case which is summarized in the Government's

7    memorandum, but the upshot of all of that, your Honor,

8    is the Defendant currently stands convicted.  The case

9    is now on before the United States District Judge next

10   on for status conference on January 28th, and I expect

11   that the Defendant will be sentenced and likely

12   sentenced to a term of incarceration in Massachusetts

13   for that fraud case.

14             Now, I understand Mr. Brown's position

15   that the Defendant has been compliant with the

16   conditions of showing up to court in Boston.  What he

17   has not been compliant however, your Honor, is with

18   the conditions that he not commit any further crime.

19   And I refer not only to the fraud, I refer not only to

20   this case where the Defendant now stands charged with

21   an additional 33 counts of fraud in a case that is,

22   your Honor, that involves approximately $450 million

23   in face value of insurance policies, the payment of

24   $24 million roughly in insurance commissions split

25   among Mr. Carpenter's companies and well as outside

1    insurance agents.  It involves a very serious case and

2    a number of additional accounts of criminal activity

3    that were committed while on pretrial release from the

4    Massachusetts case.

5              In addition, we've put before your

6    Honor the facts of the civil litigation in New York,

7    specifically where Judge Swain found Mr. Carpenter,

8    who testified and was deposed in litigation in New

9    York, to be an incredible witness, to have actually

10   misled or been untruthful during the course of his

11   testimony there in relation to that, which I would

12   also note directly relates to the Charter Oak Trust

13   which is a subject of this criminal indictment.

14             I would also note in relation to the

15   Massachusetts litigation something that we neglected

16   to mention, for which I apologize, your Honor.  In

17   addition to the Massachusetts criminal case, the

18   Defendant and his entities were also found to have

19   engaged in various fraudulent conveyances in an effort

20   to avoid a civil judgment which is related to the

21   criminal case, the victims in the criminal case in

22   Massachusetts have brought action against the

23   Defendant.  And that is, your Honor, under Case Number

24   108-CV-11785, and that following a jury trial on the

25   District of Massachusetts entry of judgments was on,

```
 1   just recently, on June 21st, 2013.  I have a copy of
 2   the judgment which I can hand up, your Honor.
 3                    THE COURT:  Mr. Brown has seen it?
 4                    MR. NOVICK:  It's a publicly filed
 5   document, but I'm handing a copy to him right now.
 6                    THE COURT:  Do you want a moment, Mr.
 7   Brown?
 8                    MR. BROWN:  If I might, your Honor,
 9   thanks.
10                    (Pause.)
11                    MR. BROWN:  Your Honor, I accept the
12   Government's representation, your Honor, which is
13   obviously a couple of documents.  There's nothing for
14   me to object to.
15                    THE COURT:  All right.  Thank you.
16                    Just give me a minute.
17                    MR. NOVICK:  Sure, your Honor.
18                    (Pause.)
19                    THE COURT:  All right.  Go ahead.
20   Thank you.
21                    MR. NOVICK:  Thank you, your Honor.
22                    Your Honor, I'd also point out I expect
23   on his filings, Mr. Brown, in part to argue that,
24   obviously, that the case against his client is not
25   strong, you know, will be beaten.  And of course
```

1    that's not unique, obviously he stands here in a

2    posture of having pleaded not guilty, but I just point

3    out there is a basis on which he makes that

4    representation.  One of those is presumably that his

5    client didn't sign individual insurance applications

6    involved here.  And I would just point out to the

7    court a couple of things that are of public record at

8    this point.

9                    And one is in the litigation in New

10   York, Judge Swain having found that Mr. Carpenter was

11   in fact in control of the relevant entities that are

12   also involved in this case, and in addition to a

13   number of pieces of evidence that will come out at

14   trail that show that Mr. Carpenter in fact was the --

15   was in control, although perhaps not the named owner

16   in particular because of his legal troubles in

17   Massachusetts, in many cases couldn't be or wouldn't

18   be the named owner of any of these policies or trustee

19   of these entities, that he had other people who held

20   that position, in one case his brother-in-law, Mr.

21   Bursey, who your Honor met earlier.

22                    However, in truth and in fact, as I

23   think will come out at trial, Mr. Carpenter was the

24   person controlling all of these entities and all of

25   the activity that went on, at least in particular at

```
 1    his place of business in Simsbury and his other
 2    offices in Stamford.  And that the Government's case
 3    is in fact very strong in that respect in the sense
 4    that there were misrepresentations on these insurance
 5    applications, that they induced these insurance
 6    companies to enter into the insurance contracts, to
 7    issue insurance policies that they wouldn't have
 8    issued had that known the truth about what was going
 9    on, about the intention.  And that Mr. Carpenter was
10    responsible for the entities, was responsible for the
11    activity at the highest level.
12                 And it's the Government's position that
13    it is a strong case, and that even notwithstanding
14    that, that all this activity, all the activity that
15    Judge Swain talks about in her order all happened
16    while the Defendant was on release in Massachusetts.
17                 And just to touch on that for one more
18    moment, your Honor, I have been in contact with the
19    Assistant United States Attorney up in Massachusetts
20    who does want to I think move for the revocation of
21    Mr. Carpenter's bond.
22                 MR. BROWN:  Excuse me, your Honor.  I'm
23    going to object to this hearsay on this point, your
24    Honor.  (Unintelligible) I can bring the U.S. Attorney
25    down from Massachusetts but it's not fair to us,
```

```
1   favorable to counter something because he had a
2   personal conversation on what some U.S. Attorney might
3   do at some point.  What matters is what did the U.S.
4   Attorney do or hasn't done, those are fair, but to
5   suggest what he might do is inappropriate.
6                 MR. NOVICK:  Your Honor, I'm purely
7   basing what I'm about to say.  First of all, I'm
8   responding to something that Mr. Brown said in brief,
9   which is that he is arguing for this client that he
10  should be released based in part on the grounds that
11  the assistant in Massachusetts has not moved for
12  revocation.  I'm merely trying to explain to the court
13  why that may be the case.
14                Beyond that it was my understanding,
15  and Mr. Brown should know better than me, that counsel
16  for the Defendant up in Massachusetts has had
17  conversations with the assistant about the possibility
18  of moving for revocation.  And the primary issue, your
19  Honor, is that the local rules in Massachusetts with
20  regard to revocation of bond, it's been explained to
21  me that they require more than just presentation of
22  the indictment, that there would have to be an actual
23  witness from here to go up and testify in
24  Massachusetts with regard to the -- in order to make
25  the Government's case for revocation.  And there's
```

1    been some reticence, at least on our part, to make an

2    agent available prior to trial to testify about the

3    instant matter.  How that gets worked out I don't

4    know, your Honor.

5              THE COURT:  All right.  Let me just

6    rule on Mr. Brown's objection.

7              The objection was to hearsay.  The

8    objection is overruled because I think both counsel

9    know that hearsay is admissible during these

10   proceedings.  In any event, what I take from this

11   exchange is that the Defendant stands convicted of a

12   case with a lengthy history in the District of

13   Massachusetts, that he faces sentencing, and though

14   he's been compliant for a long time with the

15   conditions of his release in Massachusetts, at least

16   in the Government's view circumstances have changed

17   and the conditions of release in the future are

18   uncertain.

19              Is that a fair inference?

20              MR. NOVICK:  That's a fair inference,

21   your Honor.

22              THE COURT:  All right.

23              MR. NOVICK:  It's also our expectation

24   that this all may become academic given that in a week

25   and a half there hopefully will be some more certainty

1    with regard to how the case in Massachusetts is going

2    to proceed with regard to the sentencing.

3                    Your Honor, again I'll end with the way

4    I -- in the way I began, which is to say that it's not

5    the Government's position that the Defendant need be

6    -- that there are no conditions of release that would

7    not -- it would secure the Defendant's appearance.  We

8    don't take that position.  What we are arguing is

9    simply that a person with a recognizance bond is not

10   sufficient given the lengthy history, given this

11   Defendant's involvement in other criminal activity,

12   other fraudulent activity, that a secured bond would

13   be appropriate.

14                   One other note, your Honor.  There has

15   become this issue was to whether the Defendant's wife

16   should be permitted to put up her -- the house that's

17   in her name, Ms. Molly Carpenter, at the address in

18   Simsbury.  The information I believe has been provided

19   to the Probation Officer and to the court.

20                   The issue with that, your Honor, which

21   I'm hesitant to wade into, is essentially there is a

22   preliminary injunction, as the court is aware, in the

23   New York case freezing or restraining disposition of

24   Mr. Carpenter's assets, whether owned directly or

25   indirectly through agents or otherwise.  And it's the

1    position of the plaintiff in the New York litigation

2    that that indirect ownership piece would restrain the

3    house, notwithstanding the fact that it's in Molly

4    Carpenter's name and has been for some time.

5              Your Honor, I don't know the answer to

6    that.  I know that what I don't want to do is

7    represent to the court that I think that it would be

8    okay to include the house with regard to a surety in

9    this -- with regard to securing the bond in this case,

10   and what I don't want to do is guide the court into a

11   situation where the court is sanctioning a breach of

12   that order in New York.

13             I have suggested to counsel and I

14   suspect that at some point in the future there will be

15   some -- somebody will seek clarification from Judge

16   Swain as to her intent.  It's my suspicion -- well, I

17   shouldn't say it's my suspicion, it's my understanding

18   based on a letter that all counsel received from the

19   plaintiffs in the New York litigation that at some

20   point they would intend to go after the house in

21   satisfaction of the judgment that they've gotten in

22   the New York litigation.

23             And so again, I choose not to get

24   involved in that.  I just -- my concern, your Honor,

25   is that we not be in violation of Judge Swain's order

1   by essentially trying to tie up the house which is

2   otherwise restrained.

3                    THE COURT:  If the house is -- I of

4   course don't know what Mr. Brown is going to say, but

5   if the house is offered and if the court were to order

6   the house as part of whatever surety, assuming we go

7   down that road, couldn't we just stand in second

8   place?

9                    MR. NOVICK:  Your Honor, I think that I

10  would be hesitant to say that only because there is a

11  very sizeable judgment in New York, and so it's -- you

12  know, and I'm sure there's going to be a legal process

13  that's going to continue.  But there have been several

14  judgments along the way by the magistrate, the

15  arbitrator, magistrate judge, the district judge all

16  found similar things along the way that there is this

17  multi-million dollar judgment in favor of the

18  plaintiffs in that case.  So I think we would be a

19  very distant second place.

20                   THE COURT:  Um-hum.

21                   MR. NOVICK:  And I'm not sure what

22  surety it would actually provide to the Government in

23  the event of Mr. Carpenter absconding.

24                   Now, if the judge were to make some

25  ruling, which I'm sure counsel for Universitas in

```
 1    litigation would have something to say about, if the
 2    judge -- if there were to be, you know, a request for
 3    a ruling and the other side had an opportunity to
 4    litigate it and then the judge said, well, no, the
 5    house is not part of my ruling because of X, Y and Z,
 6    then I think then we're not standing in second place
 7    to anyone and then it because legitimate.
 8                Now, the second order of question I
 9    think becomes -- my understanding is that there is
10    $125,000 in equity in the house.  I received documents
11    from Mr. LaBelle (phonetic) on behalf of Ms. Carpenter
12    to that point with a recent appraisal.  And so then
13    the second order question for the court is whether
14    security of $125,000 in effect is sufficient given the
15    Defendant's history in this case.
16                And on that point, your Honor, the
17    Government believes that in light of bonds that have
18    been set for both the co-Defendant in this case as
19    well as Mr. Waesche -- as well as Mr. Waesche who is a
20    separately charged individual who is out on a $300,000
21    secured bond, that $125,000 of security seems
22    insufficient.  But, again, I think that's a second
23    order question.  It's my understanding the only thing
24    that Mr. Brown has to offer the court with regard to
25    security is this house and the Government, to answer
```

1    the first question, is simply unwilling at this state

2    to say that that's a possibility given the preliminary

3    injunction given the status of the New York

4    litigation.

5                    THE COURT:  All right.

6                    MR. NOVICK:  Thank you, your Honor.

7                    THE COURT:  Thank you.

8                    Mr. Brown?

9                    MR. BROWN:  Thank you, your Honor.

10                   Your Honor, I'm not sure which way to

11   take it so I'll just arbitrarily take one step at a

12   time here.  And the first step is perhaps the most

13   obvious, your Honor, and that is --

14                   THE COURT:  May I interrupt you before

15   you go on to the first step?  I of course don't have a

16   Pretrial Services report for your client, so maybe you

17   could start with --

18                   MR. BROWN:  Basics?

19                   THE COURT:  -- the basics, yes.  How

20   old is he, where was he born, where does he live.

21                   MR. BROWN:  Yes, your Honor.  Yes, your

22   Honor.  Basically my client is 59 years of age.  He's

23   married with a lovely bride sitting in the back there,

24   Molly.  They've been married -- 32?

25                   MR. CARPENTER:  32 years, yes.

1              MR. BROWN:  32 years.  And obviously

2    have a very solid marriage.  They reside in Simsbury

3    in this infamous house that the court's heard about

4    which I will discuss in a few moments.

5              He has obviously been involved and

6    employed in the insurance business virtually all of

7    his life.  He was born in Connecticut, went to school

8    in Connecticut, got his degrees in Connecticut.  He

9    did go through law school, your Honor.  Right now his

10   license is under suspension simply because of the

11   incidences and matters involved in the Massachusetts

12   matter.  And so he does have degrees certainly beyond

13   high school and college.

14             As far as I know there has never been

15   an allegation that he has a substance abuse problem.

16   There's no evidence or information, your Honor, and I

17   might add that he's been scrutinized by Pretrial

18   Services up in Boston under the prosecution that the

19   prosecutor had indicated, so that they've done an

20   extensive investigation.  And in fact, as recently as

21   last Monday -- I think it was Monday.

22             MR. CARPENTER:  Tuesday.

23             MR. BROWN:  Tuesday, I'm sorry, he was

24   required to drive up to Boston to meet with Pretrial

25   Services --

```
 1                    MR. CARPENTER:  Probation.

 2                    MR. BROWN:  Do me a favor,

 3   (unintelligible).

 4                    -- and probation in anticipation of

 5   activities that will occur in the Boston matter, and

 6   so everyone is aware of the indictment in Connecticut,

 7   your Honor.  Everyone is aware of the matters

 8   involving the First Circuit and the case decisions

 9   that were had there.

10                    THE COURT:  Are there children?

11                    MR. BROWN:  Yes, I'm sorry.  There's

12   one adult daughter who is here supporting her father.

13                    THE COURT:  And what's the daughter's

14   name?

15                    MR. BROWN:  Caroline, your Honor.

16                    THE COURT:  Caroline.  And how old is

17   Caroline?

18                    MR. BROWN:  23?

19                    CAROLINE MECKEL:  I'm 27, your Honor.

20                    MR. BROWN:  27.  Thank you.

21                    THE COURT:  And where does Caroline

22   work and --

23                    MR. BROWN:  Well, she's married and she

24   lives in her own house, your Honor.  She purchased it

25   with --
```

1                    THE COURT:  Is she employed?

2                    MR. BROWN:  Yes, your Honor.  She works

3    for one of the relevant companies, your Honor.  She's

4    married to Ron and she has her own house.  She lives

5    independently of mom and dad.

6                    THE COURT:  And does she have children?

7                    MR. BROWN:  No, your Honor.

8                    THE COURT:  All right.  And how long

9    have Mr. and Mrs. Carpenter owned the house they live

10   in?

11                   MR. BROWN:  Your Honor, the house they

12   live in was owned by the parents of Mrs. Carpenter,

13   and when the parents passed the daughter Molly

14   ultimately gave title back in I believe the '90s, your

15   Honor.  There is no connection between any allegations

16   of any misappropriation of any funds or misuse of

17   funds relative to this abode because the house was

18   purchased long before any of these allegations arose,

19   your Honor.

20                   THE COURT:  And the --

21                   MR. BROWN:  And I might add, your

22   Honor, title is solely in Mrs. Carpenter's name.  And

23   I would point out, your Honor -- I'll just slide into

24   that, your Honor, because it might be helpful to keep

25   some continuity purposes, that the order of the court

1  in New York, you won't find Molly Carpenter's name

2  anywhere in that order because she's not a part of

3  that order.  And I have to concede, I didn't win the

4  book in laws school on real estate, but it seems to

5  me, your Honor, that under Connecticut law that if you

6  go into a marriage, you otherwise obtain on your own,

7  through your own family a house, that it's your house,

8  and that this court in New York has no jurisdiction

9  over her.  And to the extent that she has interest in

10 that house, that's her interest.

11              Now, the attorneys, the people that

12 were asked by Mr. Novick in terms of, well, what do

13 you think, are the very people that have been fighting

14 Dan Carpenter for the last two, three, four years, and

15 obviously it's in their self-serving interest to try

16 to block up any property.  So it's not as if this is

17 some independent judgment relative to that particular

18 house.  But what cannot be disputed is that she is the

19 owner of the house and what cannot be disputed is that

20 the court in New York has no jurisdiction over what

21 she does or doesn't do with the house.

22              THE COURT:  Am I to understand that

23 Mrs. Carpenter inherited the house or it was conveyed

24 to her?

25              MRS. CARPENTER:  No, we bought it from

```
 1   my mother.
 2                 MR. BROWN:  But, but -- okay.  They
 3   originally bought it -- she lived in the house and
 4   when she passed ultimately my client, back in the '90s
 5   I believed, quit-claimed any interest he may have had
 6   in that house, again long before these events arose.
 7   But ultimately, because it was her mother's,
 8   ultimately that's what her mother wanted to
 9   (inaudible) the house.
10                 THE COURT:  So the Defendant and his
11   wife bought the house in the '90s; is that what I'm
12   being told?
13                 MR. CARPENTER:  '95.
14                 MR. BROWN:  1995, your Honor.
15                 THE COURT:  And when was it quit-
16   claimed to --
17                 MR. CARPENTER:  1997.
18                 MR. BROWN:  '97, your Honor.
19                 THE COURT:  All right.
20                 MR. BROWN:  I believe the house was
21   appraised somewhere in the neighborhood of around
22   400,000 or so.  Mr. LaBelle can certainly answer those
23   questions.  He's the attorney who represents Molly
24   Carpenter, your Honor.  He's present, and I had asked
25   them to both be present and here they are.
```

```
 1                    THE COURT:  Thank you.  Now --

 2                    MR. BROWN:  And just for the record,

 3   Mrs. Carpenter would be here whether I asked her or

 4   not, but --

 5                    THE COURT:  Now, is Mrs. Carpenter

 6   employed?

 7                    MR. BROWN:  Yes, your Honor.  She has

 8   another company that she works in.  She works -- I

 9   mean I don't want to mislead the court, your Honor,

10   it's -- the address is in the same location, your

11   Honor, as my client's address, but she's an

12   independent woman and runs her own business.

13                    I would also want to note to answer, to

14   continue answering the questions, one of the questions

15   of what we have is (inaudible) the passport, does

16   (inaudible) holding any passport, and the answer is,

17   your Honor, the U.S. State Department presently has

18   possession of that passport, and as I understand it

19   the passport time has lapsed, meaning that he would

20   need to renew that passport, but he doesn't have

21   present control or possession, and I might add as the

22   conditions of his release, your Honor, he has

23   surrendered his passport.

24                    And as I had indicated in my brief,

25   your Honor, that I provided to the court and I
```

1    provided the court with the document, in my brief,

2    your Honor, I noted in one of my exhibits, I think it

3    was the second exhibit, my client for business reasons

4    had requested a return of the passport.  And there was

5    an order from the U.S. District Court by Judge O'Toole

6    up in Boston on February 10th, 2012 wherein Judge

7    O'Toole, since the Government seems to think that

8    District Court judges obviously need something, so did

9    cite the judge in New York, I want to cite the judge

10   in Massachusetts that states in part, and the

11   Government has a copy of this, your Honor, provided to

12   them yesterday, that Mr. Carpenter has fully complied

13   with all the requirements set by Pretrial Services and

14   granted that order that he be permitted to -- he had

15   business reasons or other reasons, your honor, to

16   travel and needed his passport, and the court made the

17   finding of compliance with all the terms and

18   conditions of pretrial release and took the

19   extraordinary step of allowing Mr. Carpenter to

20   receive is passport back.  As other things happened he

21   never actually, if I understand it, never in fact took

22   the passport back.

23              But the point of the document, your

24   Honor, is to give the court some sense that another

25   federal District Court judge after hearing, hearing

1   both sides of both the prosecutor and the defense side

2   up in Massachusetts in the District Court up there,

3   made the finding that Mr. Carpenter has in fact been

4   in compliance and had enough confidence in Mr.

5   Carpenter that he's willing to allow him for a limited

6   purpose to have his passport for business purposes

7   without losing any sense that Mr. Carpenter would not

8   show up when ordered by the District Court.

9           Again, I bring that up, your honor,

10  only to restate the obvious, which is Mr. Carpenter

11  does not present a flight risk.  I don't think the

12  Government is pushing that issue, but I just felt that

13  the court needed to have some sense that periodically

14  the court has been reviewing Mr. Carpenter's behavior

15  while on pretrial release, your Honor, and simply made

16  that finding in the whatever it's worth department.

17          What I want to point out, your Honor --

18          THE COURT:  All right.

19          MR. BROWN:  -- is that -- let's start

20  with this indictment.  This indictment, it's been

21  under investigation, your Honor.  Mr. Carpenter has

22  been aware of the federal investigation somewhere

23  between at least two to three years back and I believe

24  it was April of 2010 his offices were first invaded, I

25  guess, by federal agents concerning an incident as to

```
 1   whether or not he was in violation of some misconduct
 2   relative to some of his businesses.  They seized a lot
 3   of documents.  Then roughly about a year later the
 4   Department of Labor and others again invaded his
 5   offices and seized additional documents.  I'm not sure
 6   there's anything left between the two of them.
 7                   THE COURT:  By invaded you mean there
 8   was a search warrant executed?
 9                   MR. BROWN:  Well, I guess the
10   Government might look at it that way.  From our point
11   of view it was kind of an intimidating event on both
12   occasions because of the number of people coming in.
13   There's just a lot of straight people that work in
14   that office and it wasn't like it was some kind of
15   drug factory or something, when quite frankly had they
16   just brought it through subpoena, these documents,
17   there is no evidence they would not have complied.
18   But I don't want to get into that.
19                   I just simply want to point out that my
20   client has been fully aware of the fact for more than
21   two years that the Office of the U.S. Attorney in
22   Connecticut, the Department of Labor and others have
23   been investigating my client and certainly he's had
24   the opportunity to I guess go to flee to Cuba or
25   wherever people go these days, and there's no evidence
```

1    of course that he did that.

2              My client has been vocal with the

3    Government and interacting with the Government in

4    terms of professing his innocence to all of this

5    stuff, and it's important to him that the truth come

6    out.  And I am saying to the court that this will

7    result in a trial and I think this is something that's

8    going to result in a plea.  And I say that only

9    because it's only relevant in the sense that, your

10   Honor, he believes in his innocence.  The Government

11   believes he's guilty, he believes his innocent, that's

12   why we have trials.  But it isn't the kind of case

13   where he will not report when required to do so.

14              The fact of the matter is, your Honor,

15   that -- without beating it to death, in the First

16   Circuit matter it's just bizarre because my client had

17   been the victim, not once, twice, of prosecutorial

18   misconduct.  And that's not just his opinion, it was

19   the opinion of the U.S. District Court judge up in

20   Massachusetts.  It's not my client's fault that the

21   first case had to be set aside because of

22   prosecutorial misconduct back in 2005.  And it's not

23   my client's fault that in 2008, I believe, the court

24   found additional misprosecutorial conduct.

25              Now, in fairness to the record,

1    subsequent to that there was an appeal by the U.S.

2    Attorney's Office and later a court up in the First

3    District after X number of years ruled in favor of the

4    Government, remanded it, and that happened, your

5    Honor, back in November, the end of November 2013.

6              During that period of time and after

7    that period of time I sat here and listened to the

8    Government's position that -- trying to explain away

9    why it might be that the U.S. Attorney's Office up in

10   Massachusetts, presumably a very capable office, has

11   not sought revocation of bond or whatever.  Now, they

12   can speculate as to maybe the reasons why, so they can

13   deal in speculations but I'll deal on the facts.  The

14   fact is that they haven't done so, not that they're

15   unaware of this indictment because as Mr. Novick has

16   stated, he's been in conference with them, you know,

17   in telephone conferences -- he didn't go up there, but

18   certainly been in telephone conference with him, so

19   they're fully aware of it.  And notwithstanding that

20   did not feel the sense of urgency or necessity to take

21   any action.

22             Now, the next point that Mr. Novick

23   made was, well, but there's a conference happening on

24   January 28th, I believe, up in Boston with the court,

25   and that's a hundred percent true.  The reason for

1    that conference, however, isn't perhaps what was made

2    clear to the court.  The reason for that conference is

3    my client has filed some motions to set aside the

4    verdict and other actions that he's legally entitled

5    to do.  The court has as a result of those motions

6    vacated any order as to a particular date for which

7    Mr. Carpenter should be sentenced, and I would note at

8    this point that no date is now set.  Is that correct?

9                    MR. CARPENTER:  No date.

10                   MR. BROWN:  Okay.  So that there is no

11   date right now, your Honor.  Rather the court is more

12   interested at this point in reviewing and considering

13   Mr. Carpenter's motion.  What happens with those

14   motions I guess will be left to others.

15                   But I just wanted to make it clear,

16   your Honor, that the state -- I'm sorry, that the U.S.

17   Attorney's Office in Massachusetts is fully aware of

18   the fact there is no sentencing date, is fully aware

19   of the fact that there are other motions to be heard.

20   Certainly if they feel any anxiety about Mr. Carpenter

21   floating around the streets of the United States they

22   could have, and you have personally experienced I know

23   cases where the U.S. Attorney's Office has brought an

24   action to revoke or otherwise affect someone who's out

25   on bond.  They haven't done so.  They haven't even

1    asked for any additional restrictions.  And obviously

2    as Exhibit A that I provided to the court today, you

3    can see the date that my client signed the promise to

4    appear, your Honor, on a non-surety bond.  I'm not

5    sure how you characterize it, but the date, if the

6    court looks at it, you'll see it's signed in 2004 --

7    you don't have to look at it, just -- it's 2004, your

8    Honor.

9              THE COURT:  Two thousand --

10             MR. BROWN:  So we're almost up to -- I

11   think it was February.  I think we're a month away

12   from a decade.  Exhibit A.

13             (Pause.)

14             MR. BROWN:  And you can see (inaudible)

15   right next to it, your Honor, is the date.  So it may

16   set a record for anybody I've ever represented, your

17   Honor, for being out on bond and pending anything.

18   But in any event, the important thing is it's been 10

19   years.  So I just want to make that point, your Honor.

20             The second point I want to make because

21   reference has been made to it is this New York matter.

22   The New York matter arose, your Honor, out of

23   ironically one of the insurance policies that has been

24   scrutinized by the U.S. Attorney's Office, which is in

25   our opinion similar to virtually all of the policies

1   in the sense that -- just to give the court a quick

2   background, your Honor.   There is certain provisions

3   under federal law under which an employer can, on

4   behalf of an employee -- and I might add we sometimes

5   think of General Motors and IBM, but it could be a

6   one-person company, two-person company, it doesn't

7   have to be a huge company -- under which an employer

8   can on behalf of an employee for whatever reason

9   that's allowed by law, secure life insurance.

10  Typically the company will finance the policy and a

11  lot of times it probably was intended for particular

12  companies, I don't know, but law is the law and it

13  doesn't preclude small companies.   The idea I suppose

14  in part is to give a benefit, a perk as a word, to an

15  employee of that company.   So that exists, your Honor.

16              And basically all of these policies

17  that are being scrutinized and questioned by the

18  Government concern universal life insurance.   And by

19  that simply the classic, sometimes people may refer to

20  it as whole life insurance versus term life insurance

21  kind of thing, where there is a value to the policy

22  and that at some point the owner can in fact either

23  surrender the policy and collect whatever equity there

24  might be, can sell the policy, or do nothing and

25  ultimately when the insured passes, which does not

1   have to be the owner, your Honor, so in this case the

2   owner is the trust, the insured in question for

3   individuals, and ultimately the person passes and then

4   per the trust, the policy, the insurance carriers pay

5   the trust.

6              The claims in these cases, your Honor,

7   and I think it's important for the court to understand

8   briefly, concerns the type of policy, your Honor, of a

9   life policy that was -- the group probably typically

10  tended to be people 70 and over, your Honor.  These

11  are the insureds.  In order for them to get the

12  policies they had to undergo a battery of health tests

13  to make sure that the insurance carriers -- and

14  there's three or four that were involved in this case,

15  your Honor, and they're articulated in the indictment.

16  And basically people would find these individuals as

17  every insurance agent in the world does, you try to

18  convince some person you really need this insurance

19  for this or that reason.

20              These people would be insured.

21  Typically the policies range from 2 to 5 million

22  dollars.  There is a secondary market or there was

23  particularly back in the early 2000s that people who

24  own these policies were selling these policies on the

25  open market.  Not everybody, but some people.  And

1   investors were buying these policies, and they would

2   take the policies over and they would continue to pay

3   the premiums and these are sort of called stranger

4   originated type policies, although they may or may not

5   have been originated by an actual stranger, but

6   someone that didn't have necessarily an interest in

7   the life of the individual, such as the mother, the

8   father, the son or daughter had it.

9            So some insurance companies decided as

10  a matter of policy, they didn't like these policies

11  for a myriad of reasons that I won't bore you with

12  today.  And so the allegations are that they

13  promulgated certain information that if you see

14  somebody that was 70 years of age and they want a

15  policy from 2 to 5 million bucks or higher or lower, I

16  don't know, we don't want that business.  And the

17  allegations of the Government is my client and others

18  knew that, notwithstanding that they didn't provide

19  the correct information, the companies issue these

20  policies and they're losers.  That's the theory I

21  guess.

22           The policies, interestingly enough,

23  your Honor, are not illegal, meaning that these types

24  of policies happen all the time.  It's not illegal for

25  an owner to sell these policies, and nobody claims

1    that they are.  The only real issue that I can see,

2    Mr. What-do-I-know-about-insurance, is whether or not

3    the companies were tricked into buying these policies.

4                As an aside, because I know the court

5    is sort of sensitive for this, the question is, well,

6    gee, were the insured, these people 70 to 75, did they

7    lose any money, my client or somebody like that to

8    cause that, and the answer is no because they didn't

9    personally pay for the policies.  They got actually,

10   without going into detail, typically at least a couple

11   years of free insurance if they weren't died

12   (phonetic) during that period of time.  One of the

13   instructions were for the policies is -- would be

14   followed by the insurance carrier.

15               So the only real issue here is whether

16   or not certain carries such as Phoenix, Lincoln, Penn,

17   those type of carriers, big insurance companies,

18   somehow or other got tricked into issuing these

19   policies.  And their theory is that -- I won't bore

20   you with the report today, but the Government at the

21   trial will try to show that as a result of all this

22   misinformation they're saying somehow they lost.  The

23   fact of the matter is, your Honor, because it was

24   brought up in (inaudible), that it's our position that

25   the carriers actually made millions and millions of

1   dollars and no one got really loss with people like

2   Mr. Carpenter, which ultimately has resulted in him

3   not having, quite frankly, a lot of money which is one

4   of the issues at hand today.

5           No violence, there's no claims of

6   violence.  There was no claims of drugs being

7   involved.  No weapons involved.  We believe that

8   whether it's a valid issue or not a valid issue, these

9   are civil arguments and not -- shouldn't be here in a

10  criminal court and we'll probably be filing a motion

11  consistent with that down the road.

12          But I just wanted to give you that

13  quick background, your Honor, so the court could have

14  some understanding as to what this case is all about.

15  So our position is whether they're right or wrong,

16  these are civil matters and not criminal matters.  And

17  that in fact I daresay contrary to any allegations, we

18  will ultimately demonstrate that the only people that

19  lost money is my client.  In fact, if he were

20  convicted, you know, the orders of restitution will I

21  suspect -- I don't think he's going to be convicted,

22  but if he were would be zero because the insurance

23  companies are really not owed any money.  So that's

24  what this is all about.

25          Now, he brings up the New York case.

1  The New York case concerns an individual, fellow named

2  Mr. Spencer, who bought into one of these policies --

3  I'm sorry, bought into two of the policies, one for 10

4  million and one for 20 million dollars.  He ultimately

5  passed within the first two years.  The first two

6  years are critical, your Honor, because during the

7  first two years of a life insurance policy typically

8  it's a contestable period of time, meaning that the

9  insurance carrier, and this is relevant because it was

10  brought up by the Government, can contest the policy,

11  can look at the policy, can look behind the policy,

12  can look at what was presented to obtain that policy

13  and if they find fraud they can void the policy and

14  not pay the money.

15              In this case, the New York case that

16  the Government brought up, concerned two policies, one

17  for 10 million and one for 20 million that when Mr.

18  Spencer passed during the two-year period, 30 million

19  dollars is what would be issued.  I guaranty this

20  court that no insurance company who's still in

21  business is going to pay 30 million dollars on a

22  policy when someone passes within the first two years

23  without scrutinizing everything to see if there is

24  some way they can weasel out or otherwise not pay --

25  legitimately, I shouldn't put them down -- not pay

1   because they believe a fraud has been perpetrated.

2                    Two policies, 30 million dollars.

3   Numerous discussions were had because they in fact

4   balked at paying initially, but ultimately, ultimately

5   they paid.  And they paid because they were compelled

6   to pay because a lawsuit was filed against them

7   because Mr. Carpenter and company were not afraid of

8   the facts coming out.  Filed a lawsuit.  The insurance

9   company backed off and paid within a very short period

10  of time, terminating the lawsuit.

11                   What's in dispute is not that.  What's

12  in dispute is whether or not in New York Mr. Carpenter

13  or others or businesses breached the contract, because

14  that's what insurance policies are, contacts, in

15  failing to pay the estate of Mr. Spencer monies that

16  were due him.  His estate believes that money that

17  should have gone was diverted, not correctly done, and

18  ultimately got a judgment.

19                   What's interesting, however, about that

20  case -- and trust me, there's a lot of animosity

21  directed at Mr. Carpenter, which is why the opinion

22  obtained by the Government is suspect, because they

23  feel that Mr. Carpenter stole the money.  Let's just

24  put it out on the table.  And when I say Mr.

25  Carpenter, Mr. Carpenter, Et Al.

1                    What's interesting is at no time, and

2   this has been going on since 2009, your Honor, has

3   there been a criminal complaint filed against him in

4   Connecticut, there hasn't been a criminal claim filed

5   against him in New York.  So this concept of fraud

6   that has been brought up today, intimated at or

7   stated, I'm not sure which, simply is not justified.

8   It is a contract dispute.  It's being handled the way

9   we want things to be handled, in a non-violent way in

10  the district courts or the state courts.  But there

11  has been no criminal complaint filed against my

12  client, and certainly I guess over three or four years

13  if they honestly felt that, because of how they feel

14  about Mr. Carpenter, one would have been filed.

15                   So I bring that up, your Honor, to

16  simply show that we disagree strongly with claims of

17  misconduct.  So I think it's fair for the court to

18  know and consider what the Government is saying on

19  their point, but simply our position.  But the

20  difference between what they say is our position is

21  supported by the facts.  So when I say to you there

22  has been no criminal complaint, there hasn't been any

23  criminal complaint.  When I say up in Boston the U.S.

24  Attorney's Office could have tried to revoke, at least

25  bring him in, it could have done that, hasn't done so.

1    Those are facts.

2              What Mr. Novick suggests is simply

3    speculation, because it hasn't been done.

4              Now, let me get on to one point on the

5    New York matter.  The court of New York clearly has

6    written and Mr. Novick's provided this court with an

7    order of the U.S. District Court, Southern District of

8    New York, which of course my client obviously intends

9    to honor.  If he has an issue with that, you know,

10   trust me, he knows how to appeal.  But until that

11   happens he will honor it.  But there is nothing in

12   that order that restricts anyone else, as far as I can

13   read, other than Mr. Carpenter or companies associated

14   with Mr. Carpenter, that's the best way I can read it

15   in a more broad term that even my client might agree

16   with me on.

17             There is nothing in there about his

18   wife, and since when can an action that concerns one

19   person but doesn't deter -- that affect another,

20   affect that person, meaning deprivation of property

21   rights without due process of law?  Because if you

22   want to buy into the Government's theory -- sorry,

23   it's not the Government's theory, that wouldn't be

24   fair to Mr. Novick.  But the theory of these lawyers

25   in New York is that somehow or other you can take her

```
 1    property without giving her an opportunity to have her

 2    case heard in court.

 3                 So under no circumstances is Mr.

 4    Carpenter going to violate that restraining order.

 5    He's not happy about it, but he's obviously going to

 6    respect it just as he's respected the other orders of

 7    this court.  But I'd like to think in the 21st Century,

 8    just because it's his wife that somehow or other she

 9    isn't entitled to be treated as an independent person.

10                 THE COURT:  How about, let me ask you

11    --

12                 MR. BROWN:  And if I may, just one

13    other point before I lose it, your Honor.

14                 THE COURT:  Yes.

15                 MR. BROWN:  Which simply means that

16    because of this order I'm kind of on behalf of my

17    client constricted on what I can offer this court.  I

18    have every confidence, as his wife does, as his

19    daughter does, that if you tell Mr. Carpenter to be

20    here, he will be here.  If you tell him to go to

21    Pretrial Services, he's going to go to Pretrial

22    Services.  And that I wish we had the 750,000 bucks.

23    Be happy to put it up, your Honor, but he doesn't.

24    And I'm simply suggesting by my motion, your Honor,

25    that it's not necessary because he will be here.  And
```

```
 1   so that's why I made that proposal.  It isn't like
 2   I've got the money and somehow or other I just want to
 3   give the Government a hard time.  But I give them a
 4   hard time, but not because of that particular reason,
 5   your Honor.
 6                   So, I feel, your Honor, that the court
 7   can have confidence that if it sets the terms and
 8   conditions on something that he can realistically do,
 9   that he will comply with those terms and conditions.
10                   THE COURT:  All right.  I have a few
11   questions.
12                   MR. BROWN:  Sure.
13                   THE COURT:  Is there any medical or
14   substance abuse history I should know about?
15                   MR. BROWN:  No, your Honor, there's
16   nothing.
17                   THE COURT:  Okay.  How about other
18   family.  You mentioned his wife and daughter.
19                   MR. BROWN:  You mean do they have
20   substance abuse issues?
21                   THE COURT:  No.  Is there other family?
22                   MR. BROWN:  Well, yes, your Honor.  I
23   mean obviously his wife is here and his daughter is
24   here.
25                   THE COURT:  Yup.  Are there any other
```

1    family?

2                    MR. BROWN:  Oh, I --

3                    MR. CARPENTER:   Two brothers and a

4    sister.

5                    MR. BROWN:  Two brothers and a sister,

6    your Honor.

7                    THE COURT:  And where are they?

8                    MR. BROWN:  Where do they live?

9                    MR. CARPENTER:  One brother is in New

10   Jersey, the other brother is in New York, and my

11   sister is in New York.

12                   MR. BROWN:  Did the court hear that,

13   your Honor?

14                   THE COURT:  Yes.  New Jersey, New York,

15   New York.  And I gather there's only one child, the

16   daughter who is with us?

17                   MR. BROWN:  Yes, your Honor.  Yes, your

18   Honor.  There's nobody outside the court, your Honor.

19   She's proud of her father (inaudible).

20                   THE COURT:  So his wife and daughter

21   offered as signatories on the bond?

22                   MR. BROWN:  I haven't asked them, your

23   Honor.  I'm sorry, I haven't asked the daughter.  I

24   have talked to Mr. LaBelle and perhaps he could speak

25   to them on behalf of his client, your Honor.  If you

```
 1  may just hear from him for a moment?
 2              THE COURT:  Surely.  Always happy to
 3  hear from Mr. LaBelle.
 4              MR. LABELLE:  Thank you, your Honor.
 5              To answer your last question first,
 6  your Honor, Mrs. Carpenter is willing to sign either
 7  an unsecured bond as a co-guarantor or a secured bond
 8  and offer her home to secure that obligation.
 9              THE COURT:  Does she have any other
10  assets?
11              MR. LABELLE:  Not really to speak of,
12  your Honor.  I inquired of that and I think the house
13  is really the only substantial asset, let me put it
14  that way.
15              THE COURT:  And when you say not
16  really, just speak up, what do you mean?
17              MR. LABELLE:  I can only represent -- I
18  spoke to her triggered by the arrangement that Mr.
19  Percy made.  I asked her whether she had a substantial
20  401(k) and she does not.  She has one but she tells me
21  it doesn't have a lot of money in it.  She owns her
22  own car.  She does operate a business.  She's the
23  chairman of a business.  She makes a substantial
24  income.
25              THE COURT:  What type of business is
```

1    it?

2                   MR. LABELLE:  She runs a company called

3    Benistar Admin Services, your Honor.  Primarily it's a

4    third party administrator type of company.  They

5    handle health insurance claims.  A typical customer

6    might be a retirement plan that offers medical care

7    for its retirees and they facilitate the submission

8    and handling of health claims.

9                   THE COURT:  Okay.  What else would you

10   like to tell me?

11                  MR. LABELLE:  With respect to the --

12   first of all, I'd like to offer to your Clerk and to

13   your Honor a certificate of title on the home.  The

14   Government has seen this but I'm providing him with a

15   copy as well.  Certificate of title was requested by

16   our office.

17                  THE COURT:  Thank you.

18                  MR. LABELLE:  It's issued by an

19   attorney who did the title work when the house was

20   last refinanced.  Mrs. Carpenter refinanced the first

21   mortgage on the home a few years ago and our firm

22   represented her in that transaction, and so we issued

23   a title policy at that time to the mortgage lender,

24   and we went back to the attorney who did the title

25   search at that time and he did an update, issued the

1    certificate of title.

2              The pertinent portions of it, your

3    Honor, validate and prove up everything that Mr. Brown

4    told you, and I can fill in a little bit of the

5    detail.  You'll see on the first page of the

6    certificate it references the deed to Mrs. Carpenter

7    and it came out of the Gail Hogangarten (phonetic)

8    grantor trust.  Gail Hogangarden was -- Hogangarten,

9    is Mrs. Carpenter's mother, and the home was

10   originally built by her parents.  The father died, the

11   interest in the home was put into this trust by her

12   mother and then was deeded out in 1995 why long, way

13   before any of the Charter Oak Trust controversy, way

14   before Universitas controversy, and it's been in Mrs.

15   Carpenter's name.  In fact, Daniel Carpenter executed

16   a quit-claim deed soon after the property was

17   transferred, and that deed was subsequently recorded

18   in 1997.  So she was actually the owner in her name in

19   1995 and has been the record owner in her name since

20   1997.

21             This particular title also recites at

22   page 12, or excuse me, at paragraph 12 the existing

23   mortgage on the property.  It was originally to

24   People's United Bank.  It's actually been assigned by

25   People's to Bank of America.

```
 1                     If I may approach your Clerk once
 2   again, your Honor?  I'm handing him copies of two
 3   recent, two of the most recent loan statements from
 4   the Bank of America in the pertinent -- obviously it
 5   confirms that the mortgage is in Molly Carpenter's
 6   name alone and I can represent to the court that I
 7   went through our firm's closing file and this was all
 8   done by Molly Carpenter and by herself as she had
 9   every legal right to do as she is the legal owner of
10   the home.
11                     I also have an appraisal, your Honor.
12   If I can approach, your Honor?
13                     THE COURT:  I gather Mr. Novick has
14   already seen all of this?
15                     MR. NOVICK:  I have, your Honor.
16                     MR. LABELLE:  He has and I'll give him
17   another copy.
18                     THE COURT:  Okay.
19                     MR. LABELLE:  The appraisal was done,
20   your Honor, you'll see the appraisal is for Wells
21   Fargo.  It was done in August of last year so it's
22   pretty current.  That was in connection with a HELOC
23   application, home equity line of credit.  Ultimately
24   that transaction did not go through, so you'll see on
25   the certificate of title the only encumbrance on the
```

1   property is the first mortgage now held by Bank of

2   America.

3                    The appraisal indicates a market value

4   of $492,500.  The most recent bank statement on the

5   mortgage loan indicates a principal balance of

6   365,500, so we're talking about $127,000 in equity in

7   the home.

8                    With respect to the New York

9   litigation, your Honor, I'd like to approach again and

10  hand your Honor a copy of the order to show cause.

11  The preliminary injunction, which was issued on

12  Monday, was brought on by order to show cause and

13  that's the document that I've given your Honor a copy

14  of.  I don't know how familiar your Honor is with New

15  York Practice, but by virtue of Federal Rule 69 the

16  litigants, the plaintiffs down there are using CPLR

17  Section 5225, which is what in New York practice is

18  called the turnover proceedings and that's why you

19  hear reference to that.

20                    But to sum up the litigation, they

21  believe they have identified persons and entities who

22  received some of the proceeds of this death benefit

23  that's the source of the controversy there, and so

24  they brought a turnover action against the named

25  entities and including Daniel Carpenter, and they

1    coupled that with a preliminary injunction request

2    against Mr. Carpenter requesting that he be retrained

3    from transferring any of his assets until the final

4    determination of this turnover proceeding.  You will

5    see that the turnover proceeding does not involve my

6    client, Mrs. Carpenter.  It does not involve the home.

7    She was not served with any process in connection with

8    the turnover proceeding.  She was not given notice;

9    she was not given any opportunity to be heard on

10   whether or not this application has any impact on her

11   personal or her real property.

12               We have advised her, and I did it with

13   full confidence, that she has every legal right to

14   pledge her home, the equity in her home, to secure a

15   bond in favor of her husband.  I respect the

16   jurisdiction of the court down there.  She is a

17   resident of Connecticut; she is not subject to the

18   jurisdiction down there unless she chooses to, but

19   more importantly she is not a party to this action,

20   she could not possibly in any way, shape or form be

21   bound by that order.  She is free to deal with the

22   property that's been in her name since 1995 as she

23   sees fit.

24               I'm a little disappointed, quite

25   frankly, that the Government has been a little cowed

1    by the fact that a disgruntled litigant fires a letter

2    across their bow and offers to interpret Judge Swain's

3    order.  I think your Honor should just take into

4    consideration the context in which this comes up, and

5    Mr. Novick was careful to say he is not wading in.  So

6    Mr. Novick, I did not hear him to say that he believes

7    that this order binds my client.

8                     Plainly under Rules of Civil Procedure,

9    rules of Constitutional law, rules of due process,

10   she's not a party.  She wasn't served with process.

11   She's not subject to personal jurisdiction, she had no

12   notice, no opportunity to be heard, and this order

13   cannot bind her.  It may have some effect on her

14   husband, it obviously does, but not her.

15                     If your Honor concludes that a secured

16   bond is necessary, what I would suggest is that the

17   court accept Mrs. Carpenter's offer to co-sign for her

18   husband and to pledge her equity in the home as

19   security, and if somebody wants to go and see Judge

20   Swain, let them do it, and if Judge Swain has a

21   different view of the world, I'm sure she'll let us

22   know and we can come back and revisit the subject.

23   But right now I am very firmly of the opinion that

24   Mrs. Carpenter has every right to do what she is

25   offering to do, and it would not be right to say that

1    she can't deal with property that she's owned since

2    1995 that was previously the home of her parents and

3    that she's owned long before a controversy arose with

4    respect to Charter Oak and that she's somehow bound by

5    some order in a proceeding that she was not party to.

6              Mr. Novick mentioned the amount,

7    obviously the equity is lower than what the Government

8    is proposing in terms of the amount of a bond.  I

9    would suggest to the court that it's still substantial

10   equity and I read a few cases on this subject.  The

11   focus ought not to be so much what the Government

12   might gain or how much the Government might get in the

13   event of a default.  When we put up security bonds the

14   idea is to incentivize the Defendant to perform his

15   obligations under his appearance bond, and the mere

16   fact that Mrs. Carpenter is going to be at risk of

17   losing her home, which is what would happen if the

18   Government, if there were a default and the Government

19   were to take her interest in the home, they might not

20   get an economic boost from it, but Mrs. Carpenter

21   would suffer the loss of her home and that's where the

22   incentive is.  These aren't designed for the

23   Government to make money or to cash in when somebody

24   defaults.  They're designed to secure the performance

25   of the obligations under the appearance bond.

1                And so I would submit to your Honor

2    that the risk of Mrs. Carpenter losing the home that

3    was her parents is very substantial and that Mr.

4    Carpenter would be highly motivated not to let that

5    happen to his wife.

6                Thank you for hearing me, your Honor.

7                THE COURT:  Thank you.

8                MR. BROWN:  Your Honor, if I could only

9    reaffirm that one point, and that is make no mistake,

10   putting up with this guy for 32 years takes a special

11   person, with all due respect to my client, and my

12   client has asked me to assure this court that if the

13   court thought that that was needed in addition to what

14   I suggested, there's no way, it's inconceivable in his

15   mind and from what I know of him that he would permit

16   his wife to lose really the one piece of property that

17   she really has that she can honestly call her own.

18                THE COURT:  Thank you.

19                All right.  I'm prepared to rule unless

20   the Government has a quick response?

21                MR. NOVICK:  Just a couple of quick

22   responses just to make sure the record is clear, your

23   Honor.

24                Mr. LaBelle is right in the sense that

25   the Government is not taking a position.  And I sort

1    of chaffed at the idea that there was a letter thrown

2    across the Government's bow.  I learned about this

3    preliminary injunction from -- not from the litigant,

4    the plaintiff in that case, but from somebody involved

5    with the defense.  And I reached out because I

6    certainly understand the defense position.  That's

7    clear.  I just wanted to know what the plaintiff's

8    position was, and the plaintiff made clear their

9    position.  And I understand Mr. LaBelle feels

10   strongly, but my position is, your Honor, that it's

11   not quite as clear cut.  If it was clear cut then I

12   would take -- I would come into here, into the court

13   and represent that it seems patently obvious that

14   either she does or doesn't have the right to put this

15   up there.

16            Mrs. Carpenter is the chairman of

17   Benistar Admin Services, Inc., but what counsel

18   doesn't talk about is that Benistar Admin Services,

19   Inc. was the legal employer of most of the people

20   involved in the Charter Oak Trust from within 100

21   Grist Mill Road.  Benistar Admin Services, Inc. was

22   found in the Massachusetts litigation to be the alter

23   ego of the Defendant, Mr. Carpenter.  Mrs. Carpenter,

24   although not charged here, certainly had some

25   involvement.  And again, I don't want to wade here,

 1    but I feel obliged to at least explain to the court

 2    that it's not as clear cut as certainly Mrs. Carpenter

 3    had some tangential involvement with the Charter Oak

 4    Trust.

 5              There are e-mails involving Mrs.

 6    Carpenter in connection with the Charter Oak Trust.

 7    Mrs. Carpenter was a respondent in related litigation

 8    in New York involving a property in Rhode Island that

 9    the court there found had come from some of this 30

10    million dollar death benefit, a one million dollar

11    house that was purchased on the shore of Rhode Island

12    and the litigants in New York attempted to get the

13    money, that the house was destroyed in a storm but get

14    the insurance proceeds, and they were successful in

15    getting the insurance proceeds.

16              THE COURT:  I'm sorry.  Tell me about

17    the house in Rhode Island.

18              MR. NOVICK:  There was a house

19    purchased in Rhode Island under the name of Moonstone

20    Partners in which Mrs. Carpenter was involved, and

21    Mrs. Carpenter was a respondent in litigation by

22    Universitas in New York in that case, and I believe --

23    one moment, your Honor.  I can give you -- it's in --

24    it's referenced in the decision that was attached to

25    the Government's motion.  I'll just read the relevant

1    paragraph.

2              On March 4th, 2013 the court entered an

3    order to show cause regarding petitioners' application

4    for turnover of the proceeds of property and casualty

5    insurance on certain real property purchased by a

6    Carpenter-affiliated entity with funds traceable to a

7    portion of the proceeds of life -- portion of the life

8    insurance proceeds.  The property and casualty

9    insurer, Mr. Carpenter, his wife and their affiliated

10   entity, Moonstone Partners, LLC, appeared as

11   respondents to the order to show cause.  After

12   evidentiary proceedings this court granted relief in

13   an order entered on November 20th, 2013.

14              And that's, again, not directly related

15   to this preliminary injunction but the same course of

16   litigation.  Mrs. Carpenter certainly was involved

17   with Mr. Carpenter in some of the activity that went

18   on as the chairman of the entity that -- or

19   chairwoman, excuse me -- of the entity that is at

20   least the nominal employer of many of these people who

21   work in Simsbury for these related entities that were

22   the subject both of the Massachusetts litigation as

23   well as this litigation.

24              I would just add, your Honor, that it's

25   not the Government that's making any representation

```
 1   about what happened in New York necessarily.  It's
 2   Judge Swain.  Judge Swain called his activity
 3   fraudulent.  It's not us who are coming up with this.
 4   She, in full view of both the arbitrators' finding of
 5   a fraudulent activity, a magistrate judge, and then
 6   had that entire record in front of her, made this
 7   judgment, made this finding of fraud.  And as to
 8   whether the Government ultimately decides to bring an
 9   indictment with regard to or seek an indictment with
10   regard to that activity, I'm not sure whether that was
11   an invitation or not, your Honor, I don't understand
12   that argument necessarily.  It's certainly the
13   Government's prerogative to charge or not charge any
14   particular thing, and I would say that our
15   investigation in this matter certainly is not
16   complete.
17             With regard to -- and again, it goes
18   back to Mr. Brown claiming that what we're saying is
19   all speculation and he's relying on facts.  Those are
20   the facts that were found in the New York litigation
21   and our position is essentially that the lack of funds
22   or at least the stated lack of funds that Mr.
23   Carpenter has is of his own doing, this preliminary
24   injunction that comes directly from him making these
25   -- testifying incredibly in New York, from him
```

1    essentially stealing money in the New York litigation,

2    at least how Judge Swain found.  You know, again, is

3    not of -- it's not the Government's fault that that

4    happened, and to the extent that we're looking for

5    facts here, I think that we can reliably look to the

6    court in New York who had full view of all of this and

7    made a decision, and a decision that I think was based

8    on the evidence there.

9              Your Honor, I could go on but I won't.

10   I think ultimately there are a number of

11   representations with regards to what the case is all

12   about that Mr. Brown made that I probably or

13   definitely don't agree with in terms of how the

14   industry works and whatnot, but it is a 48-page

15   indictment that the court has and I'll rely on the

16   allegations that are in that indictment.

17             But I will just close again by saying

18   it's not that the Government doesn't think that there

19   may be conditions to secure, that are capable of

20   securing Mr. Carpenter's release.  We just feel that

21   or believe that they have not been presented to the

22   court at this time.

23             Thank you, your Honor.

24             THE COURT:  Thank you.

25             What assets does the Defendant's

```
 1   daughter have?  She's got her arm up in the air.
 2                MR. BROWN:  Your Honor, she is a recent
 3   owner of a house, your Honor, she shares with her
 4   husband, and (inaudible) equity in that but -- you
 5   know, she's a responsible (inaudible), your Honor.
 6   Runs her own house.
 7                MS. MECKEL:  I would be willing to do
 8   whatever I need to.
 9                THE COURT:  You want a moment with her?
10                MR. BROWN:  If I may.
11                THE COURT:  Of course.
12                (Pause.)
13                MR. BROWN:  She just has a couple of
14   words she would like to say to the Court.
15                THE COURT:  All right.
16                MR. BROWN:  Why don't you step up here
17   and identify yourself for the judge.  Your relation to
18   the Defendant, who are you and what your relationship
19   is to the Defendant.
20                MS. MECKEL:  Good afternoon, your
21   Honor.
22                THE COURT:  Good afternoon.
23                MS. MECKEL:  My name is Caroline Meckel
24   and my --
25                THE COURT:  I'm sorry.  What's your
```

```
 1   last name?
 2                   MS. MECKEL:  Meckel, M as in Mary, E-C-
 3   K-E-L.  I am Dan Carpenter's daughter and Molly
 4   Carpenter's daughter.
 5                   My husband and I bought our first home
 6   in Simsbury, Connecticut a couple miles actually from
 7   where my parents lived and live.  I've lived in
 8   Simsbury for most of my life and wanted to be close to
 9   work and to family.  I do work for my mother.  We have
10   a family-centered business.
11                   I have very -- almost no equity in the
12   home.  We just bought it in November.  We've made one
13   mortgage payment.  I don't have a whole lot.  I have
14   more student debt and mortgage debt than I have
15   assets, but I'd be willing to sign anything that I
16   have.
17                   THE COURT:  All right.  Thank you very
18   much.
19                   MR. BROWN:  Your Honor, the only thing
20   the court didn't ask about that it may inquire about
21   is terms relative to travel, your Honor.  My client
22   certainly needs to go up periodically to
23   Massachusetts, Rhode Island and New York, and on
24   occasion, your Honor, does have business commitments
25   quite frankly throughout the United States.  I would
```

1  suggest that he generally be free to travel through

2  New England and New York and work with the Probation

3  Office by simply notifying them with the court's

4  permission if he needs to travel to Florida or other

5  states in connection with his business.  So, personal

6  -- as he mentioned, he has family down there, so for

7  personal and business reasons, your Honor.

8           THE COURT:  I'm sorry, that was where?

9  He has family in New York you said, right?

10          MR. BROWN:  He has family in New York

11 and Florida, your Honor, and I would simply state that

12 he be free to travel at least in New England, New

13 York, and if he needs to go some other place that he

14 be -- that the Probation Office be permitted, your

15 Honor, to simply -- he be required to notify Probation

16 and they can use their own judgment relative to the

17 (inaudible), your Honor.

18          MR. NOVICK:  Your Honor, I think --

19 just one moment.

20          (Pause.)

21          MR. NOVICK:  Your Honor, we're fine

22 with the same -- with regard to that piece, travel to

23 contiguous states and then anything beyond that

24 permission from the Probation department, Probation

25 Office.

```
 1                    I'd just also like to make one other
 2    point, your Honor, with regard to what Mr. Labelle
 3    said.  I'm hesitant to agree with a scenario in which
 4    we take a risk to violate a District Court order in
 5    New York and then clean it up afterwards if need be.
 6    You know, the Government has been extremely
 7    accommodating here I think in putting off arraignment
 8    after the Defendant's request, in agreeing to put off
 9    arraignment, obviously the court's permission, and
10    this order was issued on Monday.  The order to show
11    cause, the request for the preliminary injunction
12    which was issued prior to that, everybody knew this
13    was coming.  It's not like this is some unfair
14    surprise that we're having this arraignment today.
15                    So I would ask or suggest that the
16    opposite ought to be true that the house not be
17    available to be put up today, but if the litigants
18    want to seek permission from Judge Swain to do so then
19    they can to so, and counsel for the other side can
20    reply and it would be fully litigated, but rather than
21    prejudice their interests at this point.
22                    And I would just note in the
23    preliminary injunction it does reference other persons
24    who are in active concert or participation with Mr.
25    Carpenter, his entities, officers, agents, servants,
```

1   employees and attorneys.  It's a fairly broad

2   preliminary injunction in terms of who it enjoins.

3                 THE COURT:  All right.  I'm prepared to

4   rule.

5                 I want to thank all counsel for their

6   preparation and their thoroughness.  I do agree that

7   there are conditions of release available and I'm

8   going to set them.

9                 I'm going to order a Type 3B bond.  I

10  set the bond in the amount of $750,000 as requested by

11  the Government.  I am going to order the family home

12  to be posted to secure the property.  I've heard the

13  arguments obviously of everyone and considered them

14  carefully and I've seen the papers that have been

15  submitted to me.  And, you know, I'm not in a position

16  of course to make a pronouncement about the house, but

17  given the information before me which is that it

18  belonged to the Defendant's in-laws and, you know, the

19  Defendant's wife's ownership of it goes back a number

20  of years before all of these complicated proceedings

21  that we've heard about, I'm prepared to permit it to

22  be used as security for the bond.  I think that we all

23  understand that if there comes a point where there's

24  an adjudication about that and, you know, the judge is

25  of the mind that it's not available I understand that,

```
 1   you know, we come after that.  And if that comes to
 2   pass I'm sure I'll be notified immediately and Mr.
 3   Carpenter will be brought back in before me and we'll
 4   have to revisit the issue of conditions of release.
 5              He has this long, long history in
 6   Massachusetts and has been exposed there for many,
 7   many years to periods of incarceration and all the
 8   information I have before me is that he's been very
 9   faithful in meeting his responsibilities in
10   Massachusetts and I must and do take that into account
11   in making decisions about his release today.
12              I also order that the $750,000 be
13   secured by any interest his daughter has in any
14   property she owns, including the real estate she's
15   mentioned.
16              I understand the concern expressed here
17   about that all of the property falling sort of the
18   $750,000 that I have set, but I agree actually with
19   the comments made by Mr. LaBelle that what we're
20   talking about here is not so much the Government's
21   recovery of the bond as disincentive for the Defendant
22   to fail to appear here in Connecticut.  He's been
23   married for many, many years.  His wife is here.  They
24   have one adult daughter and we're tying up his, as far
25   as I can see from everything that's being presented to
```

1   me today, we're tying up all of the assets that his

2   wife and daughter have in the eventuality, which is of

3   course what we're all considering here, that Mr.

4   Carpenter stands convicted of the crimes that he's

5   accused of, that's what his wife and daughter are left

6   with.  And, you know, I'm not persuaded that Mr.

7   Carpenter would leave his wife and his only child in

8   that fix.  So that's with regard to the bond.

9                   As for the conditions of release I

10  order the following:

11                  The Defendant must not violate federal,

12  state and local law while on release.

13                  He must cooperate in the collection of

14  a DNA sample if it's authorized by statute.

15                  He must advise the court or Pretrial

16  Services in writing before any change of address and

17  telephone number.

18                  He must appear in court as required and

19  if convicted surrender as directed to serve any

20  sentence that might be imposed.

21                  He must sign his appearance bond.

22                  He shall submit to supervision by and

23  report for supervision to the United States Probation

24  Office.

25                  I understand that the representation

```
 1   has been made to me that he has no passport,

 2   nonetheless for the record I am going to include a

 3   provision that he surrender any passport.  I also

 4   order that he not obtain a passport or other

 5   international travel document.

 6                   As to travel restrictions, he is

 7   restricted to Connecticut, Massachusetts, Rhode Island

 8   and New York.  He may travel to other states within

 9   the mainland United States with the advance permission

10   of the United States Probation Office and he must

11   request that permission no less than 72 hours in

12   advance of any travel.

13                   Is there any request about restrictions

14   on witness or victim contact?

15                   MR. NOVICK:  No, your Honor.

16                   I would just add one other request for

17   a condition which would be that the Defendant be

18   obligated to comply with any lawfully issued court

19   orders in the United States or state court.

20                   THE COURT:  All right.  I'll get to

21   that.

22                   Do you own any firearms, Mr. Carpenter?

23                   MR. CARPENTER:  No, your Honor.

24                   THE COURT:  The Defendant shall not

25   possess a firearm, destructive device or other weapon.
```

```
 1    No excessive use of alcohol.  No use or possession of

 2    a controlled substance unless prescribed by a licensed

 3    medical practitioner.

 4                    Defendant shall report as soon as

 5    possible to the Pretrial Services Office or

 6    supervising officer every contact with law enforcement

 7    personnel, including arrests, questioning, or traffic

 8    stops.

 9                    And Condition S, he shall comply with

10    all court orders of course in this district as well as

11    any other federal or state court.

12                    Is there anything else we should take

13    up this morning, either counsel?

14                    MR. NOVICK:  Nothing from the

15    Government, your Honor.

16                    MR. BROWN:  No, your Honor.

17                    THE COURT:  If you'd give me just a

18    moment.

19                    (Pause.)

20                    THE COURT:  Yes.  If I didn't make this

21    clear, I should, that the wife and daughter must be

22    co-signers on the bond.  All right.

23                    Nothing else?

24                    MR. NOVICK:  Nothing, your Honor.

25    Thank you.
```

```
 1                    THE COURT:  All right.  We're in
 2   recess.  Thank you.
 3                    MR. BROWN:  Your Honor?
 4                    THE COURT:  Yes, sir?
 5                    MR. BROWN:  Could we have, I think it
 6   was probably mentioned, but the time period, could we
 7   have 10 days, your Honor, to perfect the order, your
 8   Honor, as it relates to the real estate, your Honor?
 9                    MR. NOVICK:  There's no objection from
10   the Government for that, your Honor.
11                    THE COURT:  How much -- you think 10
12   days from --
13                    MR. BROWN:  Well, I don't know.  I
14   don't do real estate bring down stuff, but I would
15   suggest --
16                    MR. NOVICK:  I think two weeks is
17   probably reasonable.
18                    MR. LABELLE:  The paperwork on the
19   Simsbury home is pretty much in place with the
20   certificates, your Honor.
21                    THE COURT:  That's right.
22                    (Voices talking over each other.)
23                    MR. BROWN:  (Inaudible) to the
24   daughter's, I had made no inquiry about that, so that
25   would take maybe two weeks.
```

```
 1                    THE COURT:  All right.  So of course
 2   Mr. LaBelle make a good point.  He passed up all of
 3   the paperwork, the paperwork that takes a lot of time
 4   appears to be done.  So I don't need to get involved
 5   in the details --
 6                    MR. BROWN:  No, you don't, your Honor,
 7   but the nature of the policy is is that the defense
 8   attorneys have to work with a certain staff person --
 9                    THE COURT:  Yup.
10                    MR. BROWN:  -- besides the U.S.
11   Attorney's Office, which we will do, that actually
12   knows more than Mr. Novick and myself put together on
13   this.  And so if we could have two weeks, your Honor,
14   to -- we'll just say February 1$^{st}$ or something, your
15   Honor.
16                    THE COURT:  I don't have a calendar,
17   but if that's acceptable to the Government --
18                    MR. NOVICK:  That's fine, your Honor.
19                    MR. BROWN:  If we need more time we'll
20   come back, but I don't think so.
21                    MR. NOVICK:  That may be a Saturday.
22                    MR. BROWN:  Then February 3$^{rd}$, your
23   Honor.  I'm sorry, you're right.  It is a Saturday.
24                    MR. NOVICK:  That's fine.
25                    MR. BROWN:  February 3$^{rd}$, your Honor.
```

1                     THE COURT:  All right.  All right,

2    February 3rd, absent objection.

3                     All right.  Thank you, Counsel.  We're

4    in recess.

5                     (Proceedings concluded:  1:58 p.m.)

1                        <u>CERTIFICATE</u>

2

3              I hereby certify that the foregoing 81

4    pages are a complete and accurate transcription to the

5    best of my ability of the electronic recording of the

6    Presentment and Arraignment Hearing in re:   UNITED

7    STATES OF AMERICA vs. DANIEL CARPENTER, ET AL.,

8    Criminal No. 3:13-CR-00226 (RNC) held before The Hon.

9    Donna F. Martinez, United States Magistrate Judge, in

10   Hartford, Connecticut, on January 17, 2014.

11

12   s/s_____          _____

13   Suzanne Benoit, Transcriber           Date

14

15

16

17

18

19

20

21

22

23

24

25