UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT


– – – – – – – – – – – – – – – x
                              :
UNITED STATES OF AMERICA      :   No.  3:13CR226(RNC)
                              :
          vs.                 :
                              :
DANIEL CARPENTER, ET AL,      :
                              :   HARTFORD, CONNECTICUT
              Defendants.     :   MARCH 3, 2014
                              :
– – – – – – – – – – – – – – – x


PRETRIAL CONFERENCE




     BEFORE:

            HON. ROBERT N. CHATIGNY, U.S.D.J.




                              Darlene A. Warner, RDR–CRR
                              Official Court Reporter

1

APPEARANCES:

2

3        FOR THE GOVERNMENT:

4            U.S. ATTORNEY'S OFFICE-NH
             157 Church Street
5            P.O. Box 1824; 23rd Floor
             New Haven, Connecticut 06510.
6            BY:  DAVID E. NOVICK, AUSA
                  NEERAJ PATEL, AUSA
7

        FOR DAVID CARPENTER:
8
             BROWN, PAINDIRIS & SCOTT
9            100 Pearl Street, 2nd Floor
             Hartford, Connecticut 06103
10           BY:  RICHARD R. BROWN, ESQ.

11       FOR WAYNE BURSEY:

12           O'BRIEN, TANSKI & YOUNG, LLP
             500 Enterprise Dr., Suite 4B
13           Rocky Hill, Connecticut 06067
             BY:  STEPHEN V. MANNING, ESQ.
14
             FOX ROTHSCHILD LLP
15           2000 Market Street, 20th Floor
             Philadelphia, Pennsylvania 19103
16           BY:  PATRICK J. EGAN, ESQ.

17

18

19

20

21

22

23

24

25

1                        10:00 A.M.

2

3           THE COURT:  Good morning.  Would you please

4      state your appearances.

5           MR. NOVICK:  For the government, David Novick

6      and Nareej Patel.  Also present at counsel table, Lynn

7      Allen from the Department of Labor, Office of Inspector

8      General.

9           MR. BROWN:  Good morning, Judge Chatigny,

10      Attorney Richard Brown, and along with me is defendant,

11      Dan Carpenter, Your Honor.

12           THE COURT:  Good morning.

13           MR. EGAN:  Good morning, Your Honor, Patrick

14      Egan appearing pro hac vice.  Local counsel is Steve

15      Manning, Wayne Bursey is present as well.

16           THE COURT:  Good morning.  This is a pretrial

17      conference.  We have pending before us a request to extend

18      the deadlines for discovery motions, jury selection and

19      the trial.  I thought this would be an opportune time to

20      talk about the nature of the case, the issues raised by

21      the indictment, what discovery will entail in terms of its

22      scope and how long it's likely to require, and ultimately

23      what would be the best schedule for submission of

24      substantive motions and jury selection and trial.  So

25      that's what I have in mind.

1          I have another matter at 11:00, but hopefully

2     we'll have enough time to make some progress this morning,

3     and if there's anything that anyone would like to raise

4     while we're together, don't hesitate.

5          Mr. Novick, to begin, would you please give me

6     an overview of the case?  Who are the alleged victims and

7     what is the conduct that you seek to have a jury consider?

8          MR. NOVICK:  Certainly, Your Honor.

9          Your Honor, the indictment charges a series of

10     conspiracy, a wire fraud and mail fraud offenses in

11     connection with the operation of a business or an employee

12     welfare benefit plan known as the Charter Oak Trust and

13     the Charter Oak Trust 2009.  It was marketed, or at least

14     conceived of, as an IRS 419(e) multiple-employer trust or

15     welfare benefit plan.  In practice it was run as a means

16     to carry out what is commonly referred to as a

17     stranger-originated life insurance scheme.

18          In short, Your Honor, the essence of what the

19     indictment charges is that the defendants, with the

20     assistance of a number of others, including outside

21     insurance agents, marketed the plan to 70-plus year old

22     individuals, essentially offering them two years of free

23     insurance following which they would be able to sell the

24     policies or have the policies revert to the investors who

25     were funding this enterprise and that the 70-plus year old

1    individuals would receive a share of the proceeds of any

2    sale of the policies.

3            The ultimate fraud here, Your Honor, is that

4    these arrangements -- again, this stranger-originated life

5    insurance hallmark is that the insurance companies were

6    unaware.  There were a number of questions on the

7    insurance applications in an attempt to ferret out whether

8    in fact these policies are being originated for the

9    purpose of resale on the secondary market, and all of

10   those questions on all of the applications in fact denied

11   the existence of an intent to sell, assign, transfer the

12   policies, and in addition denied the existence of any

13   financing or outside payment or funding of these policies

14   which again is a hallmark of this type of arrangement.

15           And in truth and indeed in speaking with the

16   insurance companies who are the ultimate victims in this

17   case, they were unaware that that was the true intent of

18   the Charter Oak Trust, and that is to procure policies for

19   resale on the life settlements market.

20           THE COURT:  The names of the companies, please?

21           MR. NOVICK:  The names of the companies Your

22   Honor are in the indictment, which I don't have a copy of

23   in front of me.  However, the principal insurance

24   companies:  Lincoln Financial Group, Lincoln National

25   Insurance Company, it was The Phoenix Companies, Phoenix

1    Life Insurance, Penn Mutual Life Insurance Company,

2    Metropolitan Life Insurance Company, AXA Life Insurance

3    Company, American National or ANICO.  I believe I

4    mentioned MetLife and Sun Life.

5          THE COURT:  Why would it be important to the

6    company to know whether the policy was this type of

7    policy?

8          MR. NOVICK:  Certainly, Your Honor.  And as the

9    indictment discusses at length, there are certain

10   assumptions that the insurance companies make about the

11   policies.  There are a number of reasons why, Your Honor.

12         One of them is that the insurance companies in

13   their underwriting tables make certain assumptions about

14   how quickly and how much in terms of premiums are going to

15   be paid in a policy.  They make certain assumptions about

16   how policies are going to last.  All of those assumptions

17   are thrown completely off by the presentation of

18   third-party investors.

19         In this case there was a hedge fund for over

20   half of the policies backing the investments by the

21   defendants in these policies.  For the policies that were

22   not backed by a hedge fund, the defendant, Mr. Carpenter

23   had a company that was financing these policies.

24         And so in truth, the assumptions that the

25   insurance companies make are thrown off because, as it

1    stands, investors have different considerations when

2    determining whether to stop payments on a policy than an

3    individual.  An individual may decide that they don't need

4    insurance at a certain point, and so a lapse rate is built

5    into the assumptions.

6            There are -- to give you another example, Your

7    Honor:  In most cases individuals will choose a -- for

8    universal life insurance policy -- will choose a level

9    payment over the life of a policy because people like

10   predictability, and oftentimes a level payment of premiums

11   over a period of time builds up what's called a cash value

12   in the insurance policies and that cash value earns

13   interest for the policyholder but also is a source of

14   capital for the insurance company which they can then, in

15   turn, invest in other either traditional investments or

16   put it back into the insurance that they decide to write.

17           In a life -- in a hedge fund or a stranger

18   investment scheme, like stranger-originated life insurance

19   investment scheme such as this one, it's in the interest

20   of the investors to fund the policies to as low a degree

21   as possible because the investors want to put in as little

22   as possible because they know they're going to sell the

23   policies after two years.  And so the -- again the

24   expectations when pricing these policies for the ultimate

25   end user, they can't -- the insurance companies can't

1    adequately assess or understand how much revenue they're

2    actually going to make from a particular policy.

3           The policies also pay out commissions at a

4    higher rate because these -- the fact that they're writing

5    these policies that would otherwise not have been written,

6    they are going to pay out these commissions to a higher

7    degree than they would have otherwise agreed to write.

8           In many of these cases, Your Honor, as the

9    indictment discusses, the individuals' net worth and

10   income were inflated and again causing the insurance

11   companies to decide or agree to write policies to a much

12   higher degree than they would otherwise have chosen.

13          Insurance companies will often say, Your Honor,

14   that insurance is not meant to be a wealth creation

15   device, it's meant to be a wealth preservation device.

16   And there are certainly reasons for that from an estate

17   planning perspective.  Someone who expects when they die

18   that they don't want their heirs, their children, to have

19   to sell off all the family assets in order to pay the

20   estate taxes, they may take out a significant life

21   insurance policy to protect them for that.  But for them

22   to have that basis or the justification to be written by

23   an insurance company, to do that, they would need to have

24   the wealth to support that.  And the insurance company is

25   simply not going to write a 5 million-dollar life

1    insurance policy on someone whose net worth is only half a

2    million dollars.  Again because these vehicles -- these

3    are vehicles that are not pure investment vehicles,

4    they're not designed to simply be wealth creation devices

5    for individuals.

6          Those are some of the reasons, Your Honor, that

7    are discussed in the indictment.

8          THE COURT:  Is it the government's claim that

9    had the information requested by the form been provided,

10   the policies would not have been written?

11         MR. NOVICK:  That is the claim, Your Honor, yes.

12         THE COURT:  What is your view of how long

13   discovery is reasonably going to take in this case?

14         MR. NOVICK:  Your Honor, if I may, let me tell

15   the Court where we have -- what we've turned over at this

16   point and what we expect the future may hold.

17         We've turned over at this point approximately

18   300,000 documents to the defense in the form of

19   concordance or loadable database files to the defense

20   which we've created through scanning all the documents

21   that we've received and processing any electronic files

22   that we've received.

23         There are other documents, in discussing with

24   the defense, they agree to have us use the Department of

25   Justice's processing facility, which obviously will make

1    this cheaper for the government and the defense who

2    doesn't have to go through their own databasing process.

3    It will presumably make it more efficient to actually

4    review the documents when we get them.

5            There are other documents that are currently in

6    South Carolina being scanned and processed that I hope to

7    be able to turn over to the defense shortly.  They aren't

8    on the same scale as the 300,000 documents that have been

9    turned over thus far.  However, there are still

10   significant disclosures to be made.

11           The larger disclosures that are ultimately going

12   to be made are in the form of forensics.  There were

13   several search warrants executed back in 2011 in

14   connection with this case and in fact there were other

15   search warrants that were executed in an unrelated case in

16   April of 2010, which we also have those drives, had

17   executed search warrants for those drives.  And so there

18   are a number of -- all my way of saying there are a number

19   of drives that either have been forensically processed or

20   in the process of being, you know, put through that

21   forensic process.

22           I don't expect, Your Honor -- and I've told the

23   defense this already -- that the government will process

24   every drive that was seized.  I think it would be a poor

25   use of government resources, especially where it's less --

1   given the time that it takes to process each drive and

2   each subset of each drive, and there are several servers

3   involved.  But we are going to look at the ones we think

4   are most likely going to contain evidence relating to the

5   case.

6          We have told the defense that if they want to

7   process all these drives themselves in the event that

8   there may be other material on them that's relevant to

9   them, then we will provide them with a copy of all the

10  images that we've taken.  They haven't taken me up on that

11  offer yet, but that still stands.

12         In the meantime, everything that we process, we

13  turn over copies to the defense, obviously, and I think

14  that will be the source of the significant amount of

15  future discovery.  And in particular there are three or

16  four servers that are in the process of being processed,

17  and we're talking about servers that contain -- you know,

18  the one that is being processed right now has a couple

19  million emails.

20         Now, all that is not going to be relevant, and

21  we're using search terms and other methods to limit down

22  the number that we actually end up getting, but that's why

23  it's taking awhile to get finished.

24         THE COURT:  Whose servers are these?

25         MR. NOVICK:  The defendants' servers, Your

1    Honor.

2              THE COURT:  And the drives?

3              MR. NOVICK:  The search warrants that were

4    executed were two locations that are controlled by the

5    companies, the defendants' companies in this case, and

6    those were at 100 Grist Mill Road in Simsbury and 100

7    First Stamford Place in Stamford.

8              There was also a search warrant executed at the

9    offices of the hedge fund we just mentioned, which was

10   also in Stamford.  We've turned over some material that

11   we've been able to process from that location.  But that

12   is ongoing.

13             There was an additional set of search warrants

14   executed down in Texas at one of those outside insurance

15   agents that I mentioned earlier, Robert Pacini, and those

16   still have to be processed.  There's a privilege issue

17   with those, Your Honor, that we're trying to work out with

18   counsel down there that I'll likely seek a protective

19   order from the Court at some point in the future, which I

20   will put on paper so that we can make the requisite

21   discovery disclosures without violating the privilege of

22   anybody else.

23             So in speaking, Your Honor, with counsel,

24   obviously it's not in the government's interest that the

25   defense not have the opportunity to look at everything,

1    and there's a significant amount of discovery that's

2    already been turned over.  In speaking with counsel,

3    government does not have an objection to setting a jury

4    selection date into next year with an understanding that

5    we would set a motion schedule at whatever the Court deems

6    appropriate, hopefully this year, to resolve the issues.

7    And I suspect based on prior conversations there had been

8    motions with regard to the search warrants that were

9    executed and whatever else the defense deems appropriate.

10           But I do understand that there's a significant

11   amount of discovery and that if after that period of time

12   or as it gets closer to the time that the jury selection

13   date would approach, there is a reason to put it over

14   further because there's more material than was expected,

15   then the government won't have an objection to that.

16           The only caveat that I offer the Court, frankly,

17   is that because of the nature of the scheme where most of

18   the -- all the insureds, Your Honor, at this point are in

19   their late 70's and into their 80's, it may become

20   important or it may become necessary to take criminal

21   depositions of these witnesses if in fact the trial is

22   going to get pushed out beyond where either there's a risk

23   that some of these necessary witnesses may not be able to

24   testify at that point, either because of ill health or

25   because of inability to travel to Connecticut.

1        And so obviously I'll make a motion to the Court

2   at the appropriate time if we think that the trial's at a

3   point where that may be necessary.  And again, we are in

4   the process of taking surveys of those individual insureds

5   to see if any are at that point, and we'll of course

6   report back to the Court depending on what we think is

7   appropriate.

8        THE COURT:  I think that in a case like this, it

9   can be helpful to focus on the documents that the

10  government would rely on to prove its case and make

11  determinations about the scope of discovery in light of

12  that set of documents rather than trying to approach it in

13  an open-ended way speaking in terms of, you know, millions

14  of emails, because otherwise it's very difficult to get

15  the case ready to try.

16       MR. NOVICK:  I completely agree, Your Honor.

17  We've taken great pains, in particular, the forensic area

18  to limit the documents that are a part of those

19  disclosures.  And, frankly, it's part of what we see as

20  well based on search terms that are relevant to the case.

21  I can't say that succeeds in all events, but by and large

22  that's what we've done.

23       With regard to the paper documents which make up

24  at least a large portion of the discovery, that's already

25  been turned over.  Those are in varying -- for example,

1    Your Honor, the insurance files for just the insureds'

2    cases that were a part of or applied for within the

3    Charter Oak Trust.   There are documents from the insurance

4    trustee who maintained a lot of the documents, the files,

5    that concerned the Charter Oak Trust.

6          So whereas I agree, Your Honor, obviously we're

7    not going to put in 300,000 documents at trial -- there

8    are, I would say, a high degree of the documents that have

9    been turned over are at least relevant to the case here,

10   whether or not they actually become a part of the trial

11   itself.   So I suspect the defense will want to have an

12   opportunity to look at them, and we continue to try to

13   narrow those search terms to try to get the documents.

14         The risk of course is, Your Honor, that if we

15   produce just what hits on the search terms, if we narrow

16   the search terms too much, of course it is obvious the

17   risk that we're going to either miss something that the

18   government would want to see and/or the defense would want

19   to see.   And so we have to be conscious of that as well.

20   But it's an ongoing process to try to limit down the

21   material.

22         I'll also say that when the search warrants were

23   first executed, the defense was given the opportunity or

24   at the time the targets, the companies were given the

25   opportunity to come in and look at the material, at least

1      the paper copies of the material, flag a number of

2      documents that they thought was outside the scope of the

3      search warrant, which I'm sure will be the subject of some

4      motion in the future.

5               But what I would say, Your Honor, is that we

6      have returned a number of documents that on our own

7      analysis decided that whether or not it was outside the

8      scope of the warrant, it was determined that we didn't

9      need it for the case going forward.  So we have taken

10     pains to not have more than was necessary in what we've

11     turned over.

12              And the last thing I'll say, Your Honor, is that

13     the hope in using Concordance or Summation or Relativity,

14     one of those databasing programs, is that it will

15     significantly limit the time or ameliorate the time that

16     is necessary to go through this material.  It's not just

17     going to be reading through material, but targeted

18     searches can be done.  So hopefully it's not just

19     somebody, an associate, sitting in the room for the

20     defense trying to read 300,000 documents.

21              THE COURT:  When would you be ready to try the

22     case?  Putting aside the defendants' concerns about

23     discovery, focusing strictly on your own burden of proof

24     and when you would propose to meet it.  When do you think

25     you would be ready to go?

1           MR. NOVICK:  I think that that time schedule is

2    fine with the government as well, Your Honor.  In early

3    February, March of next year.  Because obviously the

4    government wants to have access to the remaining items

5    that have been sent down to South Carolina and that are in

6    the process of being analyzed forensically, and I think

7    that a critical mass will be reached at that point where I

8    think the government will be prepared to proceed.

9           We obviously could be prepared to proceed

10   whenever the Court deems it appropriate, but I think that

11   the dates that have been discussed with the defense are

12   appropriate given the complexity of the case.

13          THE COURT:  All right.

14          Mr. Brown what do you think is a realistic

15   schedule for this case?

16          MR. BROWN:  I would concur in a sense that in my

17   opinion -- I have other comments to make, but as it

18   relates to the Court's inquiry, a minimum of a year, and

19   to me it would be closer to 18 months, Your Honor, from

20   today would be a realistic period of time.

21          I might say for the record that my client's

22   anxious to have this trial.  If we could, we'd have it

23   tomorrow morning, but I have to hold him back because

24   there's no way I could possibly be prepared.

25          The government's had approximately two to three

1    years' head start.  They were looking into this case as

2    far back I think as 2010, 2011, somewhere in that

3    ballpark, and have spent a significant amount of time

4    since then, several agencies, reviewing documents,

5    strategizing and doing what they had to do to prepare

6    their case for the indictment and eventual trial.

7            So I don't need as much time as they have, but I

8    honestly, in doing a job for my client, would feel that I

9    couldn't do a job if I didn't have at least somewhere

10   between 12 to 18 months at this point.

11           Attorney Egan did run an examination of the

12   drive given to us, and so far we've come up with 305,000

13   documents that consist of 11 -- 1.1 -- 1.2 million

14   documents -- pages, I'm sorry.  Obviously much of that may

15   be irrelevant to the trial, but until we get some sense

16   and some handle on it, there's no way of knowing which

17   pages we're referring to as irrelevant and which are

18   material.

19           So that's the way that we see that.

20           Counsel is correct.  We do have a series of

21   motions which we intend to file.  We would probably like

22   to do that somewhere between four and six months out.  I

23   don't think I want to wait a year for those.  We believe

24   some of those may be dispositive.

25           To give the Court some idea how close we are

1    between us and the government, the government obviously

2    believes two things:

3              One, that crimes have been committed; and two,

4    that these gentlemen at this table committed said crimes.

5              We don't even agree that a crime has been

6    committed.  This is not like a bank robbery or selling

7    drugs.  We're not satisfied that the government will be

8    able to demonstrate that in fact a crime or crimes have

9    been committed.

10             The government referred to this concept of STOLI

11   stranger-originated life insurance contracts.  Meaning

12   that simply these are contracts for insurance, Your Honor

13   that ultimately may be sold on the open market, that they

14   have a life interest -- I'm sorry, a residual interest in

15   terms of value that other people, investors, may be

16   interested in.

17             The Court should know, Your Honor, that first of

18   all the most fundamental concept is that STOLI type life

19   insurance is not illegal.  It's not a crime, it's never

20   been a crime, and I don't think the government even claims

21   that it's a crime.  And in fact insurance companies

22   historically have sold such policies.

23             It's true that recently, whatever you want to

24   define that as, 2006, 2007, 2008, certain companies want

25   to take a closer look at what they perceive to be STOLI

1   type of contracts, but insurance companies themselves

2   engage in such conduct.

3            So that we have this real problem from the

4   getgo.

5            THE COURT:  Government says they can prove

6   material misrepresentations were made.

7            MR. BROWN:  No, no, I understand that.  But I

8   simply want to point out to the Court, Your Honor, that

9   merely because a contract is STOLI doesn't mean that it's

10  illegal and it doesn't mean that my clients have violated

11  any laws.

12           THE COURT:  It would be the government's burden

13  to prove that fraud was committed, meaning that the

14  defendants willfully engaged in what they knew to be

15  criminal conduct, and it's the government's burden to

16  prove that beyond a reasonable doubt.  You have no burden

17  whatsoever.

18           MR. BROWN:  Yes, Your Honor.

19           THE COURT:  None at all.

20           MR. BROWN:  I appreciate that.

21           I would also want to point out that the Court

22  asked earlier about, well, had the government -- I'm

23  sorry, had the insurance carriers known of this type of

24  funding, would that have caused them not to issue the

25  policy, and it's the position of the government that,

1    yes -- and they just told the Court that.  And that's not

2    an accurate statement.  Not accurate at all.

3            It's a factor that goes into consideration.  But

4    we have evidence already given to us by the government

5    from people who they may use at the trial that don't

6    necessarily agree merely because of the nature of the

7    funding, because that's all we're talking about there.  Is

8    it by the insured himself?  Is it by a family member?  Is

9    it by a bank?  Is it by some private institution?  For the

10   funding of it.

11           It goes into the consideration, but it is not

12   dispositive based upon evidence that's already been

13   provided to us, and we already knew before that, that

14   necessarily they would turn it down.

15           In addition to that, Your Honor, it's our

16   position -- again, one end of the spectrum and the other

17   is -- that the victims are not those places with the big

18   buildings known as insurance companies, as we have several

19   here in Hartford, but these gentlemen sitting at this

20   table that will be our position to show that they made an

21   awful lot of money while at the same time my client and

22   others lost a lot of money.

23           So I bring this up, Your Honor, because it's not

24   the day for the trial, just to give the Court a little

25   flavor where we're headed on this thing.

1           I'm personally learning a lot about life

2    insurance that I never knew and may not care to know again

3    in the future.  But I think it is important for the Court

4    to know that we're not close in that respect in agreeing

5    that there has been a crime committed or that the victims

6    are the carriers versus ourselves.

7           THE COURT:  In broad outline, Mr. Brown, this

8    case has some of the characteristics of a case that I

9    inherited I guess it was probably a year and a half ago.

10   It was a fraud case.  It had been pending at that point

11   for over two years, maybe close to three years.

12          When I first received it, I had a conference and

13   I was told that the case encompassed scores of millions of

14   documents, that millions of dollars had been spent to that

15   point in the case, and that discovery was barely underway

16   and that the case would be very difficult to get ready for

17   trial in less than a year.  Like this one, there were lots

18   of victims.  Like this one, the defendant said that no

19   crime was committed.  They were victims.

20          Ultimately the case went to trial, and I can't

21   tell you how many pages of documents were displayed to the

22   jury, but it was perhaps a couple of thousand tops.  The

23   government undertook to prove that certain transactions

24   were representative of the frauds alleged in the

25   indictment and the government undertook to prove that the

1       transactions were very similar in nature, they were

2       representative therefore of the alleged schemes.

3              My point here is that what came to me as this

4       vast, unmanageable case, turned out to be actually just

5       another fraud case, and it's regrettable that it took

6       years and millions of dollars to bring that case to trial.

7       This is why I think it's better to look at what the

8       government is going to offer at trial and then decide what

9       needs to be done in light of that.

10             MR. BROWN:  Well, Your Honor, that's true, but

11      the problem I have with that theory is -- and quite

12      frankly I've worked with Mr. Novick in the past.  I think

13      we have a good relationship, and I feel that we can do a

14      lot of things informally that will help expedite the

15      obtaining of the documents and the reviewing of the same.

16      The problem is I'm not doing my job if I simply rely upon

17      the government's judgment as to what they perceive to be

18      important or not important.

19             THE COURT:  I heard that very same statement

20      from counsel for the defendants in the other case, and I

21      appreciate your position, Mr. Brown.  Again, you have no

22      burden at all, as you well know.  You don't have to say a

23      word at this trial if you don't want to.  The government

24      has to prove its case beyond a reasonable doubt.

25             They have to prove, first of all, false

1    statements, right?  As Senator Moynihan said, everybody's

2    entitled to his own opinion but not everybody's entitled

3    to his own facts.  Either there were false statements or

4    there weren't, and it's the government's burden to prove

5    that false statements were made.

6            Am I right, Mr. Novick?

7            MR. NOVICK:  That's right, Your Honor.

8            THE COURT:  In the other case, the defendants

9    said false statements were made but they weren't materials

10   because the banks -- this was a mortgage fraud case --

11   because the banks were complicit in the fraud.  Yes, we

12   lied, yes, we omitted information, but they didn't care.

13   They would have issued the mortgages anyway.  That became

14   the next focus of attention, you know, was it material?

15           Again, it's the defendants right to put the

16   government to its burden of proof.  The defense has no

17   burden at all.  The government has to prove that the

18   information was material, right?

19           MR. NOVICK:  That's right, Your Honor.

20           THE COURT:  Okay.  So that's where I think our

21   focus needs to be.  Were there misrepresentations?  Were

22   they material?  How many documents is the government going

23   to rely on?  What is the scope of the proof that the

24   government is going to rely on?

25           The defendants have an opportunity to meet that,

1   but I don't think we should say it's going to take two

2   years for the defendants to figure out whether there were

3   lies or not, whether they were material or not.  That

4   doesn't need to be the case.

5          MR. NOVICK:  Your Honor, if I may, I assume

6   we're talking about the Rivernider case.

7          THE COURT:  Correct.

8          MR. NOVICK:  I don't think this is going to be

9   as complicated as that matter.  Government will argue that

10  it's actually a very simple case, that the

11  misrepresentations are very straightforward.

12          The misrepresentations, frankly, are pled in

13  great detail.  The indictment in this case is 48 pages

14  long.  The misrepresentations and what the nature of them

15  are is pled in very great detail in the indictment and,

16  it's not very difficult, I think, for the defense to go

17  back and look at.

18          The core misrepresentations are really going to

19  be the insurance applications in this case and the core

20  wires and mailings in furtherance thereof are going to be,

21  you know, either the faxes of the applications, the

22  emailing of the applications or the, you know, emails

23  or -- in relation to money wires or money wires

24  themselves.

25          So I think that the core of what the case is is

1   very much there and can be easily searched for.

2              THE COURT:  Is it there now?  Is it on the table

3   now?

4              MR. NOVICK:  Principally it should be in those

5   databases that the defense has access to now.  I would say

6   that -- to give Your Honor an idea of just the scale,

7   there are 84 policies in the Charter Oak Trust, so

8   potentially 84 sets of misrepresentations.

9              Now, in the indictment, we have chosen 12 that

10   have been specifically articulated or enumerated,

11   understanding that the conspiracy count would encompass

12   all 84 of those policies over 76 different insureds.  And

13   it is possible, I would say likely, that we will have

14   evidence with regard to a few of the others that aren't

15   specifically enumerated.

16              And again, part of that will depend when we go

17   to trial, the availability, if you will, of the insureds,

18   and potentially the other evidence in the case.

19              THE COURT:  There are 12 insureds?

20              MR. NOVICK:  Twelve insureds enumerated in the

21   indictments and 76 insureds overall who would potentially

22   be witnesses.

23              Now, I am -- I would be not doing an effective

24   job on behalf of the government if I called 76 insureds to

25   testify, and so we will certainly be picking and choosing,

```
1   again as time goes on and as I understand, A, who's going
2   to be available to testify at trial; and, B, what the
3   defenses are going to be offered.
4           Now, Your Honor specifically mentioned, which I
5   think is correct, the two questions here, which is, number
6   one, is the -- you know, are these misrepresentations?
7   And number two, is it material?
8           And in varying times in conversation with
9   various counsel, either for the defendants themselves or
10  for the companies in question, I've heard different
11  things.  I certainly have met with counsel in the past to
12  try to discuss this pre-indictment to understand really
13  what the defense is.
14          It may be materiality.  It may be the veracity
15  of the statements themselves.  And I don't know that I a
16  hundred percent know what the defense is going to be at
17  that point which will drive, in some part, who the
18  witnesses are that we're going to need from the insurance
19  companies.
20          I use as an example, but just by way of an
21  example, a recent trial in the Southern District of New
22  York, the Binday case, B-I-N-D-A-Y, where again the
23  Court's decisions prior to trial with regard to some of
24  the motions, in particular jury instructions, drove who
25  the appropriate people were to testify on behalf of the
```

1    insurance companies at the trial.

2         And so I think a lot of that will play out as

3    the defense has an opportunity to go through the documents

4    to identify what their theory of the defense is and

5    understanding that they have no burden here.

6         But again it -- you're correct, Your Honor, I

7    could simply put on the insurance companies, the insurers

8    and the applications and make my case, but I also have to,

9    if I'm doing my job, anticipate or understand what the

10   defense is going to be allowed to argue, what the theory

11   of the defense is, and it may be multiple things, again in

12   conversations.  I don't know that I'm certain about that.

13        I'd also add, Your Honor, that as Mr. Brown

14   suggested, that there are going to be a number of motions.

15   I don't know if I agree with the idea that they'd be

16   dispositive motions, but certainly motions I suspect

17   having to do with search warrants, having to do with the

18   indictment itself, and I don't know that they need six

19   months to do that, but I don't begrudge Mr. Brown his

20   assessment of what he needs to get there.

21        So again, Your Honor, I do think that in some

22   respects it's straightforward.  I would argue it's

23   straightforward, and I think that the defense here is

24   going to try to poke at whether it's that straightforward

25   as often happens in these types of cases.

1          And I think, if I may understand the defense's

2     argument to some extent, which is that we have had -- I

3     wouldn't say that we've had these documents for as long as

4     they say we have.  We certainly had some of them for some

5     period of time.  There have been some privileged

6     litigation pre-indictment in this case, and it was only

7     very recently that we were able to resolve a fair bit of

8     that privileged litigation through entering into a

9     Rule 502 agreement in front of Judge Hall as the grand

10    jury judge in that matter in that case, enabling us to

11    then have access to a number of documents that were sort

12    of held up in this what otherwise would have been a

13    document-by-document privilege review.

14         So it's moving a lot more quickly than it had

15    been, but again, I don't -- it's not in the government's

16    interest here, Your Honor, to delay this any longer than

17    is absolutely necessary.

18         THE COURT:  It's not in anybody's interest.

19         MR. NOVICK:  And so I am sensitive to Your

20    Honor's experience with Rivernider.  I understand that,

21    and certainly I'll consult with Mr. Durham and see if

22    there are things that he learned in that case that would

23    be helpful in moving this case forward as quickly as

24    possible.

25         THE COURT:  All right.

1          MR. BROWN:  If I may, Your Honor?  I just would

2     want to note, Your Honor, that again the time is needed

3     because of the fact that truthfully I don't even know what

4     we have at this point much less which parts are relevant

5     or not relevant.

6          We're not interested in delaying this case any

7     more than we need to.  It's of great concern to my client

8     to be exonerated sooner rather than later.

9          We were not involved with the applications

10     themselves.  There was fraud in this case, there's no

11     question about it.  The insureds lied, the agents -- the

12     agents, people licensed by the so-called victims, I like

13     to call them complainants at this time until it's been

14     established that they lost something that they were

15     entitled not to lose.  At this point they're complainants,

16     not victims.

17          But my client was not involved with that

18     process, Your Honor, and his name's not on those

19     applications.

20          So that I feel, Your Honor, the time period is

21     such -- I might add, if we get done early, we'd be happy

22     to come back to the Court and say, you know, we don't even

23     need all this time.

24          THE COURT:  Well, what I would like to do is

25     give Mr. Egan a chance to be heard and then I'm going to

1   leave you to confer on a proposed schedule, and you'll

2   need to persuade me that it's appropriate.

3            Under the Speedy Trial Act, I have an obligation

4   to move this case to a trial as soon as reasonable in the

5   circumstances, and so I'm going to ask you to confer about

6   what makes sense and then I'll give you an opportunity to

7   persuade me that you actually need that much time, and

8   then we'll set that schedule and that's going to be it.

9            You know, letting matters drift doesn't serve

10  anybody's interest.  I think it's important to focus on

11  what Mr. Novick has just said.  Consistent with the

12  indictment, you've got 12 insureds, that's the core of the

13  case, let's proceed from there.

14           The trial is not about or should not be about

15  stranger-originated life insurance policies in the

16  abstract or how the insurance industry operates in

17  general.  The question is were material misrepresentations

18  made in violation of the criminal laws of the United

19  States in respect to those 12 people, not 80-whatever, but

20  those 12.

21           I mean, I understand that the indictment

22  encompasses a conspiracy, not just those 12, but the focus

23  needs to be on the core of the case, that's my point.

24           MR. EGAN:  Thank you, Your Honor.

25           I don't have a lot to add.  Your Honor clearly

1    understands the nub of the case.  And like all cases, it

2    seems extremely complicated, but then when it gets down to

3    what really matters, it tends to be relatively simple.

4            But regardless of that fact, there are a number

5    of documents that are critical to the defense to look at

6    and analyze carefully.  In particular, these insurance

7    companies spent a lot of time analyzing these particular

8    claims and approving these policies.  And among the

9    million pages that we received are the files from the

10   underwriting, and we have to review those carefully and

11   determine whether or not there might be materials in there

12   that would be germane to any type of motion that we might

13   want to file.

14           I would suggest to the Court, while I can

15   certainly understand your concerns that, you know, you

16   give lawyers time, they fill it up and then they come back

17   and say, hey, we want more.  I mean it happens in every

18   case.  But I would suggest that the time period that's

19   been suggested by the government would actually be -- and

20   Mr. Brown -- would actually be appropriate because there

21   will be significant pretrial motions in this case.  They

22   will require extensive briefing.

23           THE COURT:  On what subjects, Mr. Egan?

24           MR. EGAN:  Your Honor, it is my view that -- and

25   we may very well have a motion to dismiss the indictment

1    based upon whether or not it makes out a case in terms of

2    materiality, whether this type of a claim is actually

3    sufficient to meet the government's burden that's there.

4    We haven't discussed whether or not what's happening with

5    regard to Brady materials.  I've received some materials

6    from the government that I would classify as Brady, but I

7    haven't made a Brady request yet.  We haven't gotten into

8    that issue.  And certainly, Your Honor, there will be

9    extensive litigation on motions to suppress the search

10   warrant.

11        So it's my view that even if we had a motion

12   schedule that required us to file motions in three months,

13   which I think would be fairly accelerated, by the time we

14   brief that and government responds and then we respond and

15   then the Court has time for the clerks and Your Honor to

16   consider, you know, if you build that into the situation,

17   plus jury instructions are going to be critical in this

18   case as they were in Binday as suggested by Mr. Novick,

19   then I think we would want to have an extensive briefing

20   on that issue as well.

21        I really don't think 12 months, Your Honor, is

22   asking too much, understanding that Your Honor would be

23   firm in terms of when we would actually, you know, have to

24   try the case.

25        So that's all I would like to add.

1          THE COURT:  The Binday case is a case similar in

2     nature to this one?

3          MR. EGAN:  The difference between the Binday

4     case and this case, it was the insurance agents who were

5     actually making the misrepresentations.  In this case, our

6     clients were essentially working for what was a multiple

7     employment welfare benefit, MEWA, which is a plan under

8     the IRS that involves a trust and the trust purchased --

9     or the trust -- I'll get in trouble if I don't do this

10    properly, so I don't want to get into too much detail.

11    But essentially these insurance policies were placed in

12    the trust, and then the insurance policies became -- the

13    trusts became the owner of the insurance policies.  And

14    there is a totally different layer in terms of what in

15    particular my client was aware of and was involved in with

16    regard to the policies as opposed to the insurance agent

17    out on the street.  The insurance agent out on the street

18    is asking the questions and fills outs the applications

19    knows full well what he's asking and what he's putting on

20    an application.  And there's a significant distinction

21    there.  And I would note and to my knowledge none of the

22    insurance agents on the street have been charged.

23          So there's a lot of issues, understanding that

24    materiality is where the rubber hits the road.  But there

25    are a lot of issues and I think that we do need adequate

1     time to fully prepare and defend our clients' interest.

2              THE COURT:  Thank you.

3              Mr. Novick, who are these agents that Mr. Egan

4     mentions?

5              MR. NOVICK:  Your Honor, some outside agents,

6     some agents who were internal to the Charter Oak family,

7     if you will, of companies.  And as to whether any of them

8     will be charged or what the parameters of that would be,

9     I'm not going to say at this point.

10             THE COURT:  Have these folks been interviewed?

11             MR. NOVICK:  In some cases yes, in some cases

12    no, because their lawyers have not permitted such

13    interviews.

14             I mentioned one in particular down in Texas

15    where the offices were searched.  And again whether those

16    charters are brought, I can't say at this stage.

17             There was one agent who worked -- who did sell

18    several policies but who was an employee of the

19    defendants' company.  That was Joseph Edward Waesche.  He

20    has been charged and that was another case.  He's actually

21    pleaded guilty in another case before Your Honor that is

22    pending sentence.

23             THE COURT:  What is his name?

24             MR. NOVICK:  Joseph Edward Waesche,

25    W-A-E-S-C-H-E, IV, and he has pleaded guilty to a

1    conspiracy count, a 371 count in connection with his

2    involvement in this case.

3            THE COURT:  All right.  Well, I'm going to ask

4    you to please confer on a proposed schedule, and I have a

5    meeting at 11:00, but if you could do that, I would hope

6    to reconvene and hear what you have to say and proceed

7    from there.

8            MR. NOVICK:  Your Honor, I have -- and I'm happy

9    to do whatever is at the Court's convenience.  I have a

10   new arrest presentment at 11:45 in front of Judge Martinez

11   on a new case actually assigned to Your Honor, which I'm

12   sure I should probably get to, and I can return to Your

13   Honor before that -- right after that, if that's okay.

14           THE COURT:  Yes.

15           MR. NOVICK:  Thanks, Your Honor.

16           MR. BROWN:  Excuse me, Your Honor, before we

17   adjourn, I was just wondering, would it make sense for us

18   to confer and submit in writing our proposal?

19           THE COURT:  If that's agreeable to --

20           MR. BROWN:  That way there we could do that in

21   the next 48 hours, Your Honor.

22           THE COURT:  If that's how you'd like to proceed

23   it's all right with me.

24           MR. BROWN:  Thank you, Your Honor.

25           THE COURT:  Thank you.

1                    (Proceedings adjourned at 10:59 a.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3              In Re: U.S. vs. CARPENTER, ET AL

4

5

6         I, Darlene A. Warner, RDR-CRR, Official Court

7   Reporter for the United States District Court for the

8   District of Connecticut, do hereby certify that the

9   foregoing pages are a true and accurate transcription of

10  my shorthand notes taken in the aforementioned matter to

11  the best of my skill and ability.

12

13

14

15
              /s/_____
16
                  DARLENE A. WARNER, RDR-CRR
17                  Official Court Reporter
                  450 Main Street, Room #223
18                Hartford, Connecticut 06103
                      (860) 547-0580
19

20

21

22

23

24

25