UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
H-13-1

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 3:13CR226 (RNC) |
| v. | VIOLATION: |
| DANIEL CARPENTER and WAYNE BURSEY | 18 U.S.C. § 1349 (Conspiracy to Commit Mail and Wire Fraud) 18 U.S.C. § 1343 (Wire Fraud) 18 U.S.C. § 1341 (Mail Fraud) 18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering) 18 U.S.C. § 1957 (Illegal Monetary Transactions) 18 U.S.C. § 1956 (a)(1)(A)(i) (Money Laundering) 18 U.S.C. § 2 (Aiding and Abetting) |

SUPERSEDING INDICTMENT

The Grand Jury charges:

GENERAL ALLEGATIONS

The Defendant and Relevant Entities

At all times relevant, unless otherwise specified:

1.      The Subject Entities were a group of related businesses operating principally from Simsbury, Connecticut (the "Simsbury Office"), and/or Stamford, Connecticut (the "Stamford Office"), that were primarily engaged in the business of, among other things, designing, installing, marketing, selling, and administering employee welfare benefit plans.

2.      Defendant DANIEL CARPENTER ("CARPENTER") was in control of the Subject Entities both in effect and, in many cases, through direct or indirect ownership interests. CARPENTER maintained his principal place of business at the Simsbury Office.

3.      Defendant WAYNE BURSEY ("BURSEY") worked for and on behalf of the

Subject Entities, often as an officer and/or member of one or more of the Subject Entities and as the "trustee" of certain employee welfare benefit plans promoted by the Subject Entities.

4.     J. Edward Waesche IV ("Waesche"), charged separately, was an insurance agent licensed by the State of Connecticut to sell life insurance, and who worked for and on behalf of the Subject Entities. Waesche maintained his primary place of business at the Stamford Office, but interacted frequently with employees at both locations.

5. Lincoln National Corporation ("Lincoln"), The Phoenix Companies ("Phoenix"), The Penn Mutual Life Insurance Company ("Penn Mutual"), Sun Life Assurance Company of Canada ("Sun Life"), AXA Equitable Life Insurance Company ("AXA"), American National Insurance Company ("ANICO"), Jefferson Pilot Financial ("Jefferson Pilot"), Metropolitan Life Insurance Company ("MetLife"), and Trans America ("TransAmerica"), along with their subsidiaries, related entities, and affiliates (collectively the "Life Insurance Providers" or "Providers"), issued life insurance policies on individuals' lives based upon applications that contained material misrepresentations knowingly made or caused to be made by CARPENTER, BURSEY, Waesche, and other co-conspirators not named in this Indictment, and were financially harmed in issuing such policies. Lincoln was a recipient of funds from the United States Government's Troubled Asset Relief Program, the bailout program created in 2008 in response to the financial crisis.

Background Regarding Life Insurance Policies

6.     A life insurance policy is a contract between a life insurance company and a policy owner and/or insured. A policy normally requires the insurance company to pay a sum of money to the insured's beneficiary, who is often a relative of the insured, upon the insured's death. This sum of money is commonly referred to as the "death benefit." To put in force and

2

maintain the validity of a policy, the insured usually makes periodic payments, known as premiums, to the insurance company throughout the policy period.

7.     At all times relevant to this Indictment, the Life Insurance Providers took the position that the death benefit − the amount paid to beneficiaries upon the death of the insured − should correspond to the amount of money that an insured's dependents or heirs would need in the event of the insured's death. Typically, this amount was derived from, among other things, the insured's lost income and/or estate taxes and expenses that the insured's dependents and heirs would be expected to realize after an insured's death. Accordingly, Providers relied upon the representations regarding an insured's financial condition, income, and other life insurance coverage in force when determining the maximum policy amount (i.e., death benefit) that the Providers would offer on an insured's life.

8.     The first two years of a life insurance policy are referred to as the "contestable period," or the "contestability period."   If an insured dies within the contestable period, the Provider may challenge the policy   and refuse to pay the death benefit   based upon the existence of misrepresentations and/or fraudulent statements in the policy's origination. Afterwards, the grounds for challenging a policy are more limited.

9.     Universal life policies are one of several types of life insurance policies offered by life insurance companies, including the Life Insurance Providers. As with other types of life insurance policies, a universal life policy provides a death benefit to the insured's beneficiaries and requires premium payments to the insurance companies. At all times relevant to this Indictment, a defining feature of the universal life policies offered by the Providers was that the insured typically had the option of paying additional premium amounts above the amount required to keep the policy valid. Any amount paid in excess of the required premium becomes a

policy's cash value.  A policy's cash value earns interest and can be used to satisfy future premium payments.  The interest accrues on a tax-deferred basis.  The Providers also generally benefited from the investment profits and realized increased cash flow generated by excess premium payments.

Background on Life Settlements and "Stranger Originated Life Insurance"

10.    In recent years, a derivative market for life insurance has developed in which existing life insurance policies are sold to third parties who lack an insurable interest in the life of the insured. Typically referred to as a "life settlement" or "senior settlement," these sales are normally lawful, assuming that the policy was procured for legitimate purposes and that there was an insurable interest at the policy's inception.  An example of a circumstance in which a policyholder may choose to sell a policy is an unforeseen life event that necessitates the current use of funds paid into a policy or the inability to continue to pay premiums to keep the policy in force.  A "viatical" or "viatical settlement" is a life settlement where typically the insured is terminally ill.

11.    An "insurable interest" is defined as an interest in the continued life of the insured individual.  A person is considered to have an insurable interest in another when, at the time of policy issuance, that person is in a position where he or she hopes for the continued life of the insured, will be damaged by the insured's death, and thus uses the policy proceeds to mitigate that damage.  Where that particular relationship is lacking, and the person to be initially benefitted by the policy is interested in the death rather than the life of the insured, such policy is considered to lack an insurable interest.

12.    As this derivative market has developed, some have sought life insurance policies not for legitimate insurance needs, but rather with the intent that investors, or others lacking an

4

insurable interest, will obtain ownership of the policies.   Policies procured under these circumstances have become known as stranger-originated life insurance ("STOLI") policies or investor-originated life insurance ("IOLI") policies (herein referred to collectively as STOLI policies).  At all times relevant to this Indictment, it was the practice of the Life Insurance Providers to deny an application for a universal life insurance policy if the policy holder intended, from the outset, to resell the policy, or if the policy holder financed the policy through an investor whose ultimate intent was to take over ownership of the policy.

13.    In a typical prohibited STOLI transaction, the STOLI investor or its representative induces a prospective insured, often a senior citizen, to purchase a life insurance policy that he or she likely would not otherwise have purchased. The prospective insured applies for the policy with a prior understanding to cede control of the policy (or of the trust owning the policy) to the investor.  The prospective insured and the investor agree that, at the end of a given period, ownership of the policy will be transferred to the investor, or some other third party, who would expect to receive the death benefit when the insured dies. The policy is often initially owned by a trust or other entity established by the insured for the benefit of a third party beneficiary.

14.    The investor may arrange financing of the premiums during the time the initial policy holder owns the policy by means of non-recourse premium financing; that is, the only collateral for the loan is the insurance policy itself.  When the policy is transferred, the loan may be forgiven in return for control over the policy. Indeed, STOLI arrangements may be marketed as "free insurance," because during the period prior to transfer of the policy, the insured has life insurance protection, paid for with a loan that will not have to be repaid if the policy is ultimately transferred.  The understanding between the investor and the insured often calls for the transfer of ownership at the end of the two-year contestable period.  As a result, the Life Insurance

Providers use the existence of non-recourse premium financing as one indicator of a STOLI policy.

15.     The Life Insurance Providers took several steps to prevent the issuance of STOLI policies because, among other things, such policies caused a discrepancy between the benefits reasonably anticipated by the Providers and the actual benefits received. To ensure that STOLI policies were not issued, the Providers, among other things, requested and then relied on representations from insurance agents and applicants regarding:

a.      the insured's financial information;

b.      the insured and/or policy owner's intent to resell the policy, or discussions regarding the possibility of resale;

c.      the existence of third-party payment of premiums;

d.      the purpose of procuring the policy;

e.      the performance of life expectancy evaluations on applicants; and

f.      the existence of other life insurance policies or pending applications for policies.

16.     The facts underlying these representations made by and on behalf of the applicants were essential elements of the agreements between the Life Insurance Providers and insureds and/or policy owners.  An insured's financial condition, an insured and/or owner's intent to resell a policy, third-party financing of premiums, outside life expectancy reports, the purpose of the policy, and the existence of other life insurance applications and policies significantly informed the Life Insurance Providers' financial expectations with respect to universal life policies. Accordingly, where Life Insurance Providers were deceived into issuing a universal life policy based on misrepresentations and/or fraudulent statements regarding the above-referenced factors, the Providers were harmed in several ways:

a.      Earlier and Greater Payout of Death Benefit: It was a standard assumption of the Life Insurance Providers that, notwithstanding other factors, an individual with a high net worth would maintain a healthier lifestyle, receive better medical care and, consequently, live longer than an individual with minimal net worth. Typically, the longer an insured lives, the more income that a life insurance company realizes. Accordingly, the fraudulent inflation of an individual's net worth in an effort to secure a high-value universal life policy negatively impacted the Life Insurance Providers in two ways. First, an insured's life that was likely to end earlier than the Provider expected resulted in less income from premium payments to the Provider and an earlier payout of a death benefit. Second, misrepresentations regarding insureds' net worths caused Providers to approve – and later pay out – larger death benefits than they otherwise would have approved.

b.      Less Premium Income: As discussed in this Indictment, a distinguishing feature of a typical universal life policy was an insured's ability to pay premiums in amounts that exceeded the minimum necessary to sustain the policy. Aside from allowing the insured to realize tax-free growth, these additional premium amounts typically supplied the Life Insurance Providers with significant increased capital and profit. By contrast, a policy held or funded by a third-party investor often would be funded at or near the minimum premium necessary to sustain the policy. As a result, the Life Insurance Providers received less income than expected from universal life policies when, unbeknownst to the Life Insurance Providers at the time of issuance, investors and other third parties held an interest.

c.      Providers' Financial Projections Rendered Unreliable: The Life Insurance Providers assumed, and built into their pricing, the fact that a certain proportion of insureds would voluntarily terminate their policies, either by surrendering them or allowing them to

lapse (i.e., fail to pay the required premiums). In contrast, third-party investors who secretly funded and/or owned policies normally did not allow policies to lapse, or did so based on different considerations than insureds. Therefore, the Providers could not accurately assess the voluntary termination rate for universal life insurance policies financed and/or owned by third-party investors. Thus, misrepresentations by agents and applicants regarding the existence of third-party premium financing and/or an insured's intent to resell universal life policies to investors undermined actuarial assumptions and financial planning that the Providers used to price their policies.

      d.    Delayed Payments Causing Decreased Cash Flow: Third-party funders and investors typically took advantage of grace periods and other features that permitted late payments of premiums with greater frequency than insured persons. As a result, in addition to not receiving expected income from higher than required premium payments, the premium payments that the Life Insurance Providers did receive from investor-funded or -owned universal life policies were typically received later in the payment periods than policies paid for by an actual insured. Accordingly, the cash flow available from those payments decreased where, unbeknownst to the Providers, investors funded and/or owned universal life policies they had issued.

      e.    Payout of Large Commissions: The issuance of large universal life insurance policies typically called for Life Insurance Providers to pay significant commissions to insurance agents, often a large percentage, if not the entirety, of the first year's premium. The Providers were able to pay such large commissions based in part on the revenue they expected to generate from the policies. In STOLI cases, where the expected revenue was diminished in several ways unbeknownst to the Providers, agents typically received

commissions that were far in excess of what was justified by the policies.

17. To prevent against the harms described above, at all times relevant to this Indictment, the Providers took substantial steps and incurred significant additional underwriting, investigation and litigation expenses in attempting to detect and prevent the issuance and maintenance of STOLI policies. Nonetheless, the payment of large commissions created incentives for some agents to mislead the Providers regarding STOLI policies, since the agents generally knew that the Providers would not have issued the policies had they known the true intent of the insured and/or policy owner.

Background on Welfare Benefit Plans

18. In some cases, life insurance policies may be purchased through an "employee welfare benefit plan." As it applies to this Indictment, a single-employer employee welfare benefit plan is comprised of a single employer that provides one or more welfare benefits, including death benefits, to designated employees. Typically, a welfare benefit plan provides a death benefit through the purchase of a life insurance policy on the life of the participating employee, and for the benefit of that employee's designated beneficiaries. All assets of an employee welfare benefit plan, including insurance policies, must be held in a trust.

19. In some cases, a "plan promoter" may market an employee welfare benefit plan to multiple unrelated employers wherein each employer may separately adopt that plan for the benefit of one or more of that employer's individual employees. This type of plan may be referred to as a "multiple employer welfare plan," a "multiple employer trust," or a "multiple employer welfare arrangement." In the case of pre-retirement death-benefit-only plans (or "DBO" plans), an adopting employer may designate the purchase of life insurance through the plan for the benefit of that employer's employees and their beneficiaries, while the plan sponsor

9

or promoter administers the plan on behalf of the adopting employers. The plan promoter creates a trust for the purpose of holding plan assets, which, in a DBO plan, includes the life insurance policies on the lives of the participating employees.

20.     In a DBO plan, the trust acts as owner and beneficiary of the life insurance policy. A participating employer must pay the required premiums to the trust, which in turn must forward the premiums to the insurance company. Then, should the employee die, the death benefit would be passed from the insurance company to the trust, and then from the trust to the employee's beneficiary. The plan promoter is typically paid an administration fee by the participating employers.

21.     Sections 419 and 419A of the Internal Revenue Code of 1986 ("IRC") regulate the tax treatment of "funded welfare benefit plans." IRC Section 419(e) defines a welfare benefit fund as "any fund which is part of a plan of an employer, and through which the employer provides welfare benefits to employees or their beneficiaries." Such plans are commonly referred to as "419(e) plans."

The Creation of the Plan and Trust

22.     In or about October 2006, a Subject Entity headquartered at the Simsbury Office (the "Plan Sponsor") established a welfare benefit plan and trust, hereinafter "the Plan" and "the Trust." According to the Declaration of Trust (the "Declaration"), the Trust was a "multiple employer trust that provides death benefits to certain specific covered individuals." The Declaration further stated that the Trust "is administered in conformity with all rules under Section 419 and 419A of the Internal Revenue Code of 1986..." BURSEY signed the Declaration as President of the Plan Sponsor. Under the terms of the Declaration, the Plan Sponsor also acted as Trustee of the Plan and Trust.

23.     The Plan purported to be a multiple employer welfare benefit plan that provided death benefits to the employees of employers who adopted the Plan. According to Plan related documents, an adopting employer designates one or more employees ("participating employees") on whom the Trust may purchase life insurance policies. The employer was required to pay to the Trust the cost of the insurance premiums, as well as a periodic administration fee, and the Trust would be the "owner" of the policy. Each participating employee was permitted to designate a beneficiary, to whom a death benefit would be paid upon the death of the participating employee. The death benefit was to be funded by the life insurance policy that was purchased on the life of the employee.

24.     The Trust designated a Delaware bank as "Insurance Trustee." The Insurance Trustee was responsible for, among other things, the authorization and execution of payments of insurance premiums from the Trust to the appropriate Life Insurance Providers, at the direction of the Plan Sponsor.

<u>The Scheme to Defraud the Life Insurance Providers</u>

25.     From in or about 2006 up to and including 2013, CARPENTER, BURSEY, Waesche, and others known and unknown to the Grand Jury engaged in a scheme and artifice to defraud the Life Insurance Providers and to obtain money and property from the Life Insurance Providers by means of materially false and fraudulent representations regarding the purpose of insurance policies purchased in the Plan and Trust, the income and net worth of applicants, the presence of premium financing, and the intent of the applicant to sell the policy, in order to induce the Life Insurance Providers to issue life insurance policies in reliance upon such false and misleading information.

26.     The scheme typically worked as follows: insurance agents working for or on

11

behalf of the Subject Entities, recruited elderly clients (the "Straw Insureds") to participate in the Plan and apply for universal life insurance policies to be placed within the Trust. Usually, the Straw Insureds were offered the promise of free life insurance for two years, after which the plan promoters would sell the policy, and provide a share of the proceeds to the Straw Insured. In some cases, the Straw Insured was offered a financial inducement to participate. The Straw Insured was not obligated to pay anything; he/she was commonly told that the premiums were being borrowed from a third party source, and that the fees for the premium loan would be paid out of the proceeds from the sale or, if the Straw Insured died within two years, the death benefit.

27.     Although the Plan and Trust claimed to be an IRC § 419(e) multiple employer plan, the agents rarely explained this aspect to the Straw Insureds. While some Straw Insureds had pre-existing companies that could be used as "employers" to enroll in the Plan and Trust, in other cases agents would assist the Straw Insured in creating a "paper" company for the purpose of enrolling in the Plan and Trust, with the Straw Insured designated as the participating employee. In some cases the paper company would be created without the knowledge, approval, and/or understanding of the Straw Insured.

28.     Once a Straw Insured agreed to enroll in the Plan and Trust, an insurance agent filled out or caused to be filled out an insurance application that contained one or more material misrepresentations. Those misrepresentations were made both on the insurance applications as well as documents that were required to be completed by the insurance agent, often called the "agent's report" or "producer's report." For example:

a.     The application and related materials falsely verified that there would be no third-party financing of premiums;

b.     The application and related materials falsely verified that the Straw Insured and/or

12

owner had no intent to sell, or had not engaged in discussion regarding the sale of, the policy;

      c.      The application and related materials falsely verified that the policy was being purchased for estate planning related purposes;

      d.      The application and related materials often falsely inflated the net worth and/or income of the Straw Insured; and

      e.      The application and related materials often falsely claimed that no life expectancy reports had been performed, or would be performed, on the Straw Insured.

      29.      Each insurance application submitted to the Providers, in connection with the Plan and Trust, indicated that the Plan and Trust was an IRC § 419(e) multiple employer plan, as described earlier in this Indictment. The Plan also required the Straw Insureds to complete certain forms created by the Subject Entities whereby the Straw Insured and his/her "Employer" agreed to participate in the Plan and Trust (the "Enrollment Forms"). The Enrollment Forms included an Adoption Agreement, whereby the Employer adopted the Plan and listed the employee (Straw Insured) to be insured; the "Election of Participation and Beneficiary Designation Form," hereinafter the "Election Form," where an individual employee (Straw Insured) enrolled in the Plan and elected a beneficiary for the life insurance to be purchased; and a "Certificate of Resolution," under which the Employer "approves, adopts, and agrees to make contributions to and fund benefits for certain employees through the [Plan and Trust], a Welfare Benefit Fund as described under Internal Revenue Code Section 419(e)."

      30.      In truth and in fact, and as the defendants well knew, no Employer or Straw Insured paid a premium into the Trust; rather, the premiums were funded by loans. Those loans typically came to the Trust from another Subject Entity headquartered at the Simsbury Offices ("Funding Entity 1"), though in some cases the actual funds came from two other Subject

Entities ("Funding Entity 2" and "Funding Entity 3") (collectively the "Funding Entities"). CARPENTER represented himself to be "Chairman of Managing Member" of Funding Entity 1. In many cases Funding Entity 1 in turn borrowed the funds from another third party financing source (the "Outside Funder"). The loan agreements provided for no recourse for either Funding Entity 1 or the Outside Funder against the assets of the Straw Insureds; in other words, the Straw Insureds had no obligation to repay the loan, except from proceeds of a sale of the policy or payment of a death benefit. Finally, each policy was procured with the primary intent to resell that policy, typically following the expiration of the two-year contestable period.

31.     In order to secure funding from the Outside Funder for payment of premiums, unbeknownst to the Providers, Funding Entity 1 and Funding Entity 2 entered into a Line of Credit Grid Promissory Note (the "Outside Loan Agreement") with the Outside Funder, which called for a $35 million line of credit from the Outside Funder, to be repaid with interest not to exceed 16%. Under the Outside Loan Agreement, Funding Entity 1 was entitled to seek funding for insurance premiums for policies to be placed in the Plan and Trust, through 27-month loans from the Outside Funder.

32.     In every case, whether or not funds came originally from the Outside Funder, Funding Entity 1 loaned money to the Trust for payment of premiums.    In some cases, especially those where money had originated from the Outside Funder, the loan from Funding Entity 1 to the Trust was documented in a Funding Obligation Agreement and Power of Attorney (the "Loan Agreement") between the Trust and Funding Entity 1.   The Loan Agreement obligated the Trust to repay the loan principal in addition to an origination fee (stated as a percentage of money borrowed) and a placement fee (stated as a percentage of the death benefit).

33.     In all cases, the loan agreement between the Trust and Funding Entity 1 was

14

reflected in a "Disclosure, Acknowledgement, and Certification Agreement," hereinafter the DAC Agreement, which was one of the Enrollment Forms. In the DAC Agreement, the Straw Insured and the agent acknowledged the existence of a loan agreement between Funding Entity 1 and the Trust. Among other terms, the DAC Agreement reflected an obligation that, upon the "maturation, disposition, or termination" of a Plan insurance policy, Funding Entity 1 must be paid back the money it lent for the premiums, in addition to an origination fee (stated as a percentage of money borrowed) and a placement fee (stated as a percentage of the death benefit).

34.    It was part of the scheme and artifice to defraud that neither the DAC Agreement nor any other loan documentation was given to the Provider.

35.    It was also part of the scheme and artifice to defraud that the loan amount was approximately twice the amount of the premiums borrowed by the end of the second year. Although the Plan documents allowed for the Straw Insured to purchase the policy at the end of two years, nearly all Straw Insureds had no intention of doing so, and in any event the loan terms made it cost prohibitive.

36.    It was also part of the scheme and artifice to defraud that CARPENTER, BURSEY, and other co-conspirators known and unknown to the grand jury, misrepresented to the Providers that the Trust was a bona fide multiple employer welfare benefit trust or arrangement falling under Section 419(e) of the Internal Revenue Code, when in truth and in fact, and as CARPENTER, BURSEY, and their co-conspirators well knew, the welfare benefit plan structure was designed to hide the true intent of the conspirators and to imply falsely an insurable interest where one did not exist.

37.    Each of these and other misrepresentations by CARPENTER, BURSEY, and their co-conspirators were material to and concerned essential elements of the bargains between (a)

15

the Life Insurance Providers, the Plan and Trust, and the Straw Insureds with respect to the policies at issue, and (b) the Life Insurance Providers and the Subject Entities with respect to commissions that the Life Insurance Providers paid to the Subject Entities and others. As detailed in this Indictment, the misrepresentations by CARPENTER, BURSEY, and others known and unknown to grand jury, created discrepancies between the benefits that the Life Insurance Providers reasonably anticipated from issuing the policies at issue and paying the accompanying millions of dollars in commissions to the Subject Entities and others working with and/or on behalf of the Subject Entities, and the actual benefits that the Providers received in doing so.

38.     CARPENTER and BURSEY, and others known and unknown to the grand jury, submitted and caused to be submitted numerous false and fraudulent life insurance applications during the course of the scheme and artifice to defraud, upon which the Life Insurance Providers issued a total of eighty-four policies on the lives seventy-six different Straw Insureds. Several of those Straw Insureds are discussed below.

39.     It was also part of the scheme and artifice to defraud that in each policy written and placed within the Plan and Trust, one of the Subject Entities (the "Commissions Entity") collected some or all of the commission paid by the relevant Provider.

40.     It was also part of the scheme and artifice to defraud that CARPENTER and BURSEY, and other known and unknown to the grand jury, did attempt to sell and/or transfer, and did in fact sell and/or transfer, several policies that were purchased through the Plan and Trust.

<u>Use of the Mails and Wires</u>

41.     It was a part of the scheme to defraud that CARPENTER, BURSEY, and others

16

known and unknown to the grand jury, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, for the purpose of executing such scheme and artifice, would and did place in a post office and authorized depository for mail matters and things, to be sent and delivered by the Postal Service, and deposited and caused to be deposited matters and things to be sent and delivered by private and commercial interstate carriers, and did take and receive therefrom, such matters and things, and knowingly caused to be delivered by mail and such carriers according to the direction thereon, and at the place it was directed to be delivered by the person to whom it was addressed, such matters and things, in violation of Title 18, United States Code, Section 1341.

42.     It was further a part of the scheme to defraud that CARPENTER, BURSEY, and others known and unknown to the grand jury, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

COUNTS 1-4
(Wire Fraud)

43.     The allegations contained in Paragraphs 1 through 42 of this Indictment are realleged as though fully set forth herein.

44.     Straw Insured-1 ("SI-1"), a then 78-year-old New York City resident, first met Waesche in 2006.  SI-1 had previously financed insurance policies on his own life in order to later sell them for a profit, and sought to do the same through the Subject Entities.  In or about

17

2006, Waesche, CARPENTER, BURSEY, and other co-conspirators facilitated the purchase of an insurance policy on SI-1's life from Phoenix (the "SI-1 Phoenix Policy") through another welfare benefit trust administered by the Subject Entities (the "predecessor trust"), with BURSEY as trustee, financed through Funding Entity 1, with no recourse to either SI-1 or his business.  The application submitted to Phoenix falsely denied the existence of premium financing or discussions regarding the sale of the policy.  After more than two years had passed, and after failing to sell the SI-1 Phoenix policy to a third party, one of the Subject Entities later purchased SI-1's beneficial interest in the policy.

45.    SI-1 also signed an agreement to refer others to the Subject Entities to participate in the Trust, in exchange for monetary compensation.

46.    In or about 2007, SI-1 sought to participate in the Trust in order to profit again from the sale of a policy insuring his life.

47.    On June 16, 2009, an insurance application for a policy on SI-1's life, to be owned by the Trust, was submitted via email to Penn Mutual.  The policy was to be owned by the Trust and was to insure the life of SI-1.  That application, signed by Waesche, BURSEY, and SI-1, contained numerous material misrepresentations, including: falsely denying that "any part of the premium [will] be paid from funds that are borrowed or otherwise financed;" falsely claiming that SI-1's financial needs included "estate planning;" and falsely denying that SI-1 had "been involved in any discussion about the possible sale or assignment of this policy to a Life Settlement, Viatical, or other secondary market provider."  The application also contained a two-page "Agent's Report," signed by Waesche, which also contained material misrepresentations, including: falsely claiming that the need for coverage was "estate tax liquidity [and] wealth transfer;" falsely denying that "any part of the premium for this policy [will] be paid for by funds

18

that are borrowed or otherwise financed;" and falsely denying any discussions about, or reason to believe, that this policy "may be sold or assigned to a Life Settlement, Viatical or other secondary market provider." The application also contained a Confidential Financial Statement that falsely inflated SI-1's net worth and income.

48. In truth and in fact, and as the defendants well knew, the policy was intended to be funded, and was in fact funded, through a loan to the Trust by Funding Entity 1, as memorialized by a DAC form signed by CARPENTER (on behalf of Funding Entity 1), Waesche, and SI-1. The policy on SI-1's life was not funded by the Outside Funder, but rather through money transferred from the Funding Entities.

49. For the purpose of executing and attempting to execute the aforesaid scheme and artifice to defraud, on or about the dates listed below, in the District of Connecticut and elsewhere, defendants CARPENTER and BURSEY, and others working for and on behalf of the Subject Entities, did knowingly cause to be transmitted, and aided and abetted others to cause to be transmitted, in interstate commerce by means of wire communication certain signs, signals and sounds the following, each of which is a separate count of the Indictment:

| Count | Date | Description |
|-------|------|-------------|
| One | June 16, 2009 | Email from an employee of the Subject Entities in Connecticut to an Employee of Penn Mutual, attaching the above-referenced Penn Mutual application for insurance on the life of SI-1 |
| Two | September 30, 2009 | Wire transfer of $159,532.34 initiated by an employee of the Subject Entities from a TD Bank branch in Connecticut to PNC Bank in Pennsylvania, transferring money from Funding Entity 2 to the Trust to finance a premium payment for the policy on SI-1's life |

| Count | Date | Description |
|-------|------|-------------|
| Three | March 23-24, 2010 | Wire transfer of $39,883.09, initiated by CARPENTER from a TD Bank branch in Connecticut to PNC Bank in Pennsylvania, transferring money from Funding Entity 1 to the Trust to finance a premium payment for the policy on SI-1's life |
| Four | March 30, 2010 | Email from an employee of the Subject Entities in Connecticut to the Insurance Trustee in Delaware requesting the processing of a $39,883.09 wire transfer, signed by BURSEY, from the Trust to Penn Mutual to pay a premium on the policy on SI-1's life |

All in violation of Title 18, United States Code Sections 1343 and 2.

## COUNT FIVE
### (Mail Fraud)

50.     The allegations contained in Paragraphs 1 through 42 of this Indictment are realleged as though fully set forth herein.

51.     In or about 2007, Straw Insured-2 ("SI-2"), a then 73-year-old male resident of Connecticut, learned about a program through which he could profit from a third-party acquiring and then selling an insurance policy on his own life.   SI-2 learned about this program both from SI-1 and from another Straw Insured.  SI-2 was then introduced to Waesche, who offered to insure SI-2 for between two and five million dollars, with the premiums to be paid by a third party.  For the first two years, SI-2's family would be the beneficiary of the policy, and would receive any death benefit, less premiums and certain fees.  Waesche told SI-2 that, after two years, he would check SI-2's life expectancy and would attempt to sell the policy to private investors.  Waesche told SI-2 he would receive whatever was left from the sale after premiums and fees were repaid.

52.     In or about January 2008, an insurance application for a policy on SI-2's life was

signed by WAESCHE, BURSEY, and SI-2, and submitted to Penn Mutual. The policy was to be owned by the Trust and was to insure the life of SI-2. That application contained numerous material misrepresentations, including: falsely denying that "any part of the premium [will] be paid from funds that are borrowed or otherwise financed;" falsely claiming that SI-2's financial needs included "estate planning;" falsely denying that SI-2 had declared bankruptcy; falsely inflating SI-2's net worth and income; and falsely denying that SI-2 had "been involved in any discussion about the possible sale or assignment of this policy to a Life Settlement, Viatical, or other secondary market provider." The application also contained a two-page "Agent's Report," signed by Waesche, that also contained material misrepresentations, including: falsely claiming that the need for coverage was "estate tax liquidity [and] wealth transfer;" falsely denying that "any part of the premium for this policy [will] be paid for by funds that are borrowed or otherwise financed;" and falsely denying any discussions about, or reason to believe, that this policy "may be sold or assigned to a Life Settlement, Viatical or other secondary market provider." The application also contained a Confidential Financial Statement that falsely inflated SI-2's net worth and income.

53. In truth and in fact, and as the defendants well knew, the policy was intended to be funded, and was in fact funded, through a loan to the Trust by Funding Entity 1, as memorialized by a DAC, signed by CARPENTER as "Chairman of Managing Member" of Funding Entity 1, and a "Funding Obligation Agreement" between the Trust and Funding Entity 1, which was signed by BURSEY on behalf of the Trust and by CARPENTER on behalf of Funding Entity 1. Funding Entity 1, in turn, borrowed the money from the Outside Funder, as reflected in a January 28, 2008 Commitment letter from the Outside Funder to Funding Entity 1, to lend $309,318.71 to Funding Entity 1 for the purpose of funding its loan to the Trust to pay

21

the premiums on the policy on SI-2's life.

54.     On or about April 14, 2010, in the District of Connecticut, for the purpose of executing and attempting to execute the above-described scheme and artifice to defraud and deprive, CARPENTER and BURSEY, and others working for and on behalf of the Subject Entities, knowingly caused to be deposited to be sent and delivered by a private and commercial interstate carrier, to wit Federal Express, and aided and abetted others to do the same, the following matter: an April 14, 2010 Funding Memorandum & Disbursement Request, from CARPENTER on behalf of Funding Entity 1 to the Outside Funder and the Insurance Trustee, to disburse $29,043 for the purpose of funding Funding Entity 1's loan to the Trust to pay a premium on the insurance policy on SI-2's life, together with a wire transfer authorization, signed by BURSEY, to transfer the funds from the Trust to Penn Mutual.

In violation of Title 18, United States Code, Sections 1341 and 2.

## COUNT SIX
### (Mail Fraud)

55.     The allegations contained in Paragraphs 1 through 42 of this Indictment are realleged as though fully set forth herein

56.     Straw Insured-3 ("SI-3"), a then 76-year-old female and her husband, a then 83-year-old male, both residents of New York, were first introduced to SI-1 in or around 2007, who in turn introduced them to Waesche. Waesche offered to purchase life insurance for SI-3 and her husband, at no cost for two years, and then to sell the policy or policies at the end of two years, with SI-3 and her husband to receive some of the proceeds.

57.     In or about July 2008, an insurance application was transmitted to Penn Mutual for a policy on the life of SI-3 (the "SI-3 Penn Application"). The policy was to be owned by the Trust and was to insure the life of SI-3. The application was signed by BURSEY, Waesche, and

22

SI-3. That application contained numerous material misrepresentations, including: falsely claiming that SI-3's financial needs included "estate planning;" falsely inflating SI-3's net worth and income; and falsely denying that SI-3 had "been involved in any discussion about the possible sale or assignment of this policy to a Life Settlement, Viatical, or other secondary market provider." That application left blank the question "will any part of the premium be paid from funds that are borrowed or otherwise financed." The application was later amended on or about September 19, 2008, in an Application Amendment signed by BURSEY, Waesche, and SI-3. The amendment changed the face amount requested to $5 million, and answered "No" to the question "will any part of the premium be paid from funds that are borrowed or otherwise financed."

58.   The SI-3 Penn Application also contained a two-page "Agent's Report," signed by Waesche, which also contained material misrepresentations, including: falsely claiming that the need for coverage was "estate tax liquidity [and] wealth transfer;" falsely denying that "any part of the premium for this policy [will] be paid for by funds that are borrowed or otherwise financed;" and falsely denying any discussions about, or reason to believe, that this policy "may be sold or assigned to a Life Settlement, Viatical or other secondary market provider."

59.   In truth and in fact, and as the defendants well knew, the policy was intended to be funded, and was in fact funded, through a loan to the Trust by Funding Entity 1, as memorialized by a DAC, signed by CARPENTER as "Chairman of Managing Member" of Funding Entity 1, and a "Funding Obligation Agreement" between the Trust and Funding Entity 1, which was signed by BURSEY on behalf of the Trust and by CARPENTER on behalf of Funding Entity 1. Funding Entity 1, in turn, borrowed the money from the Outside Funder, as reflected in a July 29, 2008 Commitment letter from the Outside Funder to Funding Entity 1, to

lend $260,926.83 to Funding Entity 1 for the purpose of funding its loan to the Trust to pay the premiums on the policy on SI-3's life.

60.     On or about August 29, 2008, in the District of Connecticut, for the purpose of executing and attempting to execute the above-described scheme and artifice to defraud and deprive, CARPENTER and BURSEY, and others working for and on behalf of the Subject Entities, knowingly caused to be deposited to be sent and delivered by a private and commercial interstate carrier, to wit Federal Express, the following matter:  an August 28, 2008 Funding Memorandum & Disbursement Request, from CARPENTER on behalf of Funding Entity 1 to the Outside Funder and the Insurance Trustee, to disburse $240,052.77 for the purpose of funding Funding Entity 1's loan to the Trust to pay a premium on the insurance policy on SI-3's life, together with a wire transfer authorization, signed by BURSEY, to transfer the funds from the Trust to Penn Mutual.

In violation of Title 18, United States Code, Sections 1341 and 2.

## COUNTS 7-10
### (Wire Fraud)

61.     The allegations contained in Paragraphs 1 through 42 of this Indictment are realleged as though fully set forth herein.

62.     In or about 2008, Straw Insured-4 ("SI-4"), a then 77-year-old female resident of California, was approached by individuals who offered to pay her in exchange for purchasing insurance on her life. SI-4 was told that the insurance premiums would be paid for by a third party who would receive the policy proceeds on her death.

63.     On or about June 26, 2008, an application for an insurance policy on the life of SI-4 was sent from the Simsbury Office to a Penn Mutual office in Oregon. The policy was to be owned by the Trust and was to insure the life of SI-4. That application, signed by Waesche,

24

BURSEY, and SI-4, contained numerous material misrepresentations, including: falsely denying that "any part of the premium [will] be paid from funds that are borrowed or otherwise financed;" falsely claiming that SI-4's financial needs included "estate planning;" falsely inflating SI-4's net worth and income; and falsely denying that SI-4 had "been involved in any discussion about the possible sale or assignment of this policy to a Life Settlement, Viatical, or other secondary market provider." The application also contained a two-page "Agent's Report," signed by WAESCHE, which also contained material misrepresentations, including: falsely claiming that the need for coverage was "estate tax liquidity;" falsely denying that "any part of the premium for this policy [will] be paid for by funds that are borrowed or otherwise financed;" and falsely denying any discussions about, or reason to believe, that this policy "may be sold or assigned to a Life Settlement, Viatical or other secondary market provider." The application also contained a Confidential Financial Statement that falsely inflated SI-4's net worth and income.

64.     The application was transmitted with a cover letter that set out the supposed need for SI-4's coverage and also contained numerous misrepresentations, including: falsely inflating SI-4's net worth; falsely claiming that SI-4 was in need of insurance to protect her assets from estate taxes upon her death; and falsely claiming that "some of the income, dividends and interest from [SI-4]'s trust assets will pay for the cost of insurance to offset future tax liability."

65.     In truth and in fact, and as the defendants well knew, the policy was intended to be funded, and was in fact funded, through a loan to the Trust by Funding Entity 1, as memorialized by a DAC form signed by Waesche and SI-4. The policy on SI-4's life was not funded by the Outside Funder, but rather through money transferred from the Funding Entities.

66.     For the purpose of executing and attempting to execute the aforesaid scheme and artifice to defraud, on or about the dates listed below, in the District of Connecticut and

elsewhere, defendants CARPENTER and BURSEY, and others working for and on behalf of the Subject Entities, did knowingly cause to be transmitted, and aided and abetted others to cause to be transmitted, in interstate commerce by means of wire communication certain signs, signals and sounds the following, each of which is a separate count of the Indictment:

| Count | Date | Description |
|-------|------|-------------|
| Seven | October 10, 2008 | Wire transfer of $55,650, initiated by CARPENTER from a Bank of America branch in Connecticut to PNC Bank in Pennsylvania, transferring money from Funding Entity 2 to the Trust to finance a premium payment for the policy on SI-4's life |
| Eight | October 10, 2008 | Email from an employee of the Subject Entities in Connecticut to the Insurance Trustee in Delaware requesting the processing of a $55,650 wire transfer, signed by BURSEY, from the Trust to Penn Mutual to pay a premium on the policy on SI-4's life |
| Nine | March 25, 2009 | Wire transfer of $55,650, initiated by CARPENTER from a Bank of America branch in Connecticut to PNC Bank in Pennsylvania, transferring money from Funding Entity 2 to the Trust to finance a premium payment for the policy on SI-4's life |
| Ten | March 25, 2009 | Email from an employee of the Subject Entities in Connecticut to the Insurance Trustee in Delaware requesting the processing of a $55,650 wire transfer, signed by BURSEY, from the Trust to Penn Mutual to pay a premium on the policy on SI-4's life |

All in violation of Title 18, United States Code Sections 1343 and 2.

## COUNTS 11-14
### (Wire Fraud)

67.     The allegations contained in Paragraphs 1 through 42 of this Indictment are realleged as though fully set forth herein.

68.     In or about 2008, Straw Insured-5 ("SI-5"), a then 74-year-old female resident of Arizona, was informed of a plan under which insurance could be purchased on her life at no cost,

and that she could receive a financial benefit as a result. SI-5 understood that the policy would be owned by a third party, who would pay the premiums, and that she had no obligation to pay anything.

69.     On or about April 11, 2008, an insurance application on SI-5's life, to be owned by the Trust, was submitted to Phoenix. The application was signed by SI-5, Waesche, and BURSEY. The application contained several material misrepresentations, including: falsely denying that "any of the first year or subsequent premiums for the policy [will] be borrowed by the proposed owner or proposed insured or by any other individual, trust, partnership, corporation, or similar or related entity;" falsely denying that the "owner, now or in the future, [will] pay premiums funded by an individual and/or entity other than the proposed insured;" falsely denying that the proposed owner or proposed insured "have been advised of the opportunity to transfer the policy to a third party within five years of its issuance;" falsely inflating SI-5's net worth and income; and falsely denying that any entity conducted or made plans to conduct a life expectancy evaluation of the insured within the past two years. The application also falsely claimed that the "bona fide need" for insurance for the proposed owner or proposed insured was "estate tax liquidity [and] wealth transfer." The application also included a "Producer's Report," signed by Waesche, which falsely answered "No" to the question "Is there any intention that any party (Including a Viatical Company), other than the Owner, will obtain any right, title, or interest in any policy issued on the life of the Proposed Life Insured(s) as a result of this application."

70.     In truth and in fact, and as the defendants well knew, the policy was intended to be funded, and was in fact funded, through a loan to the Trust by Funding Entity 1, as memorialized by a DAC form signed by Waesche and SI-5. The policy on SI-5's life was not

27

funded by the Outside Funder, but rather through money transferred from the Funding Entities. The Outside funder declined to fund the policy on SI-5's life based upon the results of life expectancy evaluations, which were run, and expected to be run, in every policy purchased through the Trust.

71.     For the purpose of executing and attempting to execute the aforesaid scheme and artifice to defraud, on or about the dates listed below, in the District of Connecticut and elsewhere, defendants CARPENTER and BURSEY, and others working for and on behalf of the Subject Entities, did knowingly cause to be transmitted, and aided and abetted others to cause to be transmitted, in interstate commerce by means of wire communication certain signs, signals and sounds the following, each of which is a separate count of the Indictment:

| Count | Date | Description |
| --- | --- | --- |
| Eleven | March 25, 2009 | Wire transfer of $69,816.67, initiated by CARPENTER from a Bank of America branch in Connecticut to PNC Bank in Pennsylvania, transferring money from Funding Entity 2 to the Trust to finance a premium payment for the policy on SI-5's life |
| Twelve | March 25, 2009 | Email from an employee of the Subject Entities in Connecticut to the Insurance Trustee in Delaware requesting the processing of a $69,816.67 wire transfer, signed by BURSEY, from the Trust to Phoenix to pay a premium on the policy on SI-5's life |
| Thirteen | January 29, 2010 | Wire transfer of $25,000, initiated by CARPENTER from a TD Bank branch in Connecticut to PNC Bank in Pennsylvania, transferring money from Funding Entity 1 to the Trust to finance a premium payment for the policy on SI-5's life |
| Fourteen | February 1, 2010 | Email from an employee of the Subject Entities in Connecticut to the Insurance Trustee in Delaware requesting the processing of a $25,000 wire transfer, signed by BURSEY, from the Trust to Phoenix to pay a premium on the policy on SI-5's life |

All in violation of Title 18, United States Code Sections 1343 and 2.

## COUNTS 15-18
### (Wire Fraud)

72.     The allegations contained in Paragraphs 1 through 42 of this Indictment are realleged as though fully set forth herein.

73.     In or about 2008, Straw Insured-6 ("SI-6"), a then 73-year-old New Jersey resident, and her husband, met with Outside Agent 1 ("OA-1"), a New York City-based insurance agent whose identity is known to the Grand Jury.  OA-1 proposed that insurance policies could be taken on the lives of SI-6 and her husband, at no cost to them, and that those policies could be sold to a hedge fund within two to three years.  SI-6 and her husband were not seeking insurance coverage at the time, nor could they afford premiums on the policies discussed.  Neither SI-6 nor her husband owned or operated any business.

74.     In or about March 2008, a life insurance application on SI-6's life was signed by BURSEY, OA-1, and SI-6, and submitted to Sun Life.  The policy was to be owned by the Trust and was to insure the life of SI-6.  The application left blank the answer to "Will the premium for this policy be financed through single or multiple loan(s) from a private or public lender now or in the future?"  The application contained numerous material misrepresentations, including: falsely denying that the policy was being purchased for the purpose of "being assigned or sold to a third party;" falsely inflating the SI-6's net worth and income; and falsely claiming that the insurance coverage was to be used primarily for "estate plan."  The application also included a "Life Insurance Source of Premium Eligibility Questionnaire," which was also signed by BURSEY and OA-1.  The questionnaire also included material misrepresentations and omissions, including: falsely failing to answer that the policy would be paid for through a non-

recourse loan and falsely denying discussions about "selling the proposed life insurance policy, trust, or limited liability company that will own this or any other life insurance policy to a life settlement company or group of investors within the next five years." The application stated "if non-recourse is checked, do not submit this application."

75.    On March 28, 2008, OA-1 wrote an email to an insurance general agent (intermediary between the insurance agent and insurance company), which was forwarded to Sun Life. In part, OA-1 claimed that the Trust was an employer-funded welfare benefit plan and that "funding will be coming from assets as well as income." Subsequently, another "Life Insurance Source of Premium Eligibility Questionnaire," signed by BURSEY and OA-1 on April 9, 2008, was forwarded to Sun Life, with the same misrepresentations as above. On April 18 and June 20, 2008, Requests for Alteration of Application were signed by BURSEY and submitted to Sun Life. In both instances, the requests falsely answered "no" to the question "will the premium for this policy be financed through single or multiple loans from a private or public lender now or in the future."

76.    In truth and in fact, and as the defendants well knew, the policy was intended to be funded, and was in fact funded, through a loan to the Trust by Funding Entity 1, as memorialized by a DAC form signed by BURSEY (on behalf of Funding Entity 1), OA-1, and SI-6. The policy on SI-6's life was not funded by the Outside Funder, but rather through money transferred from the Funding Entities.

77.    For the purpose of executing and attempting to execute the aforesaid scheme and artifice to defraud, on or about the dates listed below, in the District of Connecticut and elsewhere, defendants CARPENTER and BURSEY, and others working for and on behalf of the Subject Entities, did knowingly cause to be transmitted, and aided and abetted others to cause to

30

be transmitted, in interstate commerce by means of wire communication certain signs, signals and sounds the following, each of which is a separate count of the Indictment:

| Count | Date | Description |
|-------|------|-------------|
| Fifteen | April 22, 2009 | Wire transfer of $32,000, initiated by CARPENTER from a Bank of America branch in Connecticut to PNC Bank in Pennsylvania, transferring money from Funding Entity 2 to the Trust to finance a premium payment for the policy on SI-6's life |
| Sixteen | April 23, 2009 | Email from an employee of the Subject Entities in Connecticut to the Insurance Trustee in Delaware requesting the processing of a $32,000 wire transfer, signed by BURSEY, from the Trust to Sun Life to pay a premium on the policy on SI-6's life |
| Seventeen | August 21, 2009 | Wire transfer of $38,000, initiated by CARPENTER from a TD Bank branch in Connecticut to PNC Bank in Pennsylvania, transferring money from Funding Entity 2 to the Trust to finance a premium payment for the policy on SI-6's life |
| Eighteen | August 24, 2009 | Email from an employee of the Subject Entities in Connecticut to the Insurance Trustee in Delaware requesting the processing of a $38,000 wire transfer, signed by BURSEY, from the Trust to Sun Life to pay a premium on the policy on SI-6's life |

All in violation of Title 18, United States Code Sections 1343 and 2.

## COUNT NINETEEN
(Mail Fraud)

78.     The allegations contained in Paragraphs 1 through 42 of this Indictment are realleged as though fully set forth herein.

79.     Straw Insured-7 ("SI-7"), a then 69-year-old New Jersey resident, was first

introduced to Waesche by SI-1 in 2007. SI-1 explained to SI-7 that he had been making money by having life insurance taken on his life and then selling the policies. Waesche explained to SI-7 that a life insurance policy would be taken on SI-7's life, the policy would be owned by the Trust, and after two years the policy would be sold – likely to a hedge fund – and SI-7 would receive some money from the sale. If SI-7 died within the first two years, his beneficiary would receive the death benefit. Waesche provided SI-7 with, among other things, a form on Funding Entity 1 letterhead entitled "[SI-7] Sample $5mm," which listed possible scenarios and payouts depending on the amount of a sale. Waesche set up a company for SI-7 in order to allow him to participate in the Plan and Trust.

80.     On or about May 21, 2007, an insurance application for a policy on SI-7's life, to be owned by the Trust, was submitted to Phoenix. The application was signed by BURSEY, Waesche, and SI-7. In a Statement of Client Intent ("SOCI"), included with the application, the applicant was informed that, among other things, Phoenix will not knowingly participate in sales programs or strategies, including premium financing arrangements, designed primarily to facilitate the eventual sale or transfer of the policy to investors. The SOCI, which was also signed by BURSEY, Waesche, and SI-7, contained several material misrepresentations, including falsely giving SI-7's "bona fide insurance need" as "estate planning;" falsely denying that any premiums would be borrowed by the proposed owner, proposed insured, or by any other individual or entity; falsely denying that the proposed owner or proposed insured have been advised of the opportunity to transfer the policy to a third party within five years of its issuance; falsely denying the existence of an agreement under which a third party would obtain any interest in the policy or entity owning the policy; and falsely denying that any entity conducted or made plans to conduct a life expectancy evaluation of the insured within the past two years.

Other parts of the application contained additional misrepresentations, including falsely inflating SI-7's net worth and income; falsely denying that "non-recourse premium financing or any other method [is] being utilized to pay premiums in order to facilitate a current or future transfer, assignment or other action with respect to the benefits provided under the policy being provided for;" and falsely denying that "there [is] any intention that any party, other than the Owner, will obtain any right, title, or interest in any policy issued on the life of the Proposed Life Insured(s) as a result of this application." Finally, on the Producer's Report, signed by Waesche, the application again falsely denied that there "is [] any intention that any party (including a Viatical Company), other than the Owner, will obtain any right, title, or interest in any policy issued on the life of the Proposed Life Insured(s) as a result of this application."

81.     In truth and in fact, and as the defendants well knew, the policy was intended to be funded, and was in fact funded, through a loan to the Trust by Funding Entity 1, as memorialized by a DAC, signed by CARPENTER as "Chairman of Managing Member" of Funding Entity 1, and a "Funding Obligation Agreement" between the Trust and Funding Entity 1, which was signed by BURSEY on behalf of the Trust and by CARPENTER on behalf of Funding Entity 1. Funding Entity 1, in turn, borrowed the money from the Outside Funder, as reflected in an August 14, 2007 Commitment letter from the Outside Funder to Funding Entity 1, to lend $252,407.27 to Funding Entity 1 for the purpose of funding its loan to the Trust to pay the premiums on the policy on SI-7's life.

82.     On or about May 11, 2010, in the District of Connecticut, for the purpose of executing and attempting to execute the above-described scheme and artifice to defraud and deprive, CARPENTER and BURSEY, and others working for and on behalf of the Subject Entities, knowingly caused to be deposited to be sent and delivered by a private and commercial

33

interstate carrier, to wit Federal Express, and aided and abetted others to do the same, the following matter: a May 10, 2010 Funding Memorandum & Disbursement Request, from CARPENTER on behalf of Funding Entity 1 to the Outside Funder and the Insurance Trustee, to disburse $30,045.20 for the purpose of funding Funding Entity 1's loan to the Trust to pay a premium on the insurance policy on SI-7's life, together with a wire transfer authorization, signed by BURSEY, to transfer the funds from the Trust to Phoenix.

In violation of Title 18, United States Code Sections 1341 and 2.

## COUNT TWENTY
### (Wire Fraud)

83.    The allegations contained in Paragraphs 1 through 42 of this Indictment are realleged as though fully set forth herein.

84.    In or about October 2008, Straw Insured-8 ("SI-8"), a then 75-year-old resident of Texas, and his wife, met with Outside Agent-2 ("OA-2"), a Houston-based insurance agent whose identity is known to the Grand Jury at OA-2's office. OA-2 presented a life insurance program whereby SI-8 would own a life insurance policy for two years, with the premiums paid by outside investors, and with SI-8 able to name the beneficiary. After two years, the investors would buy SI-8 out of the policy and he would receive money. OA-2 directed SI-8 to sign a series of documents, and OA-2 assisted SI-8 in forming a company in order to participate in this program.

85.    On or about December 29, 2008, an application for insurance on the life of SI-8 was faxed from the Simsbury Office in Connecticut to Lincoln in North Carolina. The application was signed by SI-8, OA-2, and BURSEY. The application included several material misrepresentations, including: falsely inflating SI-8's income and net worth; falsely denying discussions about the possible sale of the policy; and falsely denying that the policy would be

34

funded "via a premium financing loan or with funds borrowed, advanced, or paid from another person or entity." These representations were made both on behalf of the insured (SI-8) and the owner (BURSEY, on behalf of the Trust). The application also included an "Agent's Report," signed by OA-2, that falsely claimed the purpose of the insurance was "Estate Planning;" falsely denied the existence of a premium financing loan; and falsely denied that the policy is being "paid for with funds from any person or entity whose only interest in the policy is the potential for earnings based on the provision of funding for this policy."

86.     The application further included a "Required Producer & Representative Certification Regarding Stranger Owned Life Insurance," which was signed by OA-2 and Inside Agent 1 ("IA-1"), an insurance agent who maintained an office at the Simsbury Office and frequently worked on behalf of the Subject Entities. This certification falsely denied discussions about the possible sale of the policy and falsely denied that the policy would be funded by premium financing. The certification was also accompanied by a Lincoln policy statement making clear that, among other things, it would deny applications for STOLI policies.

87.     SI-8 later took a phone call from an individual verifying information on SI-8's application.   OA-2, who was in the background during the call, instructed SI-8 regarding the answers to the caller's questions.

88.     In truth and in fact, and as the defendants well knew, the policy was intended to be funded, and was in fact funded, through a loan to the Trust by Funding Entity 1, as memorialized by a DAC, signed by CARPENTER as "Chairman of Managing Member" of Funding Entity 1, and a "Funding Obligation Agreement" between the Trust and Funding Entity 1, which was signed by BURSEY on behalf of the Trust and by CARPENTER on behalf of Funding Entity 1.  Funding Entity 1, in turn, borrowed the money from the Outside Funder, as

35

reflected in a December 24, 2008 Commitment letter from the Outside Funder to Funding Entity 1, to lend $345,788.49 to Funding Entity 1 for the purpose of funding its loan to the Trust to pay the premiums on the policy on SI-8's life.

89.     For the purpose of executing and attempting to execute the aforesaid scheme and artifice to defraud, on or about the dates listed below, in the District of Connecticut and elsewhere, defendants CARPENTER and BURSEY, and others working for and on behalf of the Subject Entities, did knowingly cause to be transmitted, and aided and abetted others to cause to be transmitted, in interstate commerce by means of wire communication certain signs, signals and sounds, to wit a December 29, 2008 facsimile of the above-referenced application for an insurance policy on SI-8's life, sent from the Simsbury Office in Connecticut to Lincoln offices in North Carolina.

In violation of Title 18, United States Code Sections 1343 and 2.

### COUNT TWENTY-ONE
(Mail Fraud)

90.     The allegations contained in Paragraphs 1 through 42 and 84 through 89 of this Indictment are realleged as though fully set forth herein.

91.     On or about December 30, 2008, in the District of Connecticut, for the purpose of executing and attempting to execute the above-described scheme and artifice to defraud and deprive, CARPENTER and BURSEY, and others working for and on behalf of the Subject Entities, knowingly caused to be deposited to be sent and delivered by a private and commercial interstate carrier, to wit Federal Express, and aided and abetted others to do the same, the following matter: a December 30, 2008 Funding Memorandum & Disbursement Request, from CARPENTER on behalf of Funding Entity 1 to the Outside Funder and the Insurance Trustee, to disburse $229,288.49 for the purpose of funding Funding Entity 1's loan to the Trust to pay a

premium on the insurance policy on SI-8's life, together with a wire transfer authorization, signed by BURSEY, to transfer the funds from the Trust to Lincoln.

In violation of Title 18, United States Code Sections 1341 and 2.

## COUNT TWENTY-TWO
### (Mail Fraud)

92.     The allegations contained in Paragraphs 1 through 42 of this Indictment are realleged as though fully set forth herein.

93.     In or about 2007, Straw Insured-9 ("SI-9"), a then 72-year-old resident of New York and California, was approached by Outside Agent-3 ("OA-3"), a partner of OA-1 with whom SI-9 had some prior dealings. OA-3 offered to have SI-9 participate in a program where a life insurance policy would be taken on SI-9's life; SI-9 would owe nothing towards the policy; after two years the policy would be sold; and SI-9 would receive some portion of the sale proceeds. SI-9 was not at the time seeking insurance, nor was she offered any other plans or programs by OA-3.

94.     On or about March 14, 2007, an application for insurance on the life of SI-9 was sent from the Simsbury Office to Lincoln. The application was signed by SI-9 and BURSEY. The application contained several material misrepresentations and omissions, including: falsely inflating SI-9's net worth; falsely denying discussions about the possible sale of the policy; falsely denying that the policy would be "paid for with a premium financing funding loan" or that the loan would be "in any part non-recourse premium financing;" and failing to answer whether the policy is "being paid for with funds from any person or entity whose only interest in the policy is the potential for earnings based on the provision of funding for the policy."

95.     The application further included a "Required Producer & Representative Certification Regarding Stranger Owned Life Insurance," which was signed by OA-1, OA-3, and

another employee of the Subject Entities who conducted business from the Stamford Office. This certification falsely denied discussions about the possible sale of the policy and falsely denied that the policy would be funded by premium financing. The certification was also accompanied by a Lincoln policy statement making clear that, among other things, it would deny applications for STOLI policies.

96. On or about March 26, 2007, an email was sent from an insurance general agent to Lincoln, reporting as "no" the previously unanswered question "whether the policy is "being paid for with funds from any person or entity whose only interest in the policy is the potential for earnings based on the provision of funding for the policy." On or about March 30, 2007, a document was faxed to Lincoln, signed by OA-1, SI-9, and BURSEY, intended to amend the application, which included false representations denying that the premiums are "being advanced, loaned or financed by a third party;" and denying discussions about the sale of the policy as an inducement to purchase the life insurance policy.

97. In truth and in fact, and as the defendants well knew, the policy was intended to be funded, and was in fact funded, through a loan to the Trust by Funding Entity 1, as memorialized by a DAC, signed by CARPENTER as "Chairman of Managing Member" of Funding Entity 1, and a "Funding Obligation Agreement" between the Trust and Funding Entity 1, which was signed by BURSEY on behalf of the Trust and by CARPENTER on behalf of Funding Entity 1. Funding Entity 1, in turn, borrowed the money from the Outside Funder, as reflected in an April 4, 2007 Commitment letter from the Outside Funder to Funding Entity 1, to lend $284,234.92 to Funding Entity 1 for the purpose of funding its loan to the Trust to pay the premiums on the policy on SI-9's life.

98. On or about March 26, 2009, in the District of Connecticut, for the purpose of

executing and attempting to execute the above-described scheme and artifice to defraud and deprive, CARPENTER and BURSEY, and others working for and on behalf of the Subject Entities, knowingly caused to be deposited to be sent and delivered by a private and commercial interstate carrier, to wit Federal Express, and aided and abetted others to do the same, the following matters: a March 26, 2009 Funding Memorandum & Disbursement Request, from CARPENTER on behalf of Funding Entity 1 to the Outside Funder and the Insurance Trustee, to disburse $17,100 for the purpose of funding Funding Entity 1's loan to the Trust to pay a premium on the insurance policy on SI-9's life, together with a wire transfer authorization, signed by BURSEY, to transfer the funds from the Trust to Lincoln.

In violation of Title 18, United States Code Sections 1341 and 2.

## COUNT TWENTY-THREE
### (Wire Fraud)

99.     The allegations contained in Paragraphs 1 through 42 of this Indictment are realleged as though fully set forth herein.

100.    In or about 2008, Straw Insured-10 ("SI-10"), a then 78-year-old female resident of Texas, was approached by OA-2, with whom she had some prior dealings, regarding the purchase of a large insurance policy on SI-10's life. OA-2 explained that SI-10 would have no financial liability for the policy, and she would not have to pay anything aside from the cost of setting up a company ("[SI-10] Investments LLC"). There was no discussion about taking over payments at a later date. SI-10 does not recall conversations about selling the policy, but OA-2 told her she would get rich.

101.    On or about September 16, 2008, an application for insurance on the life of SI-10 was faxed from the Simsbury Office in Connecticut to Lincoln in North Carolina. The application was signed by SI-10, OA-2, and BURSEY. The application included several

39

material misrepresentations, including: falsely inflating SI-10's income and net worth; falsely denying discussions about the possible sale of the policy by the owner; and falsely denying that the policy would be funded "via a premium financing loan or with funds borrowed, advanced, or paid from another person or entity." These representations were made both on behalf of the insured (SI-10) and the owner (BURSEY, for the Trust). The application also included an "Agent's Report," signed by OA-2, that falsely denied the existence of a premium financing loan, and falsely denied that the policy is being "paid for with funds from any person or entity whose only interest in the policy is the potential for earnings based on the provision of funding for this policy."

102.     On September 17, 2008, a "Required Producer & Representative Certification Regarding Stranger Owned Life Insurance" (the "SI-10 Certification") was faxed from the Simsbury Office to Lincoln in North Carolina. It was signed by OA-2 and IA-1, and falsely denied that the policy would be funded by premium financing.   This fax included a policy statement from Lincoln that makes clear that it will deny applications for STOLI policies.

103.     In truth and in fact, and as the defendants well knew, the policy was intended to be funded, and was in fact funded, through a loan to the Trust by Funding Entity 1, as memorialized by a DAC, signed by CARPENTER as "Chairman of Managing Member" of Funding Entity 1, and a "Funding Obligation Agreement" between the Trust and Funding Entity 1, which was signed by BURSEY on behalf of the Trust and by CARPENTER on behalf of Funding Entity 1. Funding Entity 1, in turn, borrowed the money from the Outside Funder, as reflected in a September 8, 2008 Commitment Letter from the Outside Funder to Funding Entity 1, to lend $868,077.91 to Funding Entity 1 for the purpose of funding its loan to the Trust to pay the premiums on the policy on SI-10's life.

104.    On or about September 16, 2008, for the purpose of executing and attempting to execute the aforesaid scheme and artifice to defraud, in the District of Connecticut and elsewhere, defendants CARPENTER and BURSEY, and others working for and on behalf of the Subject Entities, did knowingly cause to be transmitted, and aided and abetted others to cause to be transmitted, in interstate commerce by means of wire communication certain signs, signals and sounds, to wit a facsimile of the above-referenced application for an insurance policy on SI-10's life, sent from the Simsbury Office in Connecticut to Lincoln offices in North Carolina.

In violation of Title 18, United States Code Sections 1343 and 2.

## COUNTS 24-25
(Mail Fraud)

105.    The allegations contained in Paragraphs 1 through 42 and 100 through 104 of this Indictment are realleged as though fully set forth herein.

106.    In the District of Connecticut, for the purpose of executing and attempting to execute the above-described scheme and artifice to defraud and deprive, CARPENTER and BURSEY, and others working for and on behalf of the Subject Entities, knowingly caused to be deposited to be sent and delivered by a private and commercial interstate carrier, to wit Federal Express, and aided and abetted others to do the same, the following matters, each being a separate count of this Indictment:

| Count | Date | Description |
|---|---|---|
| Twenty-Four | September 22, 2008 | A Funding Memorandum & Disbursement Request, from CARPENTER on behalf of Funding Entity 1 to the Outside Funder and the Insurance Trustee, to disburse $537,001.84 for the purpose of funding Funding Entity 1's loan to the Trust to pay a premium on the insurance policy on SI-10's life, together with a wire transfer authorization, signed by BURSEY, to transfer funds from the Trust to Lincoln |

| Count | Date | Description |
|-------|------|-------------|
| Twenty-Five | August 26, 2009 | A Funding Memorandum & Disbursement Request, from CARPENTER on behalf of Funding Entity 1 to the Outside Funder and the Insurance Trustee, to disburse $305,151.87 for the purpose of funding Funding Entity 1's loan to the Trust to pay a premium on the insurance policy on SI-10's life, together with a wire transfer authorization, signed by BURSEY, to transfer funds from the Trust to Lincoln |

All in violation of Title 18, United States Code Sections 1341 and 2.

### COUNT TWENTY-SIX
(Wire Fraud)

107.   The allegations contained in Paragraphs 1 through 42 of this Indictment are realleged as though fully set forth herein.

108.   In or about 2008, Straw Insured-11 ("SI-11"), a then 75-year-old female Texas resident, together with her husband, met with OA-2 at OA-2's office in Houston, Texas.  OA-2 told SI-11 and her husband about a way to increase their income through an insurance policy. OA-2 explained that a policy would be taken out on SI-11's life, with her husband as beneficiary. The Trust would take out a loan from a hedge fund to pay the annual premium.  For two years, SI-11 would be fully insured while the lender pays the premiums.  After two years, the Trust would sell the policy for approximately $1.5 million, with SI-11 and her husband to receive a share of the proceeds.  A limited liability company would be set up by an attorney working with OA-2 to enable SI-11 to participate in the Plan and Trust.  OA-2 instructed SI-11 to answer "no" if asked whether she considered a sale of the policy.

109.   On or about January 5, 2009, an application for insurance on the life of SI-11 was faxed from the Simsbury Office in Connecticut to Lincoln in North Carolina.  The application was signed by SI-11, OA-2, and BURSEY.  The application included several material misrepresentations, including: falsely inflating SI-11's income and net worth; falsely

42

denying discussions about the possible sale of the policy by the owner; and falsely denying that the policy would be funded "via a premium financing loan or with funds borrowed, advanced, or paid from another person or entity." These representations were made both on behalf of the insured (SI-11) and the owner (BURSEY, for the Trust). The application also included an "Agent's Report," signed by OA-2, that falsely claimed the purpose of the insurance was "Estate Planning;" falsely denied the existence of a premium financing loan; and falsely denied that the policy is being "paid for with funds from any person or entity whose only interest in the policy is the potential for earnings based on the provision of funding for this policy."

110.    The application also included a "Required Producer & Representative Certification Regarding Stranger Owned Life Insurance," which was signed by OA-2 and JA-1. This certification falsely denied that the policy would be funded by premium financing, and falsely denied discussions regarding the sale of the policy. The certification was accompanied by a policy statement from Lincoln that makes clear that it will deny applications for STOLI policies.

111.    In truth and in fact, and as the defendants well knew, the policy was intended to be funded, and was in fact funded, through a loan to the Trust by Funding Entity 1, as memorialized by a DAC, signed by CARPENTER as "Chairman of Managing Member" of Funding Entity 1, and a "Funding Obligation Agreement" between the Trust and Funding Entity 1, which was signed by BURSEY on behalf of the Trust and by CARPENTER on behalf of Funding Entity 1. Funding Entity 1, in turn, borrowed the money from the Outside Funder, as reflected in a December 24, 2008 Commitment Letter from the Outside Funder to Funding Entity 1, to lend $473,862.45 to Funding Entity 1 for the purpose of funding its loan to the Trust to pay the premiums on the policy on SI-11's life.

43

112.   On or about January 5, 2009, for the purpose of executing and attempting to execute the aforesaid scheme and artifice to defraud, in the District of Connecticut and elsewhere, defendants CARPENTER and BURSEY, and others working for and on behalf of the Subject Entities, did knowingly cause to be transmitted, and aided and abetted others to cause to be transmitted, in interstate commerce by means of wire communication certain signs, signals and sounds, to wit a facsimile of the above-referenced application for an insurance policy on SI-11's life, sent from the Simsbury Office in Connecticut to Lincoln offices in North Carolina.

In violation of Title 18, United States Code Sections 1343 and 2.

## COUNTS 27-28
(Mail Fraud)

113.   The allegations contained in Paragraphs 1 through 42 and 108 through 112 of this Indictment are realleged as though fully set forth herein.

114.   On or about the dates set forth below, in the District of Connecticut, for the purpose of executing and attempting to execute the above-described scheme and artifice to defraud and deprive, CARPENTER and BURSEY, and others working for and on behalf of the Subject Entities, knowingly caused to be deposited to be sent and delivered by a private and commercial interstate carrier, to wit Federal Express, and aided and abetted others to do the same, the following matters, each being a separate count of this Indictment:

| Count | Date | Description |
|---|---|---|
| Twenty-Seven | January 5, 2009 | A Funding Memorandum & Disbursement Request, from CARPENTER on behalf of Funding Entity 1 to the Outside Funder and the Insurance Trustee, to disburse $314,362.45 for the purpose of funding Funding Entity 1's loan to the Trust to pay a premium on the insurance policy on SI-11's life, together with a wire transfer authorization, signed by BURSEY, to transfer funds from the Trust to Lincoln |

| Count | Date | Description |
|-------|------|-------------|
| Twenty-Eight | November 4, 2009 | A Funding Memorandum & Disbursement Request, from CARPENTER on behalf of Funding Entity 1 to the Outside Funder and the Insurance Trustee, to disburse $122,000 for the purpose of funding Funding Entity 1's loan to the Trust to pay a premium on the insurance policy on SI-11's life, together with a wire transfer authorization, signed by BURSEY, to transfer funds from the Trust to Lincoln |

All in violation of Title 18, United States Code Sections 1341 and 2.

COUNTS 29-32
(Wire Fraud)

115.   The allegations contained in Paragraphs 1 through 42 of this Indictment are realleged as though fully set forth herein.

116.   In or about 2008, Straw Insured-12 ("SI-12"), a then 69-year-old Connecticut resident, was referred to Waesche through SI-1, after SI-1 explained to SI-12 that he was making money by purchasing and selling insurance policies on his own life. Waesche explained that they would look for an insurance company to issue a policy on SI-12's life, and that SI-12 may have to fill out paperwork and provide financial information. Waesche offered a "hold harmless" agreement in the event any information in the application was not completely accurate. SI-12 understood that the Trust would pay the premiums for two years. If SI-12 passed away within two years, his beneficiary would get the death benefit, less premium payments and fees. After two years, SI-12 could either take over the policy and premium payments, or the policy could be sold to a hedge fund and SI-12 may get some money from the sale. At the time, SI-12 was not seeking insurance and had no intent to take over the policy, nor could he afford to do so even if he wanted to.

117.   On or about April 9, 2008, an insurance application on SI-12's life, to be owned

45

by the Trust, was submitted to Phoenix. The application was signed by SI-12, Waesche, and BURSEY, on behalf of the Trust. The application contained several material misrepresentations, including: falsely denying that "any of the first year or subsequent premiums for the policy [will] be borrowed by the proposed owner or proposed insured or by any other individual, trust, partnership, corporation, or similar or related entity;" falsely denying that the "owner, now or in the future, [will] pay premiums funded by an individual and/or entity other than the proposed insured;" falsely denying that the proposed owner or proposed insured "have been advised of the opportunity to transfer the policy to a third party within five years of its issuance;" and falsely denying that any entity conducted or made plans to conduct a life expectancy evaluation of the insured within the past two years. The application also falsely claimed that the "bona fide need" for insurance for the proposed owner or proposed insured was "estate tax liquidity, wealth transfer, [and] business succession." The application also included a "Producer's Report," signed by Waesche, which falsely denied "any intention that an party (Including a Viatical Company), other than the Owner, will obtain any right, title, or interest in any policy issued on the life of the Proposed Life Insured(s) as a result of this application."

118. In truth and in fact, and as the defendants well knew, the policy was intended to be funded, and was in fact funded, through a loan to the Trust by Funding Entity 1, as memorialized by a DAC form signed by Waesche and SI-12. The policy on SI-12's life was not funded by the Outside Funder, but rather through money transferred from the Funding Entities.

119. For the purpose of executing and attempting to execute the aforesaid scheme and artifice to defraud, on or about the dates listed below, in the District of Connecticut and elsewhere, defendants CARPENTER and BURSEY, and others working for and on behalf of the Subject Entities, did knowingly cause to be transmitted, and aided and abetted others to cause to

46

be transmitted, in interstate commerce by means of wire communication certain signs, signals and sounds the following, each of which is a separate count of the Indictment:

| Count | Date | Description |
|-------|------|-------------|
| Twenty-Nine | October 3, 2008 | Wire transfer of $57,000, initiated by CARPENTER from a Bank of America branch in Connecticut to PNC Bank in Pennsylvania, transferring money from Funding Entity 2 to the Trust to finance a premium payment for the policy on SI-12's life |
| Thirty | October 6, 2008 | Email from an employee of the Subject Entities in Connecticut to the Insurance Trustee in Delaware requesting the processing of a $57,000 wire transfer, signed by BURSEY, from the Trust to Phoenix to pay a premium on the policy on SI-12's life |
| Thirty-One | May 5, 2009 | Wire transfer of $57,600, initiated by CARPENTER from a Bank of America branch in Connecticut to PNC Bank in Pennsylvania, transferring money from Funding Entity 2 to the Trust to finance a premium payment for the policy on SI-12's life |
| Thirty-Two | May 6, 2009 | Email from an employee of the Subject Entities in Connecticut to the Insurance Trustee in Delaware requesting the processing of a $57,600 wire transfer, signed by BURSEY, from the Trust to Phoenix to pay a premium on the policy on SI-12's life |

All in violation of Title 18, United States Code Sections 1343 and 2.

COUNT THIRTY-THREE
(Conspiracy to Commit Mail and Wire Fraud)

120.    The allegations in paragraphs 1-119 of this Indictment are incorporated herein by reference.

121.    From in or about 2006 through in or about 2013, in the District of Connecticut and elsewhere, CARPENTER, BURSEY, and others known and unknown to the grand jury, willfully and knowingly did combine, conspire, confederate, and agree together and with each

other to commit mail and wire fraud as described in this Indictment, in violation of Title 18, United States Code, Sections 1341 and 1343, that is, to devise and execute a scheme to defraud the Life Insurance Providers by means of false and fraudulent pretenses, representations, and promises, and to execute that scheme by means of use of private interstate and commercial carriers and interstate wire communications.

All in violation of Title 18, United States Code Section 1349.

## COUNT THIRTY-FOUR
### (Conspiracy to Commit Money Laundering)

122.     The allegations in paragraphs 1-119 of this Indictment are incorporated herein by reference.

### Background on SI-13

123.     In or about 2006, Straw Insured 13 ("SI-13"), a then 75-year old resident of Florida, agreed to participate as an insured in the Trust. SI-13 was introduced to the Trust by OA-1. SI-13 named as the beneficiary of his participation in the Trust a New York City-based charity (hereinafter the "SI-13 charity"). As explained below, two Trust-owned insurance policies on SI-13's life were issued by Lincoln based upon applications that contained false and fraudulent representations (the "SI-13 fraud").

124.     The first policy on SI-13's life to be placed in the Trust was originated through a Lincoln application dated December 17, 2006, signed by BURSEY (as trustee), SI-13, and OA-1. This policy had a face value (i.e., death benefit) of $10 million (the "$10 million policy"). The application contained several material misrepresentations and omissions, including: falsely denying discussions about the possible sale of the policy; falsely denying that the policy would be "paid for with a premium financing funding loan" or that the loan would be "in any part non-recourse premium financing;" and falsely denying that the policy is "being paid for with funds

from any person or entity whose only interest in the policy is the potential for earnings based on the provision of funding for the policy." On January 11, 2007, an amendment to the $10 million policy application was executed that, among other statements, falsely represented that "the premiums illustrated to be paid in the first two years are not being advanced, loaned, or financed by a third party," and that "I have not been involved in any discussion about the possible sale or assignment of this policy as an inducement to purchase the life insurance policy for sale at a later date." The amendment was separately executed by BURSEY and SI-13.

125.    In truth and in fact, and as the defendants well knew, the $10 million policy was intended to be funded, and was in fact funded, through a loan to the Trust by Funding Entity 1, as memorialized by a DAC, also dated December 17, 2006. Funding Entity 1, in turn, borrowed the money from the Outside Funder, as reflected in a January 11, 2007 Commitment letter from the Outside Funder to Funding Entity 1, to lend $964,785.00 to Funding Entity 1 for the purpose of funding its loan to the Trust to pay premiums on the $10 million policy on SI-13's life. A Funding Memorandum & Disbursement Request, dated January 12, 2007, on behalf of Funding Entity 1, directed the Outside Funder to disburse $696,035.00 to Funding Entity 1 for the purpose of a premium payment on the $10 million policy. A "Funding Obligation Agreement" between the Trust and Funding Entity 1, which was signed by BURSEY on behalf of the Trust and by CARPENTER on behalf of Funding Entity 1, was later executed on or about April 4, 2007. The loan by Funding Entity 1 to the Trust was secured by a "Collateral Assignment Agreement" in favor of Funding Entity 1, which was executed by the Insurance Trustee on behalf of the Trust on April 6, 2007, and by CARPENTER on behalf of Funding Entity 1 on April 4, 2007.

126.    The second policy on SI-13's life to be placed in the Trust was originated through

a Lincoln application dated March 19, 2007, signed by BURSEY (as trustee), SI-13, and OA-1. This policy had a face value of $20 million (the "$20 million policy"). The $20 million policy application contained several material misrepresentations and omissions, including falsely denying discussions about the possible sale of the policy. Also on March 19, 2007, an amendment to the policy application was executed by BURSEY and SI-13 that, among other statements, falsely represented that "the premiums illustrated to be paid in the first two years are not being advanced, loaned, or financed by a third party," and that "I have not been involved in any discussion about the possible sale or assignment of this policy as an inducement to purchase the life insurance policy for sale at a later date."

127.   In truth and in fact, and as the defendants well knew, the $20 million policy was intended to be funded, and was in fact funded, through a loan to the Trust by Funding Entity 1, as memorialized by a DAC, signed by CARPENTER as "Chairman Managing Member" of Funding Entity 1, and a "Funding Obligation Agreement" between the Trust and Funding Entity 1, which was signed by BURSEY on behalf of the Trust and by CARPENTER on behalf of Funding Entity 1. The loan by Funding Entity 1 to the Trust was secured by a "Collateral Assignment Agreement" in favor of Funding Entity 1, which was executed by the Insurance Trustee on behalf of the Trust on March 20, 2007, and by CARPENTER on behalf of Funding Entity 1 on March 19, 2007. Funding Entity 1, in turn, borrowed the money from the Outside Funder, as reflected in a February 12, 2007, Commitment Letter from the Outside Funder to lend $1,915,448.94 to Funding Entity 1 for the purpose of funding its loan to the Trust to pay premiums on SI-13's $20 million policy. A Funding Memorandum and Disbursement request was executed on or about March 19, 2007, signed by Carpenter as Managing Member of Funding Entity 1, directing Outside Funder to release $1,393,273.55 to pay a premium on the

$20 million policy.

128.    On December 26, 2007, in the District of Connecticut, for the purpose of executing and attempting to execute the above-described scheme and artifice to defraud and deprive, CARPENTER and BURSEY, and others working for and on behalf of the Subject Entities, knowingly caused to be deposited to be sent and delivered by a private and commercial interstate carrier, to wit Federal Express, and aided and abetted others to do the same, the following matters: a December 21, 2007, Funding Memorandum & Disbursement Request, from CARPENTER on behalf of Funding Entity 1 to the Outside Funder and the Insurance Trustee, in order to disburse $150,000 for the purpose of funding Funding Entity 1's loan to the Trust to pay a premium on the $10 million policy on SI-13's life, together with a wire transfer authorization, signed by BURSEY, to transfer the funds from the Trust to Lincoln; and also a December 21, 2007 Funding Memorandum & Disbursement Request, from CARPENTER on behalf of Funding Entity 1 to the Outside Funder and the Insurance Trustee, in order to disburse $284,705.79 for the purpose of funding Funding Entity 1's loan to the Trust to pay a premium on the $20 million policy on SI-13's life, together with a wire transfer authorization, signed by BURSEY, to transfer the funds from the Trust to Lincoln.

129.    SI-13 died unexpectedly on June 10, 2008. On June 16, 2008, a representative of the Subject Entities e-mailed "death claim" forms, that is, forms by which an insured's death is reported and a death benefit is requested by the beneficiary, from the Simsbury Office to OA-1 in New York. The death claim forms were executed by BURSEY. On July 16, 2008, the general agent that acted as middleman between OA-1 and Lincoln sent the death claim forms to Lincoln. The death claim forms falsely failed to acknowledge that the policies on SI-13's life had been collaterally assigned to Funding Entity 1.

130.    As SI-13 died within the two-year contestability period, Lincoln initiated an investigation into the policies' origination. Over the ensuing several months, representatives of the Subject Entities sent mailings as well as interstate wires, in the form of facsimiles and emails, requesting that Lincoln expedite its investigation into the death claim, so that the Subject Entities could pay the claim owed to the SI-13 charity. On or about October 22, 2008, BURSEY signed a letter to Lincoln expressing his displeasure with the speed of Lincoln's death claim investigation, and noted "[t]he ultimate beneficiary, [the SI-13 charity], continues to be patient with us for the moment, but I fear that in due time they will become suspicious of your lack of performance." On April 24, 2009, Lincoln requested a series of documents from the Subject Entities to "help us understand how the 419 Plan was established and administered." On April 27, 2009, BURSEY sent a responsive letter to Lincoln. Nowhere in that response, nor in any other communication provided to Lincoln, did the defendants or anyone else reveal to Lincoln that SI-13's policies were funded by Funding Entity 1 or the Outside Funder, nor were the DAC's, Funding Obligation Agreements, Collateral Assignment Agreements, Commitment Letters, or any other funding-related documents provided to Lincoln. BURSEY's response also reiterated "the fiduciary duty we have to pay death benefits to [the SI-13 charity]."

131.    On May 5, 2009, BURSEY, on behalf of the Trust, filed suit against Lincoln, demanding payment of the death benefits associated with both policies insuring SI-13's life (the "death benefit funds"). On May 15, 2009, Lincoln paid the death benefit claim to the Trust by sending two checks for $10,225,758.92 and $20,451,517.83 from Lincoln (in Greensboro, North Carolina) to the Subject Entities in Connecticut. The checks were endorsed by BURSEY and then deposited into a Trust bank account at TD Banknorth with account number ending in 4548 ("Trust account 4548"). Trust account 4548 was not the account that had been used to pay

insurance premiums on Trust-owned policies; rather, it was set up specifically to receive the death benefit funds.

132.    As the beneficiary of SI-13's participation in the Trust, the SI-13 charity requested payment of the death benefit funds from the Trust (the "SI-13 charity death claim"). However, on October 2, 2009, the Subject Entities denied the SI-13 charity death claim.

133.    Beginning on May 21, 2009, the defendants and others working with the defendants transferred the death benefit funds to several different places, but in no instance did they provide any of the death benefit funds to SI-13's beneficiary, the SI-13 charity. Instead, the defendants used the death benefit funds to pay for, among other things, various Trust-related insurance premiums, other insurance premiums, and a home in Rhode Island. The death benefit funds were passed through various bank accounts controlled by CARPENTER and/or BURSEY, and others working for or with the defendants. Some of those bank accounts are described below.

<u>Background on Bank Accounts</u>

134.    The defendants and their co-conspirators utilized several different bank accounts to receive and disburse the death benefit funds. These bank accounts were in the names of the Trust, the Funding Entities, another welfare benefit trust operated by the Subject Entities ("Trust-2"), and other business organizations owned and/or controlled by CARPENTER and other co-conspirators, including entities referred to herein as Business Organization 1 ("BO-1") through Business Organization 4 ("BO-4"). Authorized signers on these bank accounts include the defendants, CARPENTER's assistant ("CA-1"), a relative of CARPENTER ("CR-1"), and another employee of the Subject Entities ("SEE-1"). These bank accounts were held at financial institutions that are engaged in, and the activities of which affect, interstate and foreign

commerce.  Among the bank accounts used by the defendants and their co-conspirators are as follows:

| Financial Institution | Account No. Ending | Entity | Authorized Signers |
|---|---|---|---|
| TD Banknorth | 4712 | Funding Entity 1 | CARPENTER, CA-1 |
| TD Banknorth | 4548 | Trust | BURSEY |
| TD Banknorth | 7136 | Funding Entity 3 | CARPENTER, CA-1 |
| TD Banknorth | 4689 | Funding Entity 2 | CARPENTER, CA-1 |
| TD Banknorth | 4697 | BO-1 | CARPENTER, CA-1 |
| TD Banknorth | 2940 | BO-2 | CARPENTER |
| TD Banknorth | 5455 | BO-3 | CARPENTER, CR-1 |
| TD Banknorth | 4671 | BO-4 | CARPENTER, CA-1 |
| Bank of America | 4932 | Funding Entity 1 | CARPENTER, BURSEY |
| Bank of America | 0017 | Funding Entity 3 | CARPENTER |
| PNC Bank | 3247 | Trust | BURSEY, CR-1, SEE-1 |
| JP Morgan Chase | 3305 | Trust-2 | BURSEY, CR-1 |
| JP Morgan Chase | 8848 | Trust-2 | BURSEY, CR-1 |

## The Conspiracy

135.    From on or about May 21, 2009, through the present, in the District of Connecticut and elsewhere, defendants CARPENTER and BURSEY did knowingly combine, conspire, and agree with each other and with other persons known and unknown to the Grand Jury to commit offenses against the United States in violation of Title 18, United States Code, Section 1956 and Section 1957, to wit:

a.    to knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, that is, mail fraud in violation of Title 18, United States Code, Sections 2 and 1341 and wire fraud in violation of Title 18, United States Code, Sections 2 and 1343, specifically the SI-13 fraud, with the intent to promote the carrying on of specified unlawful activity, that is, mail fraud in violation of Title 18, United States Code, Sections 2 and 1341 and wire fraud in violation of Title 18, United States Code, Sections 2 and 1343, and that while conducting

and attempting to conduct such financial transactions knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i);

b.     to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, mail fraud in violation of Title 18, United States Code, Sections 2 and 1341 and wire fraud in violation of Title 18, United States Code, Sections 2 and 1343, specifically the SI-13 fraud, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

c.     to knowingly engage and attempt to engage in monetary transactions by, through or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is, mail fraud in violation of Title 18, United States Code, Sections 2 and 1341 and wire fraud in violation of Title 18, United States Code, Sections 2 and 1343, such property having been derived from a specified unlawful activity, that is, mail fraud in violation of Title 18, United States Code, Sections 2 and 1341 and wire fraud in violation of Title 18, United States Code, Sections 2 and 1343, specifically the SI-13 fraud, in violation of Title 18, United States Code, Section 1957.

All in violation of Title 18, United States Code Section 1956(h).

COUNTS 35-39
(Illegal Monetary Transactions)

136.     The allegations contained in Paragraphs 122 through 135 of this Indictment are realleged as though fully set forth herein.

137.     On or about the dates set forth below, in the District of Connecticut and elsewhere, defendants CARPENTER and BURSEY did knowingly engage and attempt to engage in, and aided, abetted, and caused others to do the same, the following monetary transactions, each of which is a separate count of this Indictment, by, through, or to a financial institution, affecting interstate or foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, mail fraud in violation of Title 18, United States Code, Sections 2 and 1341 and wire fraud in violation of Title 18, United States Code, Sections 2 and 1343, specifically the SI-13 fraud.

| Count | Date | Monetary Transaction |
|-------|------|----------------------|
| 35 | May 21, 2009 | Transfer of $8,677,276.75 from Trust account 4548 to Funding Entity 1 account 4712, initiated by a checking debit memo signed by BURSEY. |
| 36 | May 22, 2009 | Wire transfer of $3,356,700 from Funding Entity 1 account 4712 to Funding Entity 1 account 4932, initiated by a wire transfer request signed by CARPENTER. |
| 37 | May 26, 2009 | Transfer of $2,186,566 from Trust account 4548 to Funding Entity 1 account 4712, initiated by a checking debit memo signed by BURSEY. |
| 38 | October 27, 2009 | Transfer of $19,800,000 from Trust account 4548 to Funding Entity 1 account 4712, initiated by a checking withdrawal form signed by BURSEY. |
| 39 | October 28, 2009 | Transfer of $19,000,000 from Funding Entity 1 account 4712 to Funding Entity 3 account 7136. |

56

All in violation of Title 18, United States Codes, Sections 1957 and 2.

COUNTS 40-47<br>(Illegal Monetary Transactions)

138.     The allegations contained in Paragraphs 122 through 135 of this Indictment are realleged as though fully set forth herein.

139.     On or about the dates set forth below, in the District of Connecticut and elsewhere, defendants CARPENTER and BURSEY did knowingly engage and attempt to engage in, and aided, abetted, and caused others to do the same, the following monetary transactions, each of which are a separate count of this Indictment, by, through, or to a financial institution, affecting interstate or foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, mail fraud in violation of Title 18, United States Code, Sections 2 and 1341 and wire fraud in violation of Title 18, United States Code, Sections 2 and 1343, specifically the SI-13 fraud.

| Count | Date | Monetary Transaction |
|---|---|---|
| 40 | June 9, 2009 | Wire Transfer of $2,833,568.64 from Funding Entity account 4712 to Trust-2 account 3305, originated by Funding Entity 1. |
| 41 | June 9, 2009 | Transfer of $2,833,568.64 from Trust-2 account 3305 to Trust-2 account 8488. |
| 42 | June 12, 2009 | Wire Transfer of $2,700,000 from Trust-2 account 8488 to BO-4 account 4671, originated by Trust-2, purporting to be a loan from Trust-2 to BO-4. |
| 43 | July 13, 2009 | Transfer of $2,500,000 from BO-4 account 4671 to Funding Entity 1 account 4712, originated by a checking debit memo signed by CARPENTER. |
| 44 | July 13, 2009 | Transfer of $2,200,000 from Funding Entity 1 account 4712 to Funding Entity 3 account 7136, originated by a checking debit memo signed by CARPENTER. |

| Count | Date | Monetary Transaction |
|---|---|---|
| 45 | July 15, 2009 | Transfer of $1,200,000 from Funding Entity 3 account 7136 to BO-2 account 2940, originated by a checking debit memo signed by CARPENTER. |
| 46 | July 15, 2009 | Transfer of $1,100,000 from BO-2 account 2940 to BO-3 account 5455, originated by a savings/CD withdrawal form signed by CARPENTER. |
| 47 | July 15, 2009 | Withdrawal of $1,040,000 from BO-3 account 5455 in the form of an official bank check made out to CARPENTER, and which was subsequently endorsed to a real estate attorney for the purpose of purchasing a home in Rhode Island. |

All in violation of Title 18, United States Codes, Sections 1957 and 2.

## COUNTS 48-57
### (Money Laundering: Promotion of Specified Unlawful Activity)

140.    The allegations contained in Paragraphs 122 through 135 of this Indictment are realleged as though fully set forth herein.

141.    Among the several places to which defendants CARPENTER and BURSEY and their co-conspirators sent the SI-13 death benefit funds included (a) the Outside Funder, to repay the loans and interest related to the insurance premiums paid on the two Lincoln insurance policies on SI-13's life; and (b) insurance companies, to pay premiums on policies that were held by the Trust and insured the lives of various Straw Insureds. Three of the Straw Insureds whose policies had premiums funded by proceeds of the SI-13 fraud were SI-5, defined above, Straw Insured 14 ("SI-14"), and Straw Insured 15 ("SI-15"). Two Lincoln insurance policies were taken by the Trust on each of the lives of SI-14 and SI-15. Like the applications for the other Straw Insureds described in this Indictment, the applications for policies on the lives of SI-14 and SI-15 contained several material misrepresentations, including: falsely denying discussions

about the possible sale of the policy; and falsely denying that the policy would be funded "via a premium financing loan or with funds borrowed, advanced, or paid from another person or entity." These representations were made both on behalf of the Straw Insured and the owner (BURSEY, for the Trust). The applications also included an "Agent's Report" that falsely denied the existence of a premium financing loan, and falsely denied that the policy was being "paid for with funds from any person or entity whose only interest in the policy is the potential for earnings based on the provision of funding for this policy." In truth and in fact, and as the defendants well knew, each policy was intended to be funded, and was in fact funded, through a loan to the Trust by Funding Entity 1. In furtherance of the origination and maintenance of the policies on SI-14's and SI-15's lives, numerous mailings and interstate wires were utilized by the defendants and others working for and with the defendants.

142.    On or about the dates set forth below, in the District of Connecticut and elsewhere, defendants BURSEY and CARPENTER did knowingly conduct and attempt to conduct, and aid, abet, and cause others to conduct, the following financial transactions affecting interstate and foreign commerce, each of which is a separate count of this Indictment, which involved the proceeds of a specified unlawful activity, that is mail fraud in violation of Title 18, United States Code, Sections 2 and 1341 and wire fraud in violation of Title 18, United States Code, Sections 2 and 1343, specifically the SI-13 fraud, with the intent to promote the carrying on of specified unlawful activity, to wit: mail fraud in violation of Title 18, United States Code, Sections 2 and 1341 and wire fraud in violation of Title 18, United States Code, Sections 2 and 1343, and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

| Count | Date | Monetary Transaction |
|-------|------|----------------------|
| 48 | May 22, 2009 | Transfer of $2,100,000 from Funding Entity 1 account 4712 to Funding Entity 3 account 7136, initiated by a checking debit memo signed by CARPENTER, for the purpose of, among other things, funding premiums to be paid on other Trust-owned insurance policies. |
| 49 | May 26, 2009 | Wire Transfer of $2,094,654.78 from Funding Entity 1 account 4932 to Outside Funder Account 1486, originated by CARPENTER, for the purpose of repaying the loan and interest related to insurance premiums paid on the $20 million Lincoln insurance policy on SI-13's life. |
| 50 | May 26, 2009 | Wire Transfer of $1,063,045.54 from Funding Entity 1 account 4932 to Outside Funder Account 1486, originated by CARPENTER, for the purpose of repaying the loan and interest related to insurance premiums paid on the $10 million Lincoln insurance policy on SI-13's life. |
| 51 | June 2, 2009 | Wire transfer of $119,875 from Funding Entity 1 account 4932 to Trust account 3247, originated by CARPENTER, for the purpose of funding a premium to be paid on a Trust-owned policy insuring SI-14's life. |
| 52 | June 3, 2009 | Wire transfer of $119,875 from Trust account 3427 to Lincoln account 1427, originated by BURSEY, for the purpose of paying a premium on a Trust-owned policy insuring SI-14's life. |
| 53 | June 9, 2009 | Wire transfer of $1,946,000 from Funding Entity 3 account 7136 to Funding Entity 3 account 0017, authorized by CARPENTER, for the purpose of, among other things, funding premiums to be paid on other Trust-owned insurance policies. |
| 54 | June 17, 2009 | Wire transfer of $61,925 from Funding Entity 3 account 0017 to Trust account 3247, originated by CARPENTER, for the purpose of funding a premium to be paid on a Trust-owned policy insuring SI-15's life. |

| Count | Date | Monetary Transaction |
|---|---|---|
| 55 | June 17, 2009 | Wire transfer of $139,633.33 from Funding Entity 3 account 0017 to Trust account 3247, originated by CARPENTER, for the purpose of funding a premium to be paid on a Trust-owned policy insuring SI-5's life. |
| 56 | June 18, 2009 | Wire transfer of $61,925 from Trust account 3247 to Lincoln account 1427, originated by BURSEY, for the purpose of funding a premium to be paid on a Trust-owned policy insuring SI-15's life. |
| 57 | July 1, 2009 | Wire transfer of $139,633.33 from Trust account 3247 to Phoenix account 3030, originated by BURSEY, for the purpose of funding a premium to be paid on a Trust-owned policy insuring SI-5's life. |

All in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i) and 2.

A TRUE BILL

/s/

FOREPERSON

UNITED STATES OF AMERICA

/s/

DEIRDRE M. DALY
UNITED STATES ATTORNEY

/s/

DAVID E. NOVICK
ASSISTANT UNITED STATES ATTORNEY

/s/

NEERAJ N. PATEL
ASSISTANT UNITED STATES ATTORNEY