## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

_____

)
UNITED STATES OF AMERICA )
        Plaintiff, )
   v. )     CRIMINAL NO. 13-CR-226 (RNC)
)
DANIEL E. CARPENTER )
        Defendant. )
_____)

## DEFENDANT'S REPLY IN SUPPORT OF HIS MOTION FOR A
## STAY OF THE SURRENDER DATE AND FOR RELEASE PENDING APPEAL

### I.      LEGAL STANDARD

The standard for bail pending appeal in the Second Circuit is well established. A court "shall order" bail pending appeal if there is clear and convincing evidence that the defendant is not likely to flee or pose a danger to public safety, and "the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in … reversal [or] an order for a new trial." 18 U.S.C. §3143(b). When a defendant satisfies that standard, bail is "mandatory." *United States v. Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004).

To be "substantial," a question need only be "one of more substance than would be necessary to a finding that it was not frivolous"—in other words, "a close question or one that very well could be decided the other way," or one that is "novel, which has not been decided by controlling precedent." *United States v. Randell*, 761 F.2d 122, 125 (2d Cir. 1985) (emphasis added).

### II.      SUBSTANTIAL QUESTIONS OF LAW OR FACT

Mr. Carpenter respectfully suggests that he has raised a number of "substantial" questions in the realm of constitutionally defective search warrants, the nature of a constructive amendment, the calculation of his Sentencing Guidelines, and a number of Due Process and

Speedy Trial issues all of which could be decided the other way despite the Government's arguments to the contrary.

However, in addition to all of these substantial issues, Mr. Carpenter's appeal will present to the Second Circuit the very first case questioning the Government's calculation of loss under the new Sentencing Guidelines Amendment (SGA) 792 standard. Accordingly, a defendant need not prove that he is likely to succeed on the substantial questions he raises; it is sufficient that if he were to succeed, reversal or a new trial is likely. *Id*. at 124-25. Mr. Carpenter undoubtedly meets this standard, and therefore this Court should grant him bail pending appeal even if the Court finds that only one of Mr. Carpenter's dozen issues are not frivolous and would warrant review by the Second Circuit.

In fact, this Court could do exactly what Judge Rakoff did in his famous "lying brokers" case. *See United States v. Allen*, 14-cr-272 (JSR), ECF 242. The Government in its Opposition Brief (Gov. Opp. at 29) stated that it could not find Judge Rakoff's comments regarding granting bail pending appeal in *Allen*, so we include the transcript from *Allen,* ECF 242 at 67-68 attached as Exhibit One, where Judge Rakoff stated:

> "And I understand what the statute says about whether there's a substantial issue for appeal and all like that. Although I think technically it doesn't really kick in until the moment of surrender, but while of course like all judges think there's no issue on appeal nevertheless I think the Kastigar issue is not without some appellate interest, so I'm not going to order their immediate surrender."

That one issue happened to be a winner for the defendants in *Allen*, and Judge Rakoff's musings in *Allen* are very similar to this Court's own comments in *United States v. Shapiro*, No. 15-cr-155 which led to an acquittal for the defendant in *United States v. Demos*, No. 16-cr-220 and a new trial for Michael Gramins in questioning the Government's prosecution in *Shapiro*:

> I don't think you can be convicted under the Constitution unless you had a sufficiently culpable state of mind such that you made a conscious choice to cross an important line

2

and expose yourself to potential imprisonment….The Supreme Court has recognized that when a challenged action or course of conduct is a technical violation of the law as opposed to morally reprehensible it becomes more important to make it clear to the jury that the government has a burden to prove that the defendant knew his conduct was unlawful. Why? Because we don't want to be exposing people to conviction and incarceration if they didn't know that this is what they were risking.

As the Government concedes, lying in arms-length commercial transactions is not always illegal. It depends on the particular facts and circumstances. *See Regent Office* at 1179 (lies that are "repugnant to standards of business morality" may nevertheless be insufficient to support a criminal conviction for fraud). Prior to the indictment in Litvak, the conduct at issue appears to have been widespread in the RMBS market. Others who engaged in this conduct have been the subject of civil enforcement proceedings or no enforcement proceedings at all. It is fair for the defendants to wonder what distinguishes their conduct from that of others who have been spared indictment. I would rather risk error on the side of lenity than the other way. *See Demos* Tr. citing Judge Chatigny in *Shapiro* attached as Exhibit Two. (Emphasis added).

The sentiments expressed by the Court in *Shapiro* could just as easily apply to Mr. Carpenter as well as Mr. Gramins, whose Rule 33 New Trial could be affirmed by the Second Circuit any day now.  In Mr. Carpenter's case, the Government has claimed for almost nine years now, since its two raids of 100 Grist Mill Road that there were several misstatements made to the carriers on the insurance applications, none of which were made by Mr. Carpenter.

Even assuming *arguendo* the statements were false (which was clearly not proven at trial nor has the Court pointed to any falsehood, oral or written, by Mr. Carpenter), all were made by other people who happened to be agents of the carriers and with no proof that Mr. Carpenter or the carriers believed the statements to be untrue.

Furthermore, none of the alleged misrepresentations were material to the insurance transaction as a matter of law. *See, e.g., United States v. Rybicki*, 354 F.3d 124, 145 (2d Cir. 2003) (en banc), as well as *United States v. Regent Office*, 421 F.2d 1174 (2d Cir. 1970) cited by the Court above.

3

Recent decisions by the Second Circuit have shown there is absolutely no difference in the economics between STOLI and non-STOLI policies. *See AEI v. Lincoln*, 892 F.3d 126, 130 (2d Cir. 2018): "Lincoln concedes that despite the fraud, the policy's premiums were calculated based on the statistics that applied to this woman with respect to her age and other conditions that [its] actuary said should be applicable here." In other words, Lincoln was not "cheated of premiums."" (Emphasis added).  Also, according to the Second Circuit, there can be no STOLI here because the Charter Oak Trust had an insurable interest in each of the insureds. *See United States v. Quatrella*, 722 Fed.Appx. 64, 66, FN1 (2d Cir. 2018) ("A STOLI policy is one obtained by the insured for the purpose of resale to an investor with no insurable interest in the life of the insured - essentially, it is a bet on a stranger's life." *Binday* at 565 (emphasis added)). Significantly, the Supreme Court in *Marinello v. United States*, 138 S.Ct. 1101 (2018) recently echoed the sentiments of this Court in *Shapiro*.  This strongly suggests that Mr. Carpenter's conviction will be vacated as *Marinello* emanated from the Second Circuit and requires knowledge that not only did the person know he was committing a crime, he had to know what punishment he would face for crossing a "well-marked" bright line:

> "We wrote that we have traditionally exercised restraint in assessing the reach of a federal criminal statute, both out of deference to the prerogatives of Congress and out of concern that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. *McBoyle v. United States*, 283 U.S. 25, 27 (1931)." *Marinello* at 1106.

The use of Justice Oliver Wendell Holmes' description of knowing what "the law" will do to you when the "bright line" of the law is crossed is particularly appropriate for this case, because the defendant in *McBoyle* literally stole an airplane but was charged under the Automobile Act as if he had stolen a car. Despite the defendant in *McBoyle* knowing that he was certainly doing something "bad" by stealing an airplane, his conviction were vacated because he

was charged under an improper statute that did not include airplanes. Similarly, Mr. Carpenter was accused of Mail and Wire Fraud, but at this late date, there is not a single exhibit showing that Mr. Carpenter lied to anyone about anything at any time or that he had the intent to steal anyone's money, or cause "tangible economic harm" to any carrier by depriving them of any information (valuable or otherwise), or that he caused any mailing or wire in furtherance of any fraud.

In *Marinello*, Chief Justice Roberts uses several familiar examples of common conduct that might actually be considered breaking the law like paying a babysitter cash that neither party to the transaction intends to report to the IRS:

> A broad interpretation would also risk the lack of fair warning and related kinds of unfairness that led this Court in *Aguilar* to "exercise" interpretive "restraint." See 515 U.S. at 600; see also *Yates* at 18-19; *Arthur Andersen LLP* v. *United States*, 544 U.S. 696, 703-04 (2005). Interpreted broadly, the provision could apply to a person who pays a babysitter $41 per week in cash without withholding taxes, see 26 CFR §31.3102-1(a)(2017); IRS, Publication 926, pp. 5-6 (2018), leaves a large cash tip in a restaurant, fails to keep donation receipts from every charity to which he or she contributes, or fails to provide every record to an accountant.  Such an individual may sometimes believe that, in doing so, he is running the risk of having violated an IRS rule, but we sincerely doubt he would believe he is facing a potential felony prosecution for tax obstruction. Had Congress intended that outcome, it would have spoken with more clarity than it did in §7212(a).

> Regardless, to rely upon prosecutorial discretion to narrow the otherwise wide-ranging scope of a criminal statute's highly abstract general statutory language places great power in the hands of the prosecutor. Doing so risks allowing "policemen, prosecutors, and juries to pursue their personal predilections," *Smith* v. *Goguen*, 415 U.S. 566, 575 (1974), which could result in the non-uniform execution of that power across time and geographic location. And insofar as the public fears arbitrary prosecution, it risks undermining necessary confidence in the criminal justice system. That is one reason why we have said that we "cannot construe a criminal statute on the assumption that the Government will 'use it responsibly.'" *McDonnell* v. *United States*, 136 S.Ct. 2355, 2373 (2016) (quoting *United States* v. *Stevens*, 559 U. S. 460, 480 (2010)). And it is why "[w]e have traditionally exercised restraint in assessing the reach of a federal criminal statute." *Aguilar* at 600." *Marinello* at 1115.

## 1.  WHETHER STOLI CONDUCT CONSTITUTED A CRIME IN 2008

Respectfully, Mr. Carpenter believes that all parties should be able to agree that no one in 2008 believed that STOLI or selling a policy on the Life Settlement market was a federal crime that would put you in prison.  See *New York Times* article on Spin-Life from December 2006 attached as Exhibit Three, and STOLI article from a week later as Exhibit Four. Certainly Mr. Carpenter did not believe he was crossing any "bright line" as described in *Marinello* and *McBoyle*, and one still sees television commercials every day from companies like Coventry Direct offering to buy insurance policies from seniors.

Moreover, Mr. Carpenter's Indictment was constructively amended at trial to include the "Right to Control" theory of fraud so as to focus on what he "did not tell the carriers."  But, nondisclosure of this sort was determined to be "outside the bounds" of the fraud statutes. *See Skilling v. United States,* 561 U.S. 358, 410 (2010).  Therefore, the only possible deceit here is fraudulently inducing a carrier to issue a policy it may not have wanted to issue if it knew the truth of the transaction.  But, for that "deceit" to amount to mail and wire fraud, there must be an intent on Mr. Carpenter's part to intentionally cause "tangible economic harm" as required by the Second Circuit.  *See United States v. Finazzo*, 850 F.3d 94 (2d Cir. 2017), citing *United States v. Mittelstaedt*, 31 F.3d 1208 (2d Cir. 1994). *See, also, United States v. Davis*, 2017 WL 3328240 (S.D.N.Y. 2017) *citing United States v. Shellef,* 507 F.3d 82, 108 (2d Cir. 2007).

To counteract this major flaw in its case, the Government has deployed a series of shifting and contradictory rationales to compensate for the lack of any coherent theory of how the carriers could have possibly suffered any "tangible economic harm" as required by the

Second Circuit's decisions going back to *United States v. Mittelstaedt*, 31 F.3d 1208 (2d Cir. 1994), and which underscores the lack of fair notice and fair warning here.

## 2.   THE GUIDELINES IN THIS CASE WERE MISCALCULATED

"A district court's sentence is subject to reasonableness review, both substantive and procedural." *United States v. Cavera*, 550 F.3d 180, 190 (2d Cir. 2008) (en banc). "Reasonableness review is similar to review for abuse of discretion and may require reversal when the district court's decision 'cannot be located within the range of permissible decisions' or is based on a legal error or clearly erroneous factual finding." *United States v. Villafuerte*, 502 F.3d 204, 206 (2d Cir. 2007) (*quoting United States v. Sindima*, 488 F.3d 81, 85 (2d Cir. 2007)). "A district court commits procedural error where it fails to calculate the Guidelines range" or "makes a mistake in its Guidelines calculation." *Cavera* at 190. Mr. Carpenter has clearly preserved his objections to the Court's *multiple* sentencing errors, but even if he had failed to do so, the Second Circuit reviews for plain error. *Villafuerte* at 208.

The Second Circuit has held that "an incorrect calculation of the applicable Guidelines range will taint not only a Guidelines sentence, if one is imposed, but also a non-Guidelines sentence, which may have been explicitly selected with what was thought to be the applicable Guidelines range as a frame of reference." *United States v. Fagans*, 406 F.3d 138, 141 (2d Cir. 2005); *see also United States v. Dorvee*, 616 F.3d 174, 181–82 (2d Cir. 2010) (observing that the Guidelines range "serves as the district court's 'starting point' in selecting a sentence" and that the court's "miscalculation of the Guidelines sentencing range carried serious consequences for the defendant"). Miscalculation of the Guidelines range therefore constitutes procedural error, which constitutes plain error, and will be automatically reversible. *See Molina-Martinez v. United States*, 136 S.Ct. 1338, 1349 (2016) (observing that "a defendant sentenced under an

incorrect Guidelines range should be able to rely on that fact to show a reasonable probability that the district court would have imposed a different sentence under the correct range" and "[t]hat probability is all that is needed to establish an effect on substantial rights"); *see also Dorvee* at 182 ("If the district court miscalculates the typical sentence at the outset, it cannot properly account for atypical factors and we, in turn, cannot be sure that the court has adequately considered the §3553(a) factors. That is what happened here, and constitutes procedural error."). *See United States v. Mangone*, 652 Fed.Appx. 15, 16 (2d Cir. 2016) (sentence vacated for a miscalculation of only 8 months).

Mr. Carpenter's appeal will present the first opportunity to rule on the effect of SGA 792 as it relates to the calculation of fraud loss following the Supreme Court's recent decision in *Rosales-Mireles v. United States*, 138 S.Ct. 1897 (2018), which was based on the Supreme Court's other relatively recent decision in *Molina-Martinez*, where a sentence was vacated even though it fell within the correct range of the Guidelines once the error on the part of the district court was discovered on appeal. In *Rosales-Mireles*, the Supreme Court vacated the defendant's sentence based on a single small miscalculation of the Sentencing Guidelines, the Supreme Court stated the following:

> District courts must determine in each case what constitutes a sentence that is "sufficient, but not greater than necessary," to achieve the overarching sentencing purposes of "retribution, deterrence, incapacitation, and rehabilitation." *Tapia v. United States,* 564 U.S. 319, 325 (2011); 18 U.S.C. §§3551(a), 3553(a)(2). Those decisions call for the district court to exercise discretion. Yet, to ensure "'certainty and fairness'" in sentencing, district courts must operate within the framework established by Congress. The Sentencing Guidelines serve an important role in that framework. "[D]istrict courts *must* begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Peugh v. United States,* 569 U.S. 530, 541 (2013). Courts are not bound by the Guidelines, but even in an advisory capacity the Guidelines serve as "a meaningful benchmark" in the initial determination of a sentence and "through the process of appellate review." *Rosales-Mireles* at 1903-04, *citing Peugh* at 541.

Of course, to consult the applicable Guidelines range, a district court must first determine what that correct range is. Even if the Court disagreed with Mr. Carpenter's math, this issue alone mandates bail pending appeal.  As the Supreme Court has repeatedly explained: "the Guidelines are the starting point for every sentencing calculation in the federal system," *Hughes v. United States,* 138 S.Ct. 1765, 1775 (2018) (*quoting Peugh* at 542).  This can be a "complex" undertaking as discussed in another Supreme Court decision vacating a sentence calculation off by only one month. *Molina–Martinez* at 1342.  Given the complexity of the calculation, however, district courts sometimes make mistakes. It is not surprising, then, that "there will be instances when a district court's sentencing of a defendant within the framework of an incorrect Guidelines range goes unnoticed" by the parties as well, which may result in a defendant raising the error for the first time on appeal as happened in *Molina–Martinez* at 1343.

In *Molina-Martinez*, the Supreme Court vacated a guilty plea sentence of 77 months where the defendant alleged that a lower sentencing range of 70-87 months was the correct sentencing range.  Whereas the Fifth Circuit required Molina-Martinez to show more than just the calculation error, the Supreme Court made it clear that:

> "…the court's reliance on an incorrect range in most instances will suffice to show an effect on the defendant's substantial rights. Indeed, in the ordinary case a defendant will satisfy his burden to show prejudice by pointing to the application of an incorrect, higher Guidelines range and the sentence he received thereunder. Absent unusual circumstances, he will not be required to show more." *Molina-Martinez* at 1347.

The defendant believed the court's sentence of 77 months to be in error and suggested that the correct lowest sentence should be 70 months.  While the Fifth Circuit agreed with the defendant that 70-87 months was the correct range, it required the defendant to show more than just the miscalculation error by the court and how he was prejudiced, as 77 months was clearly within the Guideline range.

Because the court had made the statement that based on the Guidelines, the lowest sentence the court could give was 77 months, it was enough for the Supreme Court to reverse and remand for a lower sentence.  In Mr. Carpenter's case, the contrast is far more stark.  From a base offense level of 7, the Court added 22 Levels for a fraud loss of between $25-65 million, 2 levels for utilizing sophisticated means, another 2 levels for deriving more than $1 million from a financial institution, 4 levels for an aggravating role adjustment, and another 2 levels for an obstruction of justice enhancement.  By far, the largest part of Mr. Carpenter's Offense Level of 39 is the 22 levels for Loss.

However, SGA 792 essentially negates the Government's entire inaccurate calculations of loss by adopting the *Manatau* Standard from Justice Gorsuch's opinion for the Tenth Circuit in *United States v. Manatau*, 647 F3d 1048 (10th Cir. 2011), by requiring a *subjective measure of intended loss*.  *See* SGA 792, at 110-14 (2015).  Under the revised commentary to U.S.S.G. §2B1.1, Application Note 3(A)(ii) which adopts the *Manatau* Standard: "intended loss under §2B1.1 means only the pecuniary harm that *the defendant himself purposefully sought to inflict*."  All of the Government enhancements are demonstrably false, but if the Second Circuit reverses just the calculation of loss under SGA 792, it would mean a resentencing and a term of less than 30 months.

Moreover, "a remand for resentencing, while not costless, does not invoke the same difficulties as a remand for retrial does." *Molina–Martinez* at 1348–49. "A resentencing is a brief event, normally taking less than a day and requiring the attendance of only the defendant, counsel, and court personnel." *United States v. Williams,* 399 F.3d 450, 456 (2d Cir. 2005).  The efficacy of granting Mr. Carpenter bail pending appeal now would save scarce judicial resources in the future, because the Government's calculated offense level of 39 is legally untenable and

Mr. Carpenter's arguments contained in his sentencing memorandum for an offense level of 3 or 4 is supported by both SGA 792 and 794, as well as recent precedent of the Supreme Court and Second Circuit.  Obviously, the Court is well aware from the voluminous filings in this case that Mr. Carpenter respectfully disputes all of the Government's enhancements, but for the purposes of this motion, Mr. Carpenter respectfully suggests to the Court that just based on SGA 792 and 794, this Guidelines calculation was clear error that warrants this Court granting bail pending appeal now, as this sentence will eventually be overturned as happened in both *Rosales-Mireles* and *Molina-Martinez*, which were based on much "closer" calls.

"[A]ny amount of actual jail time is significant for Sixth Amendment purposes," *Glover v. United States,* 531 U.S. 198, 203 (2001). "Guidelines miscalculations, even if a defendant is sentenced on a non-guideline basis, ultimately result from the Court relying upon erroneous governmental information." *Glover* at 204; *see also Peugh* at 537. That was especially so in this case where the Court's error in imposing Mr. Carpenter's sentence was based largely on the Government's erroneous use of loss amounts and allegations of facts that were demonstrably untrue.  This in and of itself is a violation of the Due Process Clause.  *See United States v. Delacruz*, 862 F.3d 163, 175 (2d Cir. 2017) *citing Townsend v. Burke*, 334 U.S. 736, 741 (1948), where the Second Circuit quoted the Supreme Court: "…what the Due Process Clause does require is that a defendant not be sentenced on the basis of "materially untrue" assumptions or "misinformation," and that he have an opportunity to respond to material allegations that he disputes, in order that the court not sentence him in reliance on misinformation." The sentence in that case was vacated for a far less important infraction by the Government than has happened in Mr. Carpenter's case.

The Guidelines in this case were also miscalculated because of the five people listed in the PSR (see ¶215) as the "culpable" participants that Mr. Carpenter was the alleged leader of, Wayne Bursey is deceased and exonerated; Jack Robinson is deceased and never indicted; and Don Trudeau was never indicted and is still a licensed agent with Lincoln.  There was no evidence adduced at trial whatsoever that Don Trudeau was involved in any scheme to defraud Lincoln, because the two agents on the Sash Spencer applications were Bruce Mactas and Don Trudeau, and they are both still with Lincoln three years after Mr. Carpenter's trial, and 10 years after Mr. Spencer's untimely death. As the Court will recall, both Waesche and Induddi-Westcott admitted that they disagreed with Mr. Carpenter on a regular basis and that they lied, cheated, and stole from Mr. Carpenter's company GMC.  Certainly they were not in a conspiracy with Mr. Carpenter.  Nor was any evidence adduced at trial showing an agreement to conspire to do anything illegal.  *See United States v. Coplan*, 703 F.3d 46, 49 (2d Cir. 2012).  Since Mr. Carpenter did not email Mactas, Alper, or Pacini, it is hard to imagine a conspiracy here when there was no conspiracy found in *Valle*, where the infamous "Cannibal Cop" emailed his sadistic fantasies to stalk, kidnap, kill, and eat women he knew from his past. *See United States v. Valle*, 807 F.3d 508 (2d Cir. 2015).  If there was no conspiracy in *Valle*, it is difficult to see how the Government proved a conspiracy here.

Perhaps the best evidence that Mr. Carpenter was not in a conspiracy with Robinson, Trudeau, or Mactas, comes from the Government's own Sentencing Memorandum in this case, where the Government cites to Gov't. Ex. 2233 which it used in its Rebuttal at Mr. Carpenter's trial three years ago in order to suggest that he terrorized everyone that dared disagree with him:

> "When Jack Robinson tried to send out a Spencer related document that he had worked on with Trudeau, Carpenter responded, "FUCK YOU BOTH THAT DON WANTS TO SEND ANYTHING OUT TODAY ....... I have been working so hard on so many projects that you two have screwed up on and you spring this on me ..... Fuck you both.

Nothing goes out without my approval and I did all these numbers already and you are wrong. Assholes!!!!!" Gov't Ex. 2233." See Gov't. Sentencing Memo at 72.

Not only does Gov't. Ex. 2233 undercut the Government's Four-Level Enhancement for being the leader of five "culpable" particpants, it substantially undermines the Government's entire theory of the case.  If it was always intended by the alleged "conspirators" that Mr. Carpenter was to have control of the Charter Oak Trust policies, then why was Mactas pressuring Trudeau to get Universitas paid out more than a year after Sash Spencer's death?  Surely, if there were a true conspiracy here as the Government alleges, Mactas would have known that the Trust was just a clever façade to disguise the true intent of the conspirators to allow Mr. Carpenter to take control of all the policies just as the defendants in *Binday* were accused.

It is respectfully submitted that the use by the Government of this exhibit proves that not only was Mr. Carpenter's Offense Level not correctly calculated in that he should not have been "enhanced" Four Levels, but it is excellent evidence that he should have received a Four-Level Mitigating Role Reduction pursuant to SGA 794 if there was, in fact, a conspiracy here among 80 or so people because there was no agreement as to the "object" of the conspiracy or the "essential nature of the conspiracy" as is required by the Second Circuit.  For example, in such notable cases as *United States v. Rosenblatt*, 554 F.2d 36 (2d Cir. 1977), where a Rabbi thought he was in a plan to evade taxes while his "co-conspirator" partner in crime was stealing Postal Orders from the Post Office, the Second Circuit held that while they were both committing crimes, they were not in a "conspiracy" together.  Obviously there was no "meeting of the minds" in that conspiracy, or in Mr. Carpenter's case.

Therefore, Gov't. Ex. 2233 entitles Mr. Carpenter to at least an argument that he should have received a Four-Level Mitigating Role Reduction under SGA 794.  Mr. Carpenter wishes to make it clear to the Court that for the purposes of this Motion he is not challenging the facts of

the case, but rather the 8-Level swing against him in the calculation of his Offense Level that is not supported at all by the evidence adduced at trial, and is therefore clear error that presents a substantial issue warranting bail pending appeal.

In Mr. Carpenter's case, the Government, Probation, and even the Court never mention or examine the possibility of a mitigating role reduction pursuant to SGA 794.  As the Second Circuit stated in *Alston*, this is clear error by the Court as well as the Government that could result in Mr. Carpenter's sentence being vacated:

> "We have previously vacated a sentence imposed in the United States District Court for the Southern District of New York on precisely this basis…. *See United States v. Soborski*, 708 F.App'x 6, 10–14 (2d Cir. 2017). We expect that, having clarified the impact of Amendment 794 in this opinion (*Alston*), the government will take note in future sentencing proceedings of the updated standard for "minor role" reductions." *United States v. Alston*, 899 F.3d 135, 150 (2d Cir. 2018).

The same can be said of the Sophisticated Means Enhancement.  There is nothing sophisticated about lying on an insurance application in order to take advantage of someone's death; a practice which actually predates the founding of this Country, the Constitution, and certainly the adoption of the Mail and Wire Fraud statutes.  The Loss-to-a-Financial Institution is also preposterous because the Government produced a large binder of thousands of checks paying millions of dollars to the brokers in this case, but there was not a single check payable to Mr. Carpenter by any carrier, nor was he a licensed agent on any of the applications.  There was no money paid to Mr. Carpenter by any financial institution, much less the $1 million from Lincoln claimed by the Government required for the Enhancement.

The obstruction of justice enhancement also lacks merit because the Government could talk to Don Trudeau at any time, and he would say that Mr. Carpenter had nothing to do with Life Fund ELITE.  The proof of that fact is that Jack Robinson brought a $180 million lawsuit against Wells Fargo based on Don Trudeau's control of Life Fund ELITE in late January 2016,

just two weeks before Mr. Carpenter's trial.  *See Avon Capital (Don Trudeau) v. Wells Fargo*, 16-cv-00101-RNC.

Mr. Carpenter's name is not mentioned even once in any of the filings in that case. Mr. Carpenter had no knowledge of the lawsuit or Mr. Trudeau's control of Life Fund ELITE, once again destroying any thought of a conspiracy or that Mr. Carpenter lied about anything at any time.  If the Court truly believed that Mr. Carpenter was involved with Mr. Trudeau and Life Fund ELITE, then it is respectfully submitted the Court should have recused itself from the *Avon Capital* case in the interests of justice as it involved an alleged co-conspirator of the Mr. Carpenter.  See the filings with this Court in *Avon Capital.*

Not only has the Government failed to prove that Mr. Carpenter was the "leader" of five-or-more "culpable" participants in a scheme to defraud (by a preponderance of the evidence), making him eligible for an enhancement under §3B1.1, the Government has totally failed to address Mr. Carpenter's entitlement to a Four-Level Reduction for having a minor role in a conspiracy with 80-100 people as the Government alleges.  Therefore, based on the Sentencing Guidelines Commission's own primers, there was no "intended" or "actual" loss in this case, and Mr. Carpenter is entitled to a Four-Level Reduction for having a "mitigating" role rather than a Four-Level Enhancement as the Government argues. Mr. Carpenter's Offense Level should have been Three (Base Level of 7 minus 4 levels) rather than the 39 that the Government erroneously proposed and the Court accepted.  This one issue constitutes much more than a "close call" that might result in Mr. Carpenter having his conviction vacated or at least his sentence reduced.

Furthermore, the sentencing process is particular to each defendant, of course, and a reviewing court must consider the facts and circumstances of the case before it. *See United States v. Davila,* 133 S.Ct. 2139, 2149 (2013) ("Our essential point is that particular facts and

circumstances matter"). The Court was required to look at Mr. Carpenter as he stood in December of 2018, not the picture the Government portrayed from 10 and 20 years ago. "[A] court's duty is always to sentence the defendant as he stands before the court on the day of sentencing." *Pepper v. United States*, 562 U.S. 476, 492 (2011), *citing United States v. Bryson,* 229 F.3d 425, 426 (2d Cir. 2000). Moreover, as the Second Circuit's decision in *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) makes clear, there is something wrong with a sentence based on 7 levels for the fraud and another 20 levels for the amount of loss. In this case, the evidence presents beyond dispute that Mr. Carpenter intended no actual "loss" or "concrete harm" to any carrier as the law of the Second Circuit requires. *See, e.g., United States v. Rossomando*, 144 F.3d 197, 201 (2d Cir. 1998), *citing United States v. Starr,* 816 F.2d 94, 98 (2d Cir. 1987) ("…absent the intent to harm, there is no crime.").

### 3. IT WAS CLEAR ERROR FOR THE COURT NOT TO APPLY THE *STUDLEY* FACTORS

Mr. Carpenter's sentence in this case is also substantively and procedurally unreasonable because the Court failed to allocate the alleged losses among the alleged co-conspirators, utilizing the two-pronged analysis required by the Second Circuit's decision in *United States v. Studley*, 47 F.3d 569 (2d Cir. 1995), where a court must establish that a defendant "is accountable for the conduct ... of others that was both: (i) in furtherance of the jointly undertaken criminal activity; and (ii) reasonably foreseeable in connection with that criminal activity." As the Court realizes, Mr. Carpenter has consistently argued that there was no conspiracy here, and if there was one, he was not a party to it. But, assuming *arguendo* that there was a conspiracy here, it was clear error for the Court not to allocate the fictitious loss in this case among the 80 alleged co-conspirators listed by the Government one week into his trial.

It is black letter law in the Second Circuit that "[t]he scope of conduct for which a defendant can be held accountable under the Sentencing Guidelines is significantly narrower than the conduct embraced by the law of conspiracy. The focus is on the specific acts and omissions for which the defendant is to be held accountable in determining the applicable guideline range, rather than on whether the defendant is criminally liable for an offense as a conspirator". *See United States v. Rigo*, 649 Fed.Appx.107, 108 (2d Cir. 2016) *quoting United States v. Perrone*, 936 F.2d 1403, 1416 (2d Cir. 1991), and U.S.S.G. §1B1.3 (emphasis added). In this case, the Court erroneously calculated an Offense Level of 39 based on the Government's fallacious calculation of loss, but the law is clear that the Court should analyze what portion of the total loss is applicable to each of the alleged conspirators using the two prongs of *Studley*. *See, also*, *United States v. Getto*, 729 F.3d 234 (2d Cir. 2013): "The Guidelines also require the district court to make a particularized finding of the scope of the criminal activity agreed upon by the defendant in order to allocate the loss applicable to each defendant." *Getto* at 234, *quoting Studley* at 574. Assuming, *arguendo*, that there was in fact any loss to the carriers in this case, which clearly there was not; none of that loss can be attributable to Mr. Carpenter's conduct.

Two good examples for the Court to consider are the "gifting tables" case of *United States v. Platt*, 608 Fed.Appx. 22 (2d Cir. 2015), where the sentences were vacated because the district court relied on a spreadsheet of losses provided by the Government (just like the clearly erroneous spreadsheet provided by the Government in this case) without any particularized finding for each of the defendants or any of the alleged co-conspirators, and *Getto*, where the Government tried to hold the defendant responsible for "boiler room" type sales that he had nothing to do with. In both cases, the sentences were vacated because the district court did not

use the *Studley* prongs to make particularized findings as to the loss apportioned to each co-conspirator based on his role in the conspiracy.

As the Second Circuit noted in both *Platt* and *Getto*: "The scope of conduct for which a defendant can be held accountable under the Sentencing Guidelines is significantly narrower than the conduct embraced by the law of conspiracy." *Platt* at 22; *Getto* at 234.   Most importantly, like the "gifting-table ladies" in *Platt*:

> [M]ere "knowledge of another participant's criminal acts or of the scope of the overall operation" does not make a defendant criminally responsible and it is less likely that an activity was jointly undertaken if the participants worked independently and did not "pool their profits and resources." *Platt* at 31, *citing Studley* at 575.

Clearly, the Government did not allege or prove any "pooling of profits and resources" in this case, so it was clear error for the Court not to even mention the *Studley* factors in a case with over 80 alleged co-conspirators with an alleged $100 million in losses caused by the alleged conspiracy in this case. The defendants' sentences in *Platt* were all vacated despite the fact, unlike Mr. Carpenter in this case, that they actually supervised, trained, and otherwise interacted with the Gifting Table participants because the Second Circuit held that it was insufficient to determine the amount of loss attributable to each of the participants, based on their own conduct for the purposes of calculating the loss amount for the sentencing of each defendant and/or co-conspirator.  This is extremely important here because there was no evidence adduced at trial that any conduct of Mr. Carpenter's contributed to the absolute "concrete" loss of any of the carriers, *see Rossomondo*, or any "tangible economic harm" as required by *Mittelstaedt*.  So, again, even assuming *arguendo* that there were any losses in this case, none would be attributable to Mr. Carpenter based on *Rigo, Platt, Getto,* and *Studley*.

Certainly there was no "tangible economic harm" intended to the carriers by Mr. Carpenter's Split-Dollar funding agreement with the Charter Oak Trust.  See Mr. Carpenter's

18

October 23, 2013 presentation to the Government on how the Charter Oak Trust's Split-Dollar Funding was to work attached as Exhibit Four.  But, even assuming somehow there was some amount of loss attributable to Mr. Carpenter, that has to be reduced by the agents and brokers who were paid commissions, and it must also be reduced by the premiums paid to the carriers.

The Court failed to do the *Studley* factors calculation as required by the Second Circuit. Unlike some of the other sentencing issues here, this is not a "close call" but rather "plain error" that should entitle Mr. Carpenter to bail pending appeal because this is a substantial issue that will invariably lead to a resentencing as happened in *Platt*.

## III.   MR. CARPENTER SHOULD BE GRANTED BAIL PENDING APPEAL BECAUSE HE IS NOT A FLIGHT RISK AND THE GOVERNMENT HAS FAILED TO PROVE THAT HE IS A DANGER TO SOCIETY

The words "flight risk" are nowhere to be found in the Government's Opposition, and that is the one issue that all defendant's seeking bail pending appeal must prove.  Once the defendant proves that, it is up to the Government to prove that the defendant poses a "danger" to the community.  The Government's allegations that Mr. Carpenter poses a "danger" to anyone is not just venal and petty, it betrays an underlying prejudice against Mr. Carpenter that is not worthy of an officer of this Court. Many years ago, the Supreme Court admonished all prosecutors that in seeking justice they might strike hard blows, but not "foul" blows.  *See Berger v. United States,* 295 U.S. 78, 88 (1935).  The prosecutors in this case have reached a new low in the criminal prosecution of an innocent man.

Mr. Carpenter was ordered by the Court to be examined by arguably the two leading forensic psychiatrists in the nation, Dr. Zonana and Dr. Baranoski.  Their reports and testimony bear out that Mr. Carpenter is in fact a "truth-teller", but for the purposes of this Motion they

both confirmed he has zero anti-social tendencies.  Mr. Carpenter is receiving treatment from Dr. Herzog at the Institute of Living every two weeks, and Dr. Herzog has known and consulted with Dr. Zonana for over 40 years.  Dr. Herzog is willing to provide a letter to the Court that Mr. Carpenter is clearly not a danger to anyone, much less the Community.  Moreover, the Government's entire Opposition is based on the idea that Mr. Carpenter is a deceptive liar who reads his wife's emails and talks to her attorneys behind her back as well as helping her employees with questions about the tax law or benefit plans.  This is natural though, as Mr. Carpenter has been a well-known tax and ERISA attorney since he passed the Bar in 1979.

No one thinks Mr. Carpenter is a flight risk, and two well-respected psychiatrists have stated he has zero anti-social tendencies, which is rare in this day and age.

## IV.  CONCLUSION

For all the reasons set forth in Defendants Motion for Bail Pending Appeal, (doc. # 408), and as supplemented in this Reply, Mr. Carpenter seeks bail pending appeal of his conviction and sentencing.[1]

THE DEFENDANT, ALEX HURT

---

[1] Mr. Carpenter also wishes to address the personal comments made by the Government in its opposition.  First, Mr. Carpenter founded the SCORE Foundation 25 years ago in 1994.  *See* Exhibit Five. Mr. Carpenter's SCORE logo had a child holding up the letter "O."  Two years ago Jason Witten, formerly of the Dallas Cowboys, set up his own SCORE Foundation to give scholarships to certain young athletes, and his "O" is in the shape of a football.

Exhibit Six shows that Mr. Carpenter sponsors the oldest soccer team in America, Stamford United, and Benistar still sponsors them even after Mr. Carpenter stepped down in 2004.  Exhibit Seven shows the creation of TOPS Soccer in Simsbury, and Exhibit Eight shows pictures of disabled children being coached by the Sharks.  Exhibit Nine shows the forms created to participate in TOPS Soccer, along with the metadata to show that the forms were created in 2002 and 2003.  Mr. Carpenter has never met Peggy Neason, nor are there any emails from Ms. Neason in the many Terabytes of information unlawfully seized from the Benistar computers.  Moreover, the reason Mr. Carpenter spoke directly to his wife's attorneys is due to the "Molly Sucks" campaign that was started by an old competitor of Benistar. Finally, see all three beneficiary designation enrollment forms signed by Sash Spencer attached as Exhibit Ten and which name Mr. Carpenter's company Grist Mill Capital as the primary beneficiary at all times, as to the claims that he stole Universitas' money.

*/S/ Jonathan J. Einhorn*

JONATHAN J. EINHORN
129 WHITNEY AVENUE
New Haven, CT   06510
einhornlawoffice@gmail.com
(203) 777-3777
Fed Bar No. ct 00163

<u>CERTIFICATION</u>

I hereby certify that on this 1st day of February, 2019, a copy of the foregoing Reply was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicted on the Notice of Electronic Filing.

/s/ *Jonathan J. Einhorn*
JONATHAN J. EINHORN