# EXHIBIT
# ONE

G3AFALL1                          Sentence

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------------x

3   UNITED STATES OF AMERICA,
                                            14 CR 272 (JSR)
4              v.

5   ANTHONY ALLEN AND ANTHONY
    CONTI,
6              Defendants.

7   ------------------------------------x

8                                        New York, N.Y.
                                         March 10, 2016
9                                        4:15 p.m.

10

11  Before:

                 HON. JED S. RAKOFF,
12
                                         District Judge
13

14                        APPEARANCES

15  UNITED STATES DEPT. OF JUSTICE
         Criminal Division
16  BRIAN YOUNG
    CAROL SIPPERLY
17  MICHAEL KOENIG
         Assistant United States Attorney
18

19  WILKIE FARR & GALLAGHER LLP
         Attorneys for Defendant Allen
20  MICHAEL SCHACHTER, ESQ.
    CASEY DONNELLY, ESQ.
21

22  TOR EKELAND, PC
         Attorneys for Defendant Conti
    TOR EKELAND, ESQ.
23  AARON WILLIAMSON, ESQ.

24

25

G3AFALL5                          Sentence

1   subsequent order, to surrender to the designated institution by

2   May 2 at 2:00 p.m. All right.  Anything else we need to take

3   up?

4              MR. SCHECHTER:  As your Honor alluded to, we do seek

5   bail pending Mr. Allen's appeal.

6              THE COURT:  The bail will be granted on the same

7   conditions previously set, subject, of course to revision at

8   any time if either side has reason to believe they are a bail

9   risk.  And I understand that the statute says about whether

10  there's a substantial issue for appeal and all like that.

11  Although I think technically it doesn't really kick in until

12  the moment of surrender, but while of course like all judges

13  think there's no issue on appeal nevertheless I think the

14  Kastigar issue is not without some appellate interest, so I'm

15  not going to order their immediate surrender.

16             MR. SCHECHTER:  So, I guess, and I apologize, your

17  Honor --

18             THE COURT:  The government is not seeking their

19  immediate surrender.

20             MR. SCHECHTER:  But in terms of, our request would be

21  that he continue on the conditions set for his release during

22  the pendency of appeal until the Court of Appeals rules and I'm

23  not sure --

24             THE COURT:  So I will grant that order with the

25  proviso that the government has the right at any time to come

G3AFALL5
                              Sentence

1  before the Court and say there's new information or reasons to

2  change that.  That could even be after you file your appeal

3  brief and maybe he'll say, Judge, they didn't even raise a

4  colorable issue.  I retain jurisdiction to change that, but for

5  now that will be the order of the Court for both defendants.

6          MR. SCHECHTER:  Thank you, your Honor.

7          MR. WILLIAMSON:  Thank you, your Honor.

8          THE COURT:  Anything else?  Thanks very much.

9          (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT
# TWO

<u>UNITED STATES DISTRICT COURT</u>

<u>DISTRICT OF CONNECTICUT</u>

<u>UNITED STATES OF AMERICA : No. 3:16-CR-220 (AWT)</u>

<u>v.</u>

<u>DAVID DEMOS,</u>

**April 29, 2018**

DEFENDANT'S RESPONSE TO THE COURT'S JURY CHARGE

I.  <u>TO BE CRIMINALLY CULPABLE A DEFENDANT MUST ACT TO DO SOMETHING THAT IS "UNLAWFUL" NOT JUST "WRONGFUL" AS THE COURT PROPOSES</u>

On April 10, 2018 the Court detailed the third element of the offense of securities fraud upon which the Defense relied during the trial.

> The third element of the offense of securities fraud is that the defendant acted willfully, knowingly, and with intent to defraud. To act "knowingly" means to act voluntarily and deliberately, rather than mistakenly or inadvertently, and not because of ignorance, mistake, accident or carelessness. To act "willfully" means to act with the intent to do something the law forbids, that is, with a bad purpose to disobey or disregard the law. To act with intent to defraud means to act with specific intent to deceive, i.e. deliberately using deception to induce another to act to his detriment; the defendant's conduct must have been the product of his conscious objective rather than the product of mistake.

Nowhere in the Court's instruction was the Defense put on notice the Court would expand its definition to now include the following language:

> The Government does not have to prove that the defendant knew he was violating any particular law, but it must prove he intentionally understood an act he knew was *wrongful.*

(emphasis added).

This addition is highly prejudicial and inconstant with precent from the Supreme Court of the United States.   In addition, the defense opend with a definition of "willfulness" and a written slide of that definition and articulated by the Court.  Indeed, the Court approved the Defense opening statement slide that was published to the jury. Had the defense been aware the Court would eschew the original willfulness instruction and  include an act the Defendant knew was wrongful, the defense trial strategy would have been significantly different. With this revised definition, the Defense anticipates that the Government will argue that Cantor Employee handbooks representing employment policies and procedures and Financial Industry Regulatory Authority ("FINRA") regulations prove that Mr. Demos knew his conduct was "wrongful" thereby meeting their burden to establish Mr. Demos's intent to violate the law. However, centuries of traditions and the common law confirm that is is incorrect to equate wrongful conduct with unlawful conduct.  The former exists in the domain of civil torts, while the later belongs in the province of the criminal law.

Presumably, the Court's proposed willfulness standard as to wrongful conduct is derived from the factually dissimilar *United States v. Kaiser*.  It cannot establish criminal liability in the context of this case and must be rejected by this Court. 609 F.3d 556 (2d Cir. 2010).

This instruction was specifically rejected by Judge Chatigny in *Shapiro* because of the factual dissimilarity between *Kaiser* and the *Litvak-Shapiro* RMBS securities fraud

2

prosecutions. In *Kaiser*, the defendant falsified SEC filings to manipulate share prices in connection with a tender offer. *See United States v. Kaiser*, 609 F.3d 556 (2d Cir. 2010). Even if the *Kaiser* defendant was unaware of the specific regulation he violated, there was no question that the defendant knew his conduct was illegal. In *Shapiro*, as here, it is not at all clear that defendants alleged misstatements were material to any of the underlying transactions and, as Judge Chatigny observed, many market participants did not realize this conduct could be criminal. *See United States v. Shapiro*, 3:15-CR-155 (RNC), Tr. Transcript, Vol. XIII, 2616-2618, **Exhibit A** at 2. ("I don't think you can be convicted under the Constitution unless you had a sufficiently culpable state of mind such that you made a conscious choice to cross an important line and expose yourself to potential imprisonment.").

In rejecting the *Kaiser* willfulness standard, Judge Chatigny in Shapiro further opined:

The Supreme Court has recognized that when a challenged action or course of conduct is a technical violation of the law as opposed to morally reprehensible it becomes more important to make it clear to the jury that the government has a burden to prove that the defendant knew his conduct was unlawful. Why? Because we don't want to be exposing people to conviction and incarceration if they didn't know that this is what they were risking. **Exhibit A** at 3.

When construing the statutory meaning of willfulness, the Supreme Court expressly considers whether the defendant knew his conduct was *illegal*, not merely wrongful. In *Ratzlaf v. United States*, a federal prosecution of a banking regulation, the

3

SHAPIRO

1    THE COURT:  Let's see where we are.

2         With regard to the defendants' other requests, I

3    think those are relatively easy to address at this time.

4         I will insert the words "to testify" on page 14.

5         All right?  I think that's a reasonable request.

6    This case is all about materiality.

7         With regard to the next request in the

8    defendants' letter regarding Section F of the securities

9    fraud charge, "defendant cannot be convicted unless the

10   government proved it engaged in a conscious wrongdoing

11   with a sufficiently culpable state of mind to do something

12   unlawful."

13        I think this is a difficult matter for the

14   Court.  There is case law cited by both parties that is

15   intention on this point.  Both sides cite authority to

16   support their positions, and the problem is particularly

17   acute in this case where the defendants have moved to

18   dismiss the indictment on the ground that this prosecution

19   violates their right to due process.

20        My research on this point has led me to find

21   that others have struggled and apparently will continue to

22   struggle with this.  The model penal code deliberately

23   avoids using the term "willfully" because it's freighted

24   with difficulty, and the authors say that it becomes a

25   matter of statutory construction.  If you look at the

1   legislative history of the relevant statutes, it's not

2   helpful.

3          So we have a problem, and for me the question

4   becomes, what is fair and reasonable in the circumstances. 

5          The government has no obligation to prove that a

6   defendant knew he was violating Rule 10(b)(5), but I don't 

7   think you can be convicted under the Constitution unless

8   you had a sufficiently culpable state of mind such that

9   you made a conscious choice to cross an important line and

10  expose yourself to potential imprisonment.

11         If the defendants are convicted in this case,

12  I'm sure the government's going to be asking me to

13  incarcerate them for years.

14         So in that context, given the state of the law,

15  I've struggled to figure out what to say.

16         I don't think the Second Circuit case law

17  requires the government to prove that the defendants knew

18  their conduct was unlawful, but at the same time, I don't

19  think it can be the case that they can be convicted, even

20  if they didn't realize their conduct was not unlawful.

21         Some of the cases cited by the defendants are in

22  the securities area, and in those cases, the court said,

23  indeed the government had a burden of proving that the

24  defendants knew their conduct was unlawful.

25         The Supreme Court has recognized that when a



1  challenged action or course of conduct is a technical

2  violation of the law as opposed to morally reprehensible,

3  it becomes more important to make it clear to the jury

4  that the government has a burden to prove that the

5  defendant knew his conduct was unlawful.

6           Why?

7           Because we don't want to be exposing people to

8  conviction and incarceration if they didn't know that this

9  is what they were risking.

10          So it's a problem, and I'm trying to do what I

11  can in the circumstances of this particular case to

12  address the parties' legitimate needs and concerns, and

13  I'm going to go with what I have.  I would rather risk

14  error on the side of lenity than the other way.

15          With regard to the next request, I think that's

16  already been dealt with.  I'm going to grant that request

17  and delete that transition sentence.

18          With regard to the last request in the

19  defendants' letter, uncalled witnesses, I don't think I

20  need to do that this minute, and I don't want to keep the

21  jury waiting any longer.

22          Bear in mind, the instructions I'm giving the

23  jury now take me through what is now, for me, closing

24  arguments on page 42.  The uncalled witnesses instruction

25  won't be given at this time.

# EXHIBIT
# THREE

The New York Times

**December 16, 2006**

# How Spin-Life Works

In 2004, a senior citizen buys a $6 million life insurance policy with a loan from **Investor A**. The yearly premium is $400,000.



If he died in 2005, his family would receive $6 million, which it would use to repay the $400,000 owed **Investor A**, plus interest.



However, if he is alive in 2006, the senior sells his policy to **Investor B** for $2 million from which he repays **Investor A**. Each additional year that the senior lives, **Investor B** pays the yearly premium.



If the senior dies in 2007, **Investor B**, not his family, will receive the death benefit of $6 million. **Investor B** would pocket $3.2 million ($6 million less $2 million less $800,000 paid in premiums during 2006 and 2007), a 114 percent return in two years.



The New York Times

🗔 Close Window

Copyright 2013 The New York Times Company

# EXHIBIT
# FOUR

**The New York Times**

BUSINESS DAY

# Late in Life, Finding a Bonanza in Life Insurance

By CHARLES DUHIGG     DEC. 17, 2006

Marvin Margolis, an 80-year-old Manhattan financial consultant, is looking for investors willing to bet on when he will die.

Two years ago, Mr. Margolis bought a large life insurance policy. Now, he's considering selling it to a group of investors, a deal that should give him as much as $2 million to enjoy in his final years. In return, the investors will get the policy's $7 million payout when he dies — which they hope will be soon, so they can stop paying his premiums.

"This is a wonderful opportunity to use my body as an asset," Mr. Margolis said. "I deserve to be able to benefit in some way from my age."

Trading in life insurance policies held by wealthy seniors has quietly become a big business. Hedge funds, financial institutions like Credit Suisse and Deutsche Bank, and investors like Warren E. Buffett are spending billions to buy life insurance policies from the elderly. Other investors are paying seniors to apply for life insurance, lending them money to buy the policies, and then reselling them to speculators.

This nascent market illustrates one way that investors are hoping to make money from a large and wealthy generation of Americans as they reach retirement age. These aging baby boomers and those even older offer both opportunities and risks for many companies, investors and swindlers seeking to capitalize on their final years.

Insurance executives, for instance, say transactions like Mr. Margolis's may cripple their industry and make it harder for the average senior to buy life insurance in the first place. Insurers are worried because they count on many customers canceling their policies before they die, usually because their children grow up and no longer need the financial protection, their pensions kick in or premiums become too expensive. If far more policies result in payouts, the insurance business becomes much less profitable.

Indeed, industry analysts say they expect the cost of life insurance to rise as companies prepare to pay out more claims.

"If payouts increase, the cost of insuring people is effectively going up, and that will definitely increase the price of policies," said J. David Cummins, a professor at the Wharton School of the University of Pennsylvania.

While that may be the case, many people have come to rely on selling their policies to provide urgently needed money for medical care and living expenses when their bank accounts run dry. However, insurance executives say that the market that has emerged could be ruinous.

"Life insurance is a way for individuals to protect their families," said C. Robert Henrikson, the chief executive of MetLife. "If someone profits from a stranger's death, it stands the whole purpose of life insurance on its head. Anything that disrupts the economic processes underlying this industry will drive the cost of life insurance through the ceiling."

Policies like Mr. Margolis's cause particular concern. It was originally paid for with a loan from speculators who will get their money back, plus a profit, if it is sold to another group of investors, according to public documents. Even if Mr. Margolis does not sell, the loan will be repaid from the death benefit when he dies.

Such policies are known as speculator-initiated life insurance, or "spin-life" policies. Investors estimate that spin-life policies worth as much as $13 billion will change hands next year.

The deals are so lucrative that older people are being wooed in every fathomable way. In Florida, investors have sponsored free cruises for seniors willing to undergo physical exams and apply for life insurance while onboard.

For insurers, such cruises are a financial Titanic. Over the next decade, the insurance industry could be forced to pay out unexpectedly more than $100 billion in death benefits as spin-life policies come to maturity, investors estimate.

In Minnesota, according to lawsuits brought by insurers, an 82-year-old named John R. Paulson bought life policies worth $120 million from seven companies and resold many of them before insurance companies realized what was going on and sued, saying that Mr. Paulson had lied on his applications.

Life insurance companies, in particular, rely on policies lapsing before the policyholder dies. Last year, for instance, insurance companies reduced their financial exposure by $1.1 trillion when 19.8 million policyholders stopped paying premiums, according to the Insurance Information Institute. In comparison, the industry paid death benefits on only 2.2 million policies.

If those lapsed policies had been sold to investors rather than canceled, insurance companies could have eventually paid out as much as a trillion dollars, say analysts.

In an attempt to mitigate such risk, some insurance companies are trying to make policies for seniors harder to buy. The biggest insurer in the United States, American International Group, earlier this year increased prices on some universal life policies for buyers more than 70 years old in an effort to thwart spin-life deals.

"We don't want this business, and we're taking steps to discourage those purchasers from coming through our doors," an A.I.G. spokesman said.

But such moves may be too late. The market for purchasing life insurance policies from seniors is an outgrowth of the so-called viatical industry that began in the 1980s, when investors bought up life insurance policies of AIDS patients. In the last two years, as interest rates and stock market returns have declined, the number of buyers seeking seniors' policies has soared.

That growth was fueled this year when the Financial Accounting Standards Board issued rules permitting investors to record purchases of policies immediately as a profit, rather than forcing them to wait until the policyholder died.

Critics contend the industry punishes the young and healthy, by driving up prices, but many people who have sold their policies say it offered their only way to avoid calamity.

"If I hadn't been able to sell this policy we would have lost our house, all of our savings, everything," said Andrew Schneider of Kaysville, Utah. Seven years ago his wife, Karen, learned she had breast cancer. Her expenses exceeded the Schneiders' medical insurance by half a million dollars. Mrs. Schneider sold her life insurance policy for about $250,000 and used the money to buy medicine and pay bills, he said. The investors who bought her policy received a $500,000 death benefit when she died last year.

"Selling that policy extended her life for years," said Mr. Schneider. "If this market hadn't existed, we would have become financially destitute."

Finding enough life insurance policies to satisfy investor hunger has proved difficult. So, in addition to the free cruises in Florida, investors including one large hedge fund have hired a California telemarketing company to call elderly citizens and ask if they would apply for life insurance in exchange for a paycheck.

The insurance industry has begun to fight back. Legislatures in New Jersey, New York and nine other states have proposed laws intended to outlaw spin-life investments or make it more difficult for investors to get payouts, according to the Life Insurance Settlement Association.

Insurance companies have also sued to cancel policies, contending that payouts benefiting outside investors violate the legal requirement that beneficiaries have an "insurable interest" in the policyholder's life.

But many advocates for the elderly and industry insiders worry that seniors will lose their legitimate ability to sell life insurance policies they have held for years.

"We've put billions of dollars in the hands of seniors who were getting thrown out of their homes or needed medication, and their only asset was a life insurance policy," said Scott Page, chief executive of the Lifeline Program, a company that helps investors buy life insurance policies from the elderly and infirm. "If you make it harder to sell these policies, you're taking money out of the hands of people who have nothing else."

Another risk is that seniors hoping to sell their life insurance policies will be stuck in bad deals. In October, the New York attorney general, Eliot Spitzer, filed a lawsuit accusing one life insurance speculator, Coventry Financial, of bid-rigging and other fraud in acquiring more than $3.6 billion in life insurance policies. Coventry said it would fight the suit.

A lawyer who has helped the elderly set up spin-life arrangements worth more than $300 million said that often the terms of the deals prevented his clients from profiting.

"Investors say, 'I'll loan you money to buy a new policy, and in a few years I'll buy it from you,'" said Larry Brody, a partner at the law firm Bryan Cave. But a few years later, when the seniors sell the policy, they owe so much in interest and fees on the loan, he said, "it eats up all the profit. And what's more, they can't buy another insurance policy, because insurers are unwilling to give them more coverage."

But those risks are worth the trouble, according to some buyers and sellers. In 2004, Irene Randall, a life-settlement broker in Albuquerque, N.M., set up an $8 million spin-life policy for her 82-year-old uncle with investors who agreed to lend him money for the premiums. In return, she said, the company hopes to buy the policy next year, paying her uncle $1.5 million.

Ms. Randall called it a great deal and said she was setting up a similar arrangement for her 82-year-old mother. She expects both her mother and uncle will live long enough to enjoy the windfall. "The one thing we know is that everyone is going to die at some point," said Ms. Randall. "If someone is willing to pay you because you're old, why not try and live it up before then?"

Jenny Anderson contributed reporting.
A version of this article appears in print on , on Page A1 of the New York edition with the headline: Late in Life, Finding a Bonanza in Life Insurance.

© 2019 The New York Times Company

# EXHIBIT
# FOUR

# Charter Oak Trust

Presentation to

USDOJ

October 21, 2013

# There Were Two Charter Oak Trusts

- The original Charter Oak Trust was funded by Grist Mill Capital's $35 million loan from Ridgewood from January 2007 to December 2008.  The Sponsor was Nova Group, Inc., a Connecticut corporation formed in January 2007 by the law firm of Halloran & Sage, which never had Daniel Carpenter listed as an officer and director.  Wayne Bursey has always been the "trustee" and signatory for Nova Group, Inc. (CT).  Nova Group, Inc. Delaware – NOVA-DE – was formed by Paul Doucette in 2002 and had nothing to do with either Charter Oak Trust.

# There Were Two Charter Oak Trusts – cont.

- The Second Charter Oak Trust was formed in 2009 by Guy Neumann and Stefan Cherneski and was called "Charter Oak Trust" 2009. Nova Group, Inc. – CT was the Sponsor and Wayne Bursey was the "trustee" and the signatory. It has a separate Tax-ID Number and was funded by Grist Mill Capital and other Carpenter-related entities. Virtually all of these policies were funded after the year-long investigation of the original Charter Oak Trust and the Sash Spencer death claim, as well as the Halloran & Sage lawsuit against Lincoln for $30 million. The lawsuit against Lincoln was not settled until December 2009.

- Virtually all of the policies in Charter Oak Trust-2009 were filed with Lincoln with the supervision and approval of Lincoln General Agents and Office of Supervisory Jurisdiction months before Carpenter or Bursey entered into the GMC Split-Dollar Funding Arrangement.

# Carpenter and Bursey were not Privy to the Misrepresentations on the Applications

- Admittedly, it appears that there have been a handful of cases in which a broker/agent or the insured has lied on the insurance applications. These apparent misrepresentations were unknown to either Carpenter or Bursey, and neither Carpenter nor Bursey had anything to do with the completing of the applications, let alone any possible misrepresentations made on the five or six "suspicious" applications in this case.

- According to a recently rediscovered Ed Waesche email from March 16, 2011, he references his meeting with a friend of his that happened to work with Ken Langaard named Larry Sodokoff (who also introduced Ed to Ken). All of the people involved in the "suspicious" applications were named in this email and were unknown to Carpenter and Bursey. They were: Phil Kuene, Tim Shissler, William Klein, Anthony Costanzo, John Walendowski and Sam Nunnes.

# COT Litigation Policies

- ## Phoenix (2010)

  - Robertson (Fraud)
  - Collins (Las Vegas)
  - Zahner (American Frozen Foods)
  - Paulsrud (Ken's Mom's Friend)

- ## Penn Mutual (2011)

  - Martinez (Fraud)
  - Knobloch (Park Avenue)
  - Carrin (Telecom)
  - Biermaier (Ken's Mom)

- Common Denominator for Above Policies: Ken Landgaard
- The above policies were referred to COT by friends of Ken Landgaard
- The only applications that appear to be totally fraudulent are Robertson and Martinez
- The applications on Zahner, Knobloch and Carrin were legitimate

# The Questions Focused on by the Government Were All Answered Truthfully

- There was no premium financing involved with the Charter Oak Trust.

- There were no "third-party interests" created by the Charter Oak Trust until, arguably, Ridgewood foreclosed on Grist Mill Capital's collateral assignment interest in the policies in September of 2010.

- There was no contemplated sale of the policies to **anyone** except the insured.

- There have been no sales of the policies, just turn overs and lapses.

- There was no STOLI involved because a Welfare Benefit Plan has an automatic and unlimited insurable interest in the policy and the Trust was the Applicant, Owner, Payer and Beneficiary of the Policy.

- To the best of the Target Attorneys' understanding, the Government's allegations of fraud suggest that certain insurers – and not the insureds themselves or any outside investors – were defrauded because people affiliated with the Charter Oak Trust submitted life insurance applications to the carriers stating that:

  - There was no premium financing involved;
  - There was no intention to create interests in the policies for third parties;
  - There was no intention to perform a future "life settlement" with the policies;
  - The Trust was not engaged in Stranger Originated Life Insurance (STOLI).

- The Government recognized in its August 6, 2013 meeting with Targets' Counsel that there are several possible defenses to the alleged fraud in this case:

  • The statements on the applications are not really false;

  • The statements made on the applications are not **knowingly** false;

  • The statements made on the applications are not material to the life insurance carrier taking the risk;

  • Carpenter did not run, organize, or participate in any scheme to defraud the insurance carriers.

By the way, all of the Attorneys involved in this case believe that all of the above statements are completely true.  More importantly, Mr. Carpenter will testify at trial that those statements were true then and they are still true to this day, even though he did not participate in or sign **any** of the Charter Oak Trust applications.

9

# The Charter Oak Trust is not a Premium Financing Program

- Premium Financing is not illegal;

- Lincoln, Phoenix, and Penn Mutual have been involved with Premium Financing programs for decades;

- Premium Financing involves a financial institution like Credit Suisse or A.I. Credit taking a secured interest in the policy and charging interest;

- Charter Oak Trust was the Applicant, the Owner of the policies, the only premium payer and the only beneficiary;

- Grist Mill Capital did not charge interest and it had a Split-Dollar Collateral Assignment in each policy;

- Every insurance carrier in America encourages Split-Dollar programs and understands the difference.

10

# How Split Dollar Works

11

# Definition of Split-Dollar Life Insurance Arrangement from Treas. Reg. §1.61-22

- "The final regulations generally define a split-dollar life insurance arrangement as any arrangement between an owner of a life insurance contract and a non-owner of the contract under which either party to the arrangement pays all or part of the premiums, and one of the parties paying the premiums is entitled to recover (either conditionally or unconditionally) all or any portion of those premiums and such recovery is to be made from, or is secured by, the proceeds of the contract. The definition does not cover the purchase of an insurance contract in which the only parties to the arrangement are the policy owner and the life insurance company acting only in its capacity as issuer of the contract."

{12}



# How Split Dollar Works

**EMPLOYER**

Employer contributes negotiated payments to SPLIT DOLLAR TRUST℠

Contributions are deductible under IRC Section 162(a). See IRS Publication 535 on Business Expenses for more detail.

## SPLIT DOLLAR TRUST

Split Dollar Program

**PARTICIPANT**

Participant receives non-taxable loans through Split Dollar "Interest Free" loan regime under IRC Section 7872 and Regulations 1.61-22

Funds are held at Major Bank

Premium Payments to Carrier

**Insurance Company**

Beneficiary receives Death Benefits Income, Estate, and Gift Tax free



# How the Charter Oak Trust Works

14

# The Charter Oak Trust is not STOLI (Nor is it STOLI in Disguise)

- The Charter Oak Trust was not a "stranger." It had an insurable interest Day One as Applicant, Owner, Premium-payer and Beneficiary of insurance policy.

- The insured cannot use the policy for any type of viatical settlement, senior settlement, life settlement or any other secondary market, as the insured does not own the policy.

- There was no "rebate" or inducement for the insured to sign up.

- There was no promise to pay the insured any money if for some reason, as provided for by the Trust terms, NOVA sold the policy on the secondary market.

15

# The Charter Oak Trust is not STOLI – cont.

- The insured cannot sell his beneficial interest in the Trust to any third party.

- There was no "pre-assignment agreement" clause to transfer insured beneficial interest to a third party.

- With the COT, there is no loan, no interest, no debt, only a clause that allowed the insured to purchase the policy from the Trust.

- Settlement resales were prohibited by the terms of the Trust.

- STOLI-IOLI operators use **individual** life insurance trusts plus Hedge Fund-friendly trustees to sell the beneficial interests of policies or STOLI policies themselves - not true with the Charter Oak Trust as "welfare benefit plan"

16

# The Charter Oak Trust Prohibited Life Settlements

- Not only did the Charter Oak Trust not promote Life Settlements, it prohibited them.

- Each Insured Participant had to state for the Charter Oak Trust and Grist Mill Capital that they did not intend to do a life settlement with the policy.

17

# The Charter Oak Trust Did Not Contemplate Third-Party Ownership

- The only party who could purchase the policy was the insured or a family trust for the insured, and no one else.

- The Trust could not do anything with any policy except with the Insurance Trustee's permission, so how could there be a scheme to defraud here?

- The **only** way that Grist Mill Capital could get its money back was in the death of a participant, or if the Insured Participants bought the policies.

- Government acknowledges that the market for selling insurance policies collapsed in 2008.

18

# Lincoln Approved **All** Trust Applications

- All Lincoln Applications submitted to the Charter Oak Trust-2009, were submitted with the blessing of Lincoln's legal department and compliance department and not one, but two, Offices of Supervisory Jurisdiction: Texas General Agent and OSJ Fred Prelle, and New York General Agent and OSJ Charles Induddi-Westcott.  See FINRA Rules on Offices of Supervisory Jurisdiction.

- See: Section 2300 – Special Products; Section 2310 – Direct Participating Policies; Section 2320 – Variable Policies

- See Diligence in Opening Accounts Sections 16(B), 16(C), and Section 17 – Maintenance of Records



# Who Were the Real Victims in This Case?

# Profits Made By The Carriers

| ALL CARRIER TOTALS | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| CARRIER | Y/E 2007 | Y/E 2008 | Y/E 2009 | Y/E 2010 | Y/E 2011 | Y/E 2012 | Y/E 2013 | TOTALS |
| AIG (AIT) | $0.00 | $0.00 | $234,348.15 | $176,598.15 | $49,916.47 | $207,304.00 | $207,304.00 | $875,470.77 |
| ANICO (COT) | $271,160.00 | $37,750.00 | $64,399.34 | $201,940.54 | $271,160.00 | $271,160.00 | $271,160.00 | $1,388,729.88 |
| ANICO (AIT) | $706,400.00 | $838,850.00 | $706,400.00 | $734,300.00 | $706,400.00 | $706,400.00 | $706,400.00 | $5,105,150.00 |
| AXA | $2,002,674.00 | $906,688.66 | $1,441,213.17 | $1,577,738.77 | $1,504,666.00 | $1,504,666.00 | $1,504,666.00 | $10,442,312.60 |
| METLIFE | $81,761.00 | $442,532.00 | $56,181.37 | $294,207.31 | $473,183.32 | $473,183.32 | $473,183.32 | $2,294,231.64 |
| PENN (COT) | $0.00 | $1,406,475.00 | $293,907.79 | $883,158.89 | $932,118.30 | $1,182,200.00 | $1,182,200.00 | $5,880,059.98 |
| PENN (AIT) | $85,601.46 | $83,421.46 | $203,967.86 | $44,020.00 | $41,934.58 | $9,471.83 | $0.00 | $468,417.19 |
| PENN-LIT | $0.00 | $387,019.26 | $521,509.97 | $223,066.18 | $0.00 | $0.00 | $0.00 | $1,131,595.41 |
| SUN | $217,875.00 | $120,000.00 | $331,280.66 | $156,873.00 | $257,815.47 | $261,900.04 | $251,781.00 | $1,597,525.17 |
| TRANS | $296,100.00 | $296,150.00 | $222,075.00 | $296,100.00 | $296,100.00 | $296,100.00 | $296,100.00 | $1,998,725.00 |
| LFG (COT) | $4,992,406.99 | $7,126,131.24 | $5,032,674.28 | $3,651,710.18 | $2,357,623.86 | $7,528,553.96 | $7,429,641.01 | $38,118,741.52 |
| LFG (2009) | $0.00 | $0.00 | $2,130,107.00 | $427,975.07 | $1,449,595.71 | $1,084,133.21 | $291,120.59 | $5,382,931.58 |
| LFG (AIT) | $260,192.50 | $0.00 | $68,101.76 | $80,659.22 | $176,424.00 | $176,424.00 | $176,424.00 | $938,225.48 |
| PHX | $2,813,369.00 | $1,253,097.33 | $1,262,251.22 | $1,714,273.87 | $2,174,121.72 | $2,128,989.00 | $1,948,989.00 | $13,295,091.14 |
| PHX-LIT | $0.00 | $654,600.00 | $552,525.00 | $260,305.00 | $0.00 | $0.00 | $0.00 | $1,467,430.00 |
| | $11,727,539.95 | $13,552,714.95 | $13,120,942.57 | $10,722,926.18 | $10,691,059.43 | $15,830,485.36 | $14,738,968.92 | $90,384,637.36 |

21

# Other Costs for Charter Oak Trust & Charter Oak Trust 2009

| OTHER COSTS FOR CHARTER OAK TRUST & CHARTER OAK TRUST 2009 | |
|---|---|
| COLLATERAL: | $1,100,000.00 |
| INTEREST PAID: | $610,685.68 |
| INTEREST CAPLTD: | $7,939,519.74 |
| COT TOTAL: | $9,650,205.42 |
| | |
| GMC 6/8/09 LOAN REPAYMENT(1): | $2,833,568.64 |
| | |
| GMC 6/8/09 LOAN REPAYMENT(2): | $965,314.17 |
| GMC 12/3/09 LOAN REPAYMENT: | $510,000.00 |
| | |
| PCMG 12/3/09 LOAN REPAYMENT: | $2,774,250.00 |
| LOAN REPAYMENT TOTAL: | $7,083,132.81 |
| | |
| TOTAL OTHER EXPENSES: | $16,733,338.23 |
| | |
| PREMIUM PAYMENTS TO CARRIERS: | $90,384,637.36 |
| | |
| GRAND TOTAL: | $107,117,975.59 |

22

# Losses Sustained by GMC-Affiliated Companies

Summary of Tax Losses on the Tax Returns of Various Entities Affiliated with Grist Mill Capital, LLC

| Tax Year | | Grist Mill Capital, LLC | Avon Capital LLC | Grist Mill Holdings, LLC | Carpenter Financial Group, Inc. | | Total Losses |
|---|---|---|---|---|---|---|---|
| 2007 | Income(Loss) | (1,543,169) | (3,904) | (451,772) | (1,349,387) | | |
| 2008 | Income(Loss) | (2,829,811) | (225,380) | (352,252) | (2,279,864) | * | |
| 2009 | Income(Loss) | (3,648,811) | (669,792) | (2,624,423) | (2,312,323) | | |
| 2010 | Income(Loss) | (3,302,727) | (1,054,536) | (2,950,161) | (2,633,382) | | |
| 2011 | Income(Loss) | (3,688,108) | (850,433) | (3,755,914) | (3,525,324) | | |
| 2012 | Income(Loss) | (10,609,778) | (11,368,411) | (10,503,680) | (2,000,000) | | |
| Total | Income(Loss) | (25,622,404) | (14,172,456) | (20,638,202) | (14,100,280) | | (74,533,342) |

* Some Amounts for Carpenter Financial Group Inc for tax year 2008 are attribitable
  to Boston Ligitation and Trials involving Dan Carpenter

# EXHIBIT
# FIVE

CERTIFICATE OF INCORPORATION
STOCK CORPORATION

246565A001 05/17/94RH37010    35.0
246565A001 05/17/94RH37010    30.0
246565A001 05/17/94RH37100    50.0
246565A001 05/17/94RH37010    25.0

S T A T E   O F   C O N N E C T I C U T

Secretary of State

The undersigned incorporator(s) hereby form(s) a corporation under the Nonstock Corporation Act of the State of Connecticut.

1.   The name of the corporation is

STAMFORD COALITION ON RECREATION & EDUCATION FOUNDATION, INC.

2.   The nature of the activities to be conducted, or the purposes to be promoted or carried out by the corporation, are as follows:   To engage in any lawful act or activity for which a corporation may be formed under the Connecticut Nonstock Corporation Act.   Also, to foster the development of recreational and educational programs and activities for children in grades 1-12.

3.   The corporation is nonprofit and shall not have or issue shares of stock or pay dividends.

4.   The classes, rights, privileges, qualifications, obligations, and the manner of election or appointment of members are as follows:   (If the corporation is to have no members, or only members not entitled to vote, so state).

No Members

5.   Other provisions:

N/A

Dated at Wilmington, Delaware this   9th   day of May 1994.

I/We hereby declare, under the penalties of false statement, that the statements in the foregoing certificate are true.

This certificate of incorporation must be signed by one or more incorporators.

| Name of incorporator 1. Lamont W. Jones | Name of incorporator 2. | Name of incorporator 3. |
|---|---|---|
| Signed (incorporator) 1. | Signed (incorporator) 2. | Signed (incorporator) 3. Sarah Thomas Corporate Agents 1013 Centre Rd Wilmington De 19805 |

FILED
STATE OF CONNECTICUT
MAY 1 7 1994
Pauline R. Kezer

Rec
to
cc

FF 10
ICC 25
Ftx 50
EXP 25

25 O/A

rec/cc/a/a/letter
5/18/94

APPOINTMENT OF STATUTORY AGENT FOR SERVICE
DOMESTIC CORPORATION

Secretary of State
30 Trinity Street
Hartford, CT  06106

Name of Corporation:

STAMFORD COALITION ON RECREATION & EDUCATION FOUNDATION, INC.

The above corporation appoints as its statutory agent for service, one of the following:

| | |
|---|---|
| Name of Natural Person Who is Resident of Connecticut | Business Address          Zip Code<br>227 Mayapple Road, Stamford, CT 06903<br>Residence Address          Zip Code<br>227 Mayapple Road, Stamford, CT 06903 |
| Daniel E. Carpenter<br>Name of Connecticut Corporation | Address of Principal Office in Conn. (If none, enter address of appointee's statutory agent for service) |
| Name of Corporation (Not organized under the | Address of Principal Office in Conn. (If none, enter "Secretary of the State of Conn.) |

Which has procured a Certificate of Authority to transact business or conduct affairs in this state.

AUTHORIZATION

| | | |
|---|---|---|
| ORIGINAL APPOINTMENT (Must be signed by a majority of Incorporators | Name of Incorporator Lamont W. Jones | Signed (Incorporator) |
| | Name of Incorporator | Signed (Incorporator) |
| | Name of Incorporator | Signed (Incorporator) |

Date: May 9, 1994
SUBSEQUENT APPOINTMENT

Name of President, Vice President or Secretary   DANIEL E. CARPENTER Esq

Signed (President, Vice President or Secretary.   Daniel E Carpenter Esq

Date:   MAY 9th 1994
Acceptance:   Name of Statutory Agent for Service.
Daniel E. Carpenter
Signed (Statutory Agent for Service)   Daniel E Carpenter Esq.

For Official Use Only

Rec; CC:
Sarah Thomas, Corporate Agents, Inc.
1013 Centre Road
Wilmington, DE 19805
Please provide filer's name and complete address for mailing receipt.

```
DEPARTMENT OF THE TREASURY          DATE OF THIS NOTICE:  05-24-95
INTERNAL REVENUE SERVICE            NUMBER OF THIS NOTICE:  CP 575 L
ANDOVER  MA    05501                EMPLOYER IDENTIFICATION NUMBER:  06-1424974
                                    FORM:  SS-4 (TELE-TIN)
                                    0816620642  O
```

FOR ASSISTANCE CALL US AT:
1-800-829-1040

STAMFORD COALITION ON RECREATION &
SCORE FOUNDATION INC.
2187 ATLANTIC ST                    OR WRITE TO THE ADDRESS
STAMFORD  CT    06902               SHOWN AT THE TOP LEFT.

                                    IF YOU WRITE, ATTACH THE
                                    STUB OF THIS NOTICE.

## WE ASSIGNED YOU AN EMPLOYER IDENTIFICATION NUMBER (EIN)

Thank you for your Tele-TIN phone call.  We assigned you employer identification number (EIN) 06-1424974.  This EIN will identify your business account, tax returns, and documents, even if you have no employees.  Please keep this notice in your permanent records.

Use your complete name and EIN shown above on all federal tax forms, payments, and related correspondence.  If you use any variation in your name or EIN, it may cause a delay in processing, incorrect information in your account, or cause you to be assigned more than one EIN.

If you want to receive a ruling or a determination letter recognizing your organization as tax exempt, you should file Form 1023/1024, Application for Recognition of Exemption, with your IRS Key District office.  Publication 557, Tax Exempt Status for Your Organization, is available at most IRS offices and has details on how you can apply.

Please use the label IRS provided when filing tax documents.  If that isn't possible, you should use your EIN and complete name and address as shown below to identify your account and to avoid delays in processing.

STAMFORD COALITION ON RECREATION &
 EDUCATION FOUNDATION INC
SCORE FOUNDATION INC
2187 ATLANTIC ST
STAMFORD  CT    06902

If this information isn't correct, please correct it using page 2 of this notice.  Return it to us at the address shown so we can correct your account.

If you haven't already completed Form SS-4, Application for Employer Identification Number, we need you to do it now so your account record will be complete.  You can get Form SS-4 at your local IRS office or by calling 1-800-TAX-FORM (1-800-829-3676).  After you complete the Form SS-4, sign and date it and write your new EIN, 06-1424974, in the upper right hand corner.  Please return it to us with page 2 of this notice by 06-08-95.  We've enclosed an envelope for your convenience.

Thank you for your cooperation.

# EXHIBIT
# SIX



THE S C O R E FOUNDATION, INC.

THE STAMFORD COALITION
ON RECREATION AND EDUCATION
WISHES TO THANK OUR FRIENDS AT
STAMFORD YOUTH SOCCER

BEST WISHES FOR THE FUTURE

BENISTAR is proud of its sponsorship of STAMFORD UNITED, America's oldest organized professional soccer team. Founded in 1906, STAMFORD UNITED has provided over 90 years of world class soccer at its best, as shown by its thrilling play in the State Championship this past season. STAMFORD UNITED's players represent more than a dozen different nationalities that have made Stamford and the United States their home.

Soccer is truly the universal sport and the universal language, and that is why we proudly support the SCORE Foundation and Stamford Youth Soccer in their work with America's next generation of soccer stars.



**CLEARWATER HOUSE**
2187 ATLANTIC STREET
STAMFORD, CT 06902

# EXHIBIT
# SEVEN











# EXHIBIT EIGHT



THE **S C O R E** FOUNDATION, INC.

STAMFORD COALITION ON RECREATION & EDUCATION

CLEARWATER HOUSE
2187 Atlantic Street
Stamford, CT 06902
Tel (203) 322-0203
Fax (203) 322-1033

# TOPS Program: Simsbury

# The Outreach Program for Soccer















# EXHIBIT NINE



- **What is TOPSoccer?**

  TOPSoccer is designed to bring the opportunity of learning and playing soccer to any boy or girl, age 8-19, who has a mental or physical disability. Our goal is to enable the thousands of young athletes with disabilities to become valued and successful members of the Simsbury Soccer Family.

- **Why do we need TOPSoccer?**

  So that every kid can know the rewards of playing on a team, of trying to score – of being in the game! It brings a sense of accomplishment and sheer joy to kids who otherwise would have to sit on the sidelines. Parents can't praise it enough, the siblings enjoy helping and cheering, the kids' laughter and enthusiasm are infectious. In this program everyone comes away a winner. **We are now forming a TOPSoccer program here in Simsbury.**

- **We need you to get involved in TOPSoccer!**

  We are still assessing the interest for this program and are currently looking for sponsors. Thus, the cost will be determined at a later date. For more information, to enroll your child, or to volunteer, please fill-out the attached form and send it in to the address provided below or call Molly Carpenter at (860) 408-7000.

- **TOPSoccer Dates**

  September 13th      October 4th
  September 20th      October 18th
  September 27th      October 25th

  **All sessions at Iron Horse Fields at 9:00a.m.**

  **See reverse side for registration information.**

  **Please fill out the reverse side and send this form to:**

  **Simsbury Soccer Club Registration**
  **542 Hopmeadow Street PMB #182**
  **Simsbury, CT  06070**




# TOPSoccer 2003 Registration Form

Visit us on our Website at www.SimsburySoccer.org

---

## PLAYER INFORMATION

Players Name: _____   Sex: _____   Date of Birth: _____

Address: _____   Zip: _____   Telephone: _____

### I WISH TO VOLUNTEER AS:

☐ Head Coach          ☐ Assistant Coach          ☐ Manager

Name: _____   Telephone: _____

## RELEASE FORM

**TO ALL PARENTS AND GUARDIANS:** The soccer program requires your child to engage in some vigorous physical activity You should be aware that the rules of soccer permit some physical contact between players, and in the course of a practice or game, contact does occur. Injuries are not frequent, but they do occur.

To induce the Simsbury Soccer Club, Inc. to accept registration and permit participation by the above named individual, I, the parent or guardian of said individual, hereby give my consent and agree to release, indemnify, and hold harmless the Simsbury Soccer Club, Inc., its directors, officers, officials, coaches, and others assisting or participating in said program from any claim arising out of injury to the above named individual.

Name _____   Date: _____   Signature: _____

## CONSENT FOR MEDICAL TREATMENT

Player: _____   Phone: _____

Doctor: _____   Phone: _____   Dentist: _____   Phone: _____

List any medical problems (including allergies) or restrictions: _____

_____

Please provide any information as to the nature of your child's disability: _____

_____

Hospital Preference: _____

In the event parent can not be reached, call:

Name: _____   Phone: _____

You have my permission to take whatever action is deemed necessary for the health and welfare of my child.

Name: _____   Date: _____   Signature: _____

*The Simsbury Soccer Club does not discriminate with regard to race, color, sex, ethnic or national origin. Equal opportunity will be given to all children in all areas of the program.*

| Name | Date modified | Type |
|------|---------------|------|
| TOPSoccer | 2/1/2019 11:48 AM | File folder |
| TOPS Soccer Simsbury | 2/8/2018 3:32 PM | Microsoft ... |
| Fall 2003 Topsoccer index cards | 9/8/2003 4:53 PM | Microsoft ... |
| TOPSoccer Fall 2003 | 8/28/2003 12:59 PM | Microsoft ... |
| TOPSoccer | 8/5/2003 12:01 PM | Microsoft ... |
| TOPSoccer Registration Form | 2/27/2003 1:05 PM | Microsoft ... |

Search again in:

Libraries  Computer  Custom...  Internet  File Contents

# EXHIBIT
# TEN



CHARTER OAK TRUST

## ELECTION OF PARTICIPATION & BENEFICIARY DESIGNATION FORM

NAME OF EMPLOYER: **HOLDING CAPITAL GROUP, INC**

NAME OF COVERED EMPLOYEE: **SASH A. SPENCER**          SSN: **065.30.4914**

To: Administrator of the CHARTER OAK PLAN & TRUST

To participate in the Plan, place your initials in the space provided next to "A" below and insert the names of your beneficiaries. To make such beneficiary designation irrevocable, place your initials in the space next to "B" below and insert the names of your beneficiaries. Please do not forget to designate at least one beneficiary.

A. _____     I wish to participate in the Plan and name the following persons or entities as the Beneficiaries of any death benefit payable under the Plan:

Name of Beneficiaries: **UNIVERSITAS EDUCATION   LLC**

Contact Person: **SHARON SIEBERT**          Phone: **212·826·0056**

Address: **404 E. 65TH ST  SUITE 13A   NY NY**

I understand that I may change this designation at any time by submitting a new Beneficiary Designation Form to the Plan Administrator, and that such new designation will become effective when accepted by the Plan Administrator.

B. _____     I wish to participate in the Plan and name the following persons or entities as the Irrevocable Beneficiaries of any death benefit payable under the Plan:

Name of Beneficiaries: _____

Contact Person: _____          Phone: _____

Address: _____

I hereby elect that the foregoing designation of ~~...~~ ~~...~~ary or beneficiaries of any death benefit that becomes payable pursuant to the Plan is irrevocable and non-amen~~...~~ d I shall have no right whatsoever to change such beneficiary designation for any reason. (If you have chosen op~~...~~ ~~...~~ our signature must be notarized.)

NOTE: I hereby designate Grist Mill Capital, LLC as primary beneficiary of any sums w~~...~~ ~~...~~ain unpaid pursuant to any other agreement I might have with Nova Group, Inc. and acknowledge that my beneficiaries as designated above will rece~~...~~ ~~...~~eath bene~~...~~ ~~...~~cl~~...~~ ~~...~~ excess of the sums payable to Grist Mill Capital, LLC.

X ~~[signature]~~          X ~~[signature]~~
Signature of Employer's Authorized Person          Signature of Covered Employee

**SASH A SPENCER , CEO**          **SASH A. SPENCER**
Name and Title of Authorized Person (Print or Type)          Name of Employee (Print or Type)

The foregoing instrument was acknowledged before me this _____ day of _____, 200__.

Date of this Designation          Notary Public

Commission Expires: _____

COPYRIGHT © 2007 NOVA GROUP, INC.
ALL RIGHTS RESERVED, REV. 01/19/07

4

212-319-6623                    p.2

Apr 26 06 01:55p

LINCOLN # 7320809
$20,000,000



CHARTER OAK TRUST

## ELECTION OF PARTICIPATION &
## BENEFICIARY DESIGNATION FORM

NAME OF EMPLOYER: HOLDINGS CAPITAL GROUP, INC.

NAME OF COVERED EMPLOYEE: SASH A. SPENCER        SSN: 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

To: Administrator of the CHARTER OAK PLAN & TRUST
To participate in the Plan, place your initials in the space provided next to "A" below and insert the names of your beneficiaries. To make such beneficiary designation irrevocable, place your initials in the space next to "B" below and insert the names of your beneficiaries. Please do not forget to designate at least one beneficiary.

A. _____      I wish to participate in the Plan and name the following persons or entities as the
                  Beneficiaries of any death benefit payable under the Plan:

                  Name of Beneficiaries: _____

                  _____ Phone: _____

                  Contact Person: _____

                  Address: _____
                  I understand that I may change this designation at any time by submitting a new Beneficiary Designation Form to the Plan
                  Administrator, and that such new designation will become effective when accepted by the Plan Administrator.

B.  ✓             I wish to participate in the Plan and name the following persons or entities as the
                  Irrevocable Beneficiaries of any death benefit payable under the Plan:

                  Name of Beneficiaries: UNIVERSITAS EDUCATION, LLC.

                  Contact Person: SHARON SIEBERT      Phone: 212-826-0056
                  Address: 404 E 55th STREET SUITE 8A NY NY
                  I hereby elect that the foregoing designation of my beneficiary or beneficiaries of any death benefit that becomes payable
                  pursuant to the Plan is irrevocable and non-amendable, and I shall have no right whatsoever to change such beneficiary
                  designation for any reason. (If you have chosen option B, your signature must be notarized.)

NOTE: I hereby designate Grist Mill Capital, LLC as primary beneficiary of any sums which remain unpaid pursuant to any other agreements I might have
with Nova Group, Inc. and acknowledge that my beneficiaries as designated above will receive all death benefit proceeds in excess of the sums payable to Grist
Mill Capital, LLC.

X _____            X _____
Signature of Employer's Authorized Person    Signature of Covered Employee

SASH A. SPENCER CEO                    SASH A. SPENCER
Name and Title of Authorized Person (Print or Type)    Name of Employee (Print or Type)

May 9th, 2008                          The foregoing instrument was acknowledged
Date of this Designation               before me this 9th day of May 2008

                                       _____
                                       Notary Public    Commission Expires: 10/31/2010

COPYRIGHT © 2007 NOVA GROUP, INC.
ALL RIGHTS RESERVED. REV. 02/27/07

                                       BARBARA A. KNIFFEN
                                       Notary Public, State of New York
                                       No. 31-4828843
                                       Qualified in New York County
                                       Commission Expires 2010

                                       10/31

4

Apr 26 06 01:55p                                    212-319-6823                    p.3

**LINCOLN # 7305475**
**$10,000,000**



CHARTER OAK TRUST

## ELECTION OF PARTICIPATION &
## BENEFICIARY DESIGNATION FORM

NAME OF EMPLOYER: HOLDINGS CAPITAL GROUP, INC.

NAME OF COVERED EMPLOYEE: SASH A. SPENCER          SSN: 065.30.4914

To: Administrator of the CHARTER OAK PLAN & TRUST

To participate in the Plan, place your initials in the space provided next to "A" below and insert the names of your beneficiaries. To make such beneficiary designation irrevocable, place your initials in the space next to "B" below and insert the names of your beneficiaries. Please do not forget to designate at least one beneficiary.

A. _____    I wish to participate in the Plan and name the following persons or entities as the Beneficiaries of any death benefit payable under the Plan:

Name of Beneficiaries: _____

Contact Person: _____    Phone: _____

Address: _____
I understand that I may change this designation at any time by submitting a new Beneficiary Designation Form to the Plan Administrator, and that such new designation will become effective when accepted by the Plan Administrator.

B. ✓    I wish to participate in the Plan and name the following persons or entities as the Irrevocable Beneficiaries of any death benefit payable under the Plan:

Name of Beneficiaries: UNIVERSITAS EDUCATION, LLC

Contact Person: SHARON SIEBERT          Phone: 212-826-0056
Address: 404 E. 55th STREET SUITE 13A, NY NY
I hereby elect that the foregoing designation of any beneficiary or beneficiaries of any death benefit that becomes payable pursuant to the Plan is irrevocable and non-amendable, and I shall have no right whatsoever to change such beneficiary designation for any reason. (If you have chosen option B, your signature must be notarized.)

NOTE: I hereby designate Grist Mill Capital, LLC as primary beneficiary of any sums which remain unpaid pursuant to any other agreements I might have with Nova Group, Inc. and acknowledge that my beneficiaries as designated above will receive all death benefit proceeds in excess of the sums payable to Grist Mill Capital, LLC.

X _____          X _____
Signature of Employer's Authorized Person          Signature of Covered Employee

SASH A. SPENCER, CEO          SASH A. SPENCER
Name and Title of Authorized Person (Print or Type)          Name of Employee (Print or Type)

_____          The foregoing instrument was acknowledged
Date of this Designation          before me this ___ day of ___ 200_

                                   _____
                                   Notary Public          Commission Expires: 10/31/2010

COPYRIGHT © 2007 NOVA GROUP, INC.
ALL RIGHTS RESERVED. REV. 02/27/07                    4

                              BARBARA A. KNIFFEN
                              Notary Public, State of New York
                              No. 01-4629843
                              Qualified in New York County
                              Commission Expires   10/31/2010